UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT JOHANNES;  et al.,

       Plaintiffs,

vs.

HEIDI WASHINGTON and
DR. DALTON SANDERS,

       Defendants.

Case No. 2:14-cv-11691-LJM-MKM
Hon. Laurie J. Michelson
Mag. Judge Mona K. Majzoub

---

Robert Gittleman, (P 14025)
Tracie R. Gittleman, (P 45176)
ROBERT GITTLEMAN LAW FIRM, PLC
Attorneys for Plaintiffs
31731 Northwestern Hwy., Ste. 101E
Farmington Hills, Michigan  48334
Telephone:  (248) 737-3600
Facsimile:   (248) 737-0084
r.gittleman@yahoo.com

Daniel E. Manville, (P 39731)
Director, Civil Rights Clinic
Michigan State Univ. College of Law
Co-Counsel for Plaintiffs
610 Abbott Road
East Lansing, Michigan  48823
Telephone:  (517) 336-8088, X1137
Facsimile:  (517) 336-8089
Daniel.manville@law.msu.edu

James T. Farrell, (P 35400
Cori E. Barkman, (P 61470)
Peter Govorchin (P31161)
Rock Wood (P41181)
Lisa Geminich (P60964)
Michigan Department of Attorney General
Corrections Division
Attorneys for Defendants
Post Office Box 30217
Lansing, Michigan  48909
(517) 373-6434

---

**PLAINTIFF'S RESPONSE TO DEFENDANTS'
POST-DISCOVERY MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Item:                                                                    Page

Table of Authorities ...................................................................... ii

Index of Exhibits ......................................................................... iv

Statement of Issues Presented ......................................................... v

Introduction ................................................................................. 1

Statement of Facts ........................................................................ 1

Arguments .................................................................................. 19

    A. Contrary to Defendants' claim, all Plaintiffs have exhausted their
        administrative remedies process ....................................... 19

    B.  Plaintiff Johannes's claim is not barred by the statute of limitations for
        personal injury actions because the unconstitutional level of dental care
        provided by MDOC constitutes a continuing violation. .................. 25

    C. Contrary to Defendants' claim, Plaintiff has established that their
        constitutional rights were violated. .................................... 31

        1. Legal Standards....................................................... 31

        2. Arguments.............................................................. 38

            i. Contrary to defendants' claim, plaintiffs have demonstrated that
               the defendants were deliberately indifferent to plaintiffs' serious
               dental needs. ...................................................... 38

               (a) MDOC's Dental Policy and Procedures as applied do not
                   provide prompt care for urgent and emergency dental needs.
                   ................................................................ 39

               (b) The policy directive imposing a two-year wait period
                   for routine dental care subjects prisoners to prolonged

pain and suffering in violation of the Eighth
Amendment................................................................... 42

(c) Lengthy waits for dentures and refusal to replace
broken or misplaced dentures in a timely manner
causes pain and suffering in violation of the Eighth
Amendment...................................................................
................................................................................. 47

ii. Defendants, in their supervisory and directorial authority over
dental care in MDOC, can be held liable for deliberate
indifference in this action..................................................... 49

iii. Contrary to defendants' claims, there exist genuine questions of
material fact as to whether named plaintiffs received
constitutionally adequate dental care. ................................. 51

Conclusion....................................................................... 61

Table of Authorities

Cases

*Abney v. McGinnis,* 380 F.3d 663 (2d Cir. 2004)...................................................... 26

*Barnes v. Briley*, 420 F.3d 673 (7th Cir. 2005) ....................................................... 24

*Blackmore v. Kalamazoo County,* 390 F.3d 890 (6th Cir. 2004))........................... 37

*Board v. Farnham,* 394 F.3d 469 (7th Cir. 2005) ................................................... 37

*Boone v. Nose,* Appeal No. 13–1935, 2013 WL 3481808 (3rd Cir. July 11, 2013)
   (unpublished)........................................................................................................ 24

*Bruce v. Ghosh*, No. 11-CV-3138, 2015 WL 1727318 (N.D. Ill. Apr. 13, 2015)
   (unpublished)........................................................................................................ 24

*Chance v. Armstrong,* 143 F.3d 698 (2nd Cir. 1998) ................................. 38, 42, 43

*Cooper v. Schriro,* 189 F.3d 781 (8th Cir. 1999) .................................................... 38

*Curry v. Scott*, 249 F.3d 493 (6th Cir. 2001).......................................................... 20

*Dixon v. Page,* 291 F.3d 485 (7th Cir. 2002) ......................................................... 26

*Domino v. Tex. Dep't Crim. J.,* 239 F.3d 752 (5th Cir. 2001) ................................ 39

*Farmer v. Brennan,* 511 U.S. 825 (1994)......................................................... 34, 36

*Farrow v. West,* 320 F.3d 1235 (11th Cir. 2003) ................................................... 39

*Gobert v. Caldwell,* 463 F.3d 339 (5th Cir. 2006) ................................................. 38

*Goldsmith v. Sharrett*, 614 Fed.Appx. 824 (6th Cir. 2015) (unpublished)............ 30

*Grear v. Gelabert* , No 07–203, 2008 WL 474098 (W.D. Mich. Feb.15, 2008),
   Jonker, J. (unpublished)....................................................................................... 21

*Harrison v. Ash,* 539 F.3d 510 (6th Cir. 2008)....................................................... 37

*Helling v. McKinney,* 509 U.S. 25 (1993) .............................................................. 35

*Hensley v. City of Columbus*, 557 F.3d 693 (6th Cir. 2009). ..................... 27, 28, 34

*Hoeft v. Menos,* No. 09-2286, 2009 WL 2562748 (7th Cir. August 20, 2009)...... 42

*Hollins v. Curtin*, No. 1:13-CV-008, 2015 WL 1458944 (W.D. Mich. Mar. 30,
   2015) (unpublished) ............................................................................................. 20

*Horn v. Madison County Fiscal Court,* 22 F.3d 653 (6th Cir. 1994).................... 36

*Hunt v. Dental Dep't,* 865 F.2d 198 (9th Cir. 1989)............................ 38, 39, 40, 41

*Hunter v. Reynolds,* 974 F.2d 734 (6th Cir. 1992) ................................................. 35

*Johnson v. Treen,* 759 F.2d 1236 (5th Cir. 1985)). ................................................ 39

*Kuhnle Bros. v. Cnty. of Geauga*, 103 F.3d 516 (6th Cir. 1997)......... 29, 30, 32, 33

*Mackovich v. United States,* 630 F.3d 1134 (8th Cir.2011); ................................. 24

*McCarthy v. Place*, 313 Fed.Appx. 810 (6th Cir. Dec. 2, 2008).......................... 42

*McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999) ............................................ 40

*Molton v. City of Cleveland,* 839 F.2d 240 (6th Cir. 1988)................................... 36

*Nat'l R.R. Passenger Co. v. Morgan,* 536 U.S. 101 (2002) ........................... passim

*Reed–Bey v. Pramstaller,* 603 F.3d 322 (6th Cir. 2010) ....................................... 20

*Rhodes v. Robinson*, 621 F.3d 1002 (9th Cir. 2010). ..................................... 22, 23

*Riggs v. Valdez*, Case No. 1:09-cv-00010, 2010 WL 4117085 (D.Idaho, Oct. 18, 2010) (unpublished) ....................................................................... 21

*Robbins v. Payne*, Case No. 11-15140, 2012 WL 4812495 (E.D.Mich. Oct. 10, 2012)........................................................................................ 21

*Romano v. Secretary, DOC,* No. 2:06–cv–375, 2011 WL 1790125 (M.D.Fla. May 10, 2011)...................................................................................... 25

*Ross v. County of Bernalillo,* 365 F.3d 1181 (10th Cir. 2004)............................ 25

*Sharpe v. Cureton*, 319 F.3d 259 (6th Cir. 2003)............................................ 30, 31

*Thaddeus–X v. Blatter,* 175 F.3d 378 (6th Cir. 1999) ......................................... 36

*Vasquez v. Dretke*, No. 05-41170, 2007 WL 756455, at *1 (5th Cir., March 9, 2007),............................................................................................ 41

*Weeks v. Chaboudy,* 984 F.2d 185 (6th Cir. 1993).............................................. 35

*Westlake v. Lucas,* 537 F.2d 857  (6th Cir. 1976) .............................................. 36

*Williams v. Mason*, 210 Fed.Appx. 389 (5th Cir. 2006) .................................... 42

*Williams v. Vincent*, 508 F.2d 542, 544 (2d Cir. 1974)...................................... 43

*Woods v. Carey*, No. CIVS041225LKKGGHP, 2006 WL 548190 (E.D. Cal. Mar. 6, 2006).......................................................................................... 56

*Wynn v. Southward,* 251 F.3d 588 (7th Cir. 2001).......................................... 37, 40


Statutes

42 U.S.C. § 1983 ....................................................................................... 19, 28

## Statement of Issues Presented

1.Contrary To Defendants' Claim, Plaintiffs Have Demonstrated That The Defendants Were Deliberately Indifferent To Plaintiffs' Serious Dental Needs.


2.Defendants, In Their Supervisory And Directorial Authority Over Dental Care In MDOC, Can Be Held Liable For Deliberate Indifference In This Action.


3. Contrary To Defendants' Claims, There Exist Geuine Questions Of Material Fact As To Whether Named Plaintiffs Received Constitutionally Adequate Dental Care.

## I.      INTRODUCTION

Defendants filed a motion for summary judgment seeking dismissal of this lawsuit based on the following: (1) failure to exhaust the grievance process; (2) the statute of limitation is applicable to Plaintiff Johannes; and (3) the Plaintiffs have failed to state a cause of action.  As discussed in the Argument section below, all three of these claims are without merit.

First, based on case law, Plaintiffs exhausted the grievance process because their grievances were resolved on the merit and Defendants have waived the failure to exhaust defense. Second, the claims of Plaintiff Johannes are subject to the continuing violation defense. Third, Plaintiffs have met their stated claims against the Defendants. For the reasons discussed *infra*, this Court should deny Defendants' motion for summary judgment.

## II.     STATEMENT OF FACTS

This statement of facts, *infra*, as to the dental conditions of the Plaintiffs is taken verbatim from the Declaration of Dr. Jay Shulman that is attached as Exhibit 24. The reference to exhibits in the Statement of Facts are those attached to the Declaration of Dr. Shulman

### B.     *Treatment of Individual Plaintiffs*

### 1.     Robert Johannes

a.      Examinations and Treatment Plans

i.   Intake Examination

59.   Mr. Johannes' intake examination was performed July 1, 2008 [R.61-15, Murphy's Declaration, Pg ID 1034; *see also* attached Exhibit 14, Johannes' dental records, at 1[1]]. A panoramic x-ray was exposed, his teeth were charted, a dental history was taken, and oral conditions were noted [Exhibit 14, at 1]. Figure 3 is a reconstruction of his dental chart based on this charting.

**Figure 3. Charting at 7/1/08 Examination**



60.   The record reports that a soft tissue examination was performed and he was found, *inter alia*, to have furcation involvement[2] in teeth 14, 15, 18, and 19, fair oral hygiene, light calculus, and moderate periodontal disease. [*Id.*] The report does not mention the presence of caries (decay)[3].

ii.   Oral Examinations

---

[1] Page number for this exhibit is located at the top right corner.
[2] A serious periodontal condition that can affect multi-rooted teeth such as molars and premolars.
[3] A panoramic radiograph is inadequate for identifying all but advanced decay; consequently, other decay may have remained undiagnosed.

61.    Mr. Johannes was placed on the examination list 10/13/08 [Exhibit 14, at 2] and was examined 5/6/09 – 205 days later (and 305 days from his intake examination) [*id*., at 2-3]. There is no documentation that a treatment plan was performed at that time.[4]

62.    Mr. Johannes requested an examination 1/25/10 [*id*. at 6] and he was seen by DUpdate10/6/2010 [*id*. at 14], 254 days after his request. The treatment plan identified fillings and a prophy to be done; however, Dr. Sanders did not identify the teeth that needed to be filled.  Mr. Johannes requested an examination and cleaning 4/24/12[5] [*id*. at 11] and was examined by Dr. Murphy 10/17/2013 [*id*. at 12] – after waiting 541 days. The treatment plan reported that Mr. Johannes should receive a prophy and a partial lower denture. [*Id*.]

63.    To summarize, Mr. Johannes requested a routine examination on three occasions and was seen in 205 (5/6/09), 254 (10/6/10) and 541 days (10/17/13). Routine examinations and treatment plans are fundamental to early identification and treatment of dental disease. Waiting times of this magnitude are inconsistent with an acceptable routine care program for a correctional institution and are substantially below accepted professional standards.

b.  Requests for Dental Treatment of Dental Pain

i.    Tooth #12

64.    Tooth #12 was not identified as having decay at the 7/1/08 intake oral examination [*id*. at 1]. Mr. Johannes first reported a lost filling on tooth #12 8/18/09 [*id*. at 3] and was examined by Dr. Sanders 8/25/09 ("gross decay. Pt. will

---

[4] While the absence of a treatment may be explained by an inoperative x-ray unit mentioned in the chart [*id*. at 3], the record does not report any follow-up visit for a treatment plan. In fact, no treatment plan was documented until 10/6/2010 – after 205 days [*Id*. at 3].

[5] Note Mr. Johannes made a follow-up request 3/27/13 [*id*. at 12] and the response was that he was "already on the list to be scheduled in order" [*Id*.] He submitted follow-up 6/17/13 [*id*.] and the response was, "already on the list to be scheduled in order" [*Id*.]

be rescheduled to restore tooth #12 […])" [*id*.], 9/9/09 ("gross decay") [*id*.], 10/6 ("single periapical x-ray") [*id*. at 5], and 3/1/10 ("consultation for extraction #12") [*Id*. at 7]. From his initial HCR, 196 days passed – without treatment provided to the tooth.  While Dr. Sanders declared the tooth to be unrestorable on 3/1/10, he had planned to restore it six months earlier. While Dr. Sanders 'saw' Mr. Johannes on several occasions, the needed treatment (a filling) was not provided – even though his 9/6 HCR stated pain.[6] To summarize, tooth #12 appears to have been restorable initially; however, due to untimely and dilatory treatment, despite Dr. Sanders having several opportunities to do so, it was eventually found to be unrestorable, requiring extraction.

### ii.     Teeth #28 and #31

65.    A 4/6/09 examination noted that tooth #29 has gross caries and since it is part of a bridge, the bridge would have to be sectioned for #29 to be removed [*Id*. at 2][7]. A dental hygienist noted on 5/12/09 that, "[l]ower right bridge is guarded condition as abutment on #31 not holding" [*id*. at 3]. Mr. Johannes submitted an HCR 9/6/09 stating that the bridge was causing problems when he chews [See attached Exhibit 15, Health Care Request 3] and was seen by Dr. Sanders 9/9/09 – three days later ("[e]xam, x-ray; gross decay"); however, treatment was not provided at that time. In fact, the issue of the bridge was not mentioned in the clinical narrative [*id*. at 3]. Mr. Johannes submitted an HCRs 10/29/09 ("bridge fell

---

[6] Dr. Murphy testified that, [i]n August and September 2009, [Mr. Johannes] received treatment to a maxillary left bicuspid, #12." [R.61-15, Murphy's Declaration, at ¶6]. However, the Summary Report shows that Dr. Sanders saw Mr. Johannes 8/25/09 at which time he diagnosed #12 as having "gross decay" and wrote that, "[p]atient will be scheduled to restore tooth #12 […]" [Exhibit 14, at 3] Dr. Sanders saw Mr. Johannes again on 9/9/09 and noted, "[v]isual inspection and x-ray revealed gross decay." [*Id*.]  According to the Summary Report, Dr. Sanders did ***not*** treat tooth #12 in August or September 2009. He simply kicked the can down the road.

[7] The note states that the patient will kite when he is ready to have #29 extracted [*id*. at 8].

out") [*id*. at 5] and was seen 11/23/09 - after 25 days [Exhibit 14, at 5].   He submitted HCRs 10/28 (sensitive tooth) [Exhibit 15, HCF 6] and 11/13 (two teeth causing problems and can taste rotten tooth) [*id*. at 7]. He was seen by Dr. Sanders 11/23/09 (#28 and #31 were unrestorable and should be extracted) - 78 days after his initial HCR stating pain [*id*., at 5]. Finally, Dr. Sanders extracted the teeth on 12/7/09 – after 92 days. To summarize, while the teeth were likely unrestorable initially, the three-month delay in treating his condition, caused Mr. Johannes gratuitous pain.

iii.   Tooth #15

66.   Mr. Johannes submitted a 3/5/10 grievance complaining (*inter alia*) about the delay in having a filling placed in #15 [Exhibit 15, at 16]. He submitted a 4/5/10 HCR (tooth #15 is cracked and needs a filling) [*id*. at 15] and Dr. Sanders placed a temporary / sedative filling on 4/19/10 – 14 days later[8] [Exhibit 14, Johannes' Dental Records, at 7]. He submitted a 6/11/10 grievance ("Dr. Sanders gave me a temporary filling in tooth #15 3 times in the last 2 months. I've written kites to get a permanent filling [Exhibit 15, at 18]. Dr. Sanders restored #15 with a permanent filling on 7/26/10 – 108 days after his initial HCR [Exhibit 14, at 8]. While it appears that the prognosis for tooth #15 is good, delayed treatment with a permanent filling subjected the tooth to risk of breaking due to chewing forces.

iv.   Tooth #13

67.   Dr. Sanders noted 7/22/10 that there was gross decay under the crown on #13 [Exhibit 14, at 8]. Mr. Johannes submitted an HCR 8/14/10 ("the tooth broke off!! Now I', down to 2 teeth to chew with") [Exhibit 15, 23] and follow-up HCRs 10/6/10 (tooth #13 is aching) [*id*. at 25], 10/21/10 (broke #13 2 months ago) [*id*. at 26], and 11/8/10 (needs #13 pulled) [*Id*. at 27]. Dr. Sanders extracted the

---

[8] There is a note on Block E stating, "DDS saw #15 needs a filling = 3-2-10. [Exhibit 15, at 15]

tooth 12/10/10 – 141 days after the initial HCR [Exhibit 14, at 10]. To summarize, while #13 was not restorable, the 141-day delay subjected Mr. Johannes to gratuitous pain.

> v.     Tooth #19

68.Mr. Johannes submitted an HCR 1/31/13 for a painful, broken tooth and was seen 2/11/13 (11 days later) at which time a periapical abscess was diagnosed and the tooth was scheduled for extraction [Exhibit 14, at 11]. It was not extracted until 3/1/13 – 29 days after the initial HCR [*id*. at 11-12].

69.To summarize, the clinical histories of #12, 13, 15, 19, 28, and 31 show a clear pattern of untimely care for routine and painful conditions. Mr. Johannes' treatment for dental pain is consistent with a dental program that has too few dentists and inadequate policies and procedures.  Such a system subjects all prisoners to risk of harm from otherwise preventable dental pain, tooth morbidity, and tooth loss.

> c.  Chewing Difficulties

70.Tooth #28 and 31 were extracted on 10/7/09 leaving Mr. Johannes with no mandibular posterior (chewing) teeth on the right side since the extraction also removed the replacements for #29 and #30. Not only was he already missing opposing molars #1 and #3 but his remaining opposing teeth on right side had no teeth to chew against and he had to chew on the left side.  On the maxillary left side, teeth #12, 13, 14, and 15 remained.

71.His chewing problems were exacerbated when #15 fractured and the temporary restoration was collecting food leaving the tooth vulnerable to chewing forces without a permanent filling. He submitted HCRs 4/5/10 [Exhibit 15, at HCR 15} and grievances 3/5/10 [*id*., HCR 16], 6/15/10 [*id*. at HCR 18], and 7/19/10 [*id*. at HCR 19] mentioning his limited chewing capacity. A

permanent filling was placed three months later HCR 7/27/10.[9] His chewing problems continued when #13 was extracted on 12/10/10, further reducing the number of posterior teeth on his left side. At this point, Mr. Johannes should have been prioritized for a mandibular partial denture since his chewing capacity was further diminished. Figure 4 shows his remaining teeth.

| Figure 4. Representation of Mr. Johannes' Teeth on 12/7/09 | | |
| --- | --- | --- |
| **Right** | **Anterior** | **Left** |



72. To summarize, while teeth #28 and #13 and the associated bridge were not salvageable, the treatment of his remaining teeth should have prioritized as well as a partial denture to reduce his discomfort when eating. Finally, my review of the clinical record, HCR responses, and grievance responses did not find any indication Mr. Johannes was offered a soft diet during the periods his problematic teeth were making chewing particularly difficult.[10]

---

[9] The point here is that treatment of his posterior teeth on the left side should have been prioritized.

[10] "To comply with existing standards of health care, all therapeutic diets shall be ordered in accordance with the procedures outlined in the Bureau of Health Care Services (BHCS) Diet Manual. Physicians, physician's assistants and dentists shall order therapeutic diets based on the prisoner's health needs in accordance with the Diet Manual. All therapeutic diets will be served as prescribed by a physician, physician's assistant or dentist in the prisoner's health record." *See* attached Exhibit 16, MDOC Policy Directive 04.07.101, Therapeutic Diet Services, effective 8/15/1994.

d. Grievances

73. Mr. Johannes submitted grievances related to his dental treatment 11/24/09 [Exhibit 15, HCR at 8], 2/19/10 [*id*. at 13], 3/5/10 [*id*. at 16], 6/13/10 [*id*. at 18], and 7/19/10 [*id*. at 19]. His 11/24/09 grievance complained of a lack of substantive treatment; that is, while Dr. Sanders examined him on four occasions (8/25 and 9/9 - lost filling #12; 10/6 and 11/23 - problems with #28 and 31) which yielded clinical notes (8/25 - Pt will be rescheduled to restore #12; Exam, x-ray. Gross decay; 10/6 – single periapical x-ray taken; and 11/23 - emergency exam, x-ray; gross decay, RV - extract #28&31). The response (bearing Dr. Sanders' signature) stated, "[t]reatment provided 12-06-09" [*id*. at 8] However, while the problem with #28 and #31 was resolved the problem of #12 was not.

74. His 3/5/10 grievance addressed two issues: (1) "[t]ooth #15 is breaking up. My biting surface is down to 2½ teeth" and (2) on 8/25/09 Dr. Sanders diagnosed him with "severe bruxism (a tooth grinding problem)" and noted that Mr. Johannes will be scheduled for an impression for a soft bite splint [Health Care Request 16]. Dr. Sanders' response was, "[t]reatment ongoing". [*Id*.] However, it was not until 4/19/10 (more than a month later) that Dr. Sanders placed a temporary restoration in #15 [R. 61-15, Murphy Declaration at 12]. Moreover, from 8/25/09 [*id*. at 9] when Dr. Sanders diagnosed Mr. Johannes with severe bruxism to 5/4/10 [*id*. at 12], when the bite splint was delivered, 252 days passed.

75. His 6/13/10 grievance complained that the temporary filling Dr. Sanders placed in tooth #15 on 4/5/10 is causing problems and he would like a permanent filling in #15. He noted sometimes when he eats, food accumulates between "my <u>only</u> 3 chewing upper teeth" [emphasis in original]

and wanted the temporary restoration replaced with a permanent one. [Exhibit 15, at 18] Dr. Sanders' response was, "[p]atient will be scheduled for exam and restorative" [*Id.*]    Dr. Sanders replaced the temporary restoration with a permanent one 7/26/10 [Exhibit 14, Johannes' Dental Records, at 8] - 143 days after he informed Dr. Sanders of the problem (on 3/5), 112 days after he submitted a 4/5/10 HCR requesting a filling, and 98 days after the temporary filling was placed (4/19/10). His 7/1919/10 grievance[11] again related to his request for a permanent filling in #15. Dr. Sanders' response was, "[t]reatment 7/26/10". [Exhibit 15, at 19]

76.    Table 4 shows the periodontal findings at Mr. Johannes' examinations and dental hygienists' assessments from 7/1/08 through 5/16/14. None of these examinations or assessments was accompanied by documented periodontal probing. Moreover, he was never treatment planned for scaling and root planning despite his being classified as having moderate or advanced periodontal disease[12].

| Table 4.  Mr. Johannes' Periodontal Assessments | | | | |
|---|---|---|---|---|
| **Date** | **Periodontal Class** | **Reason** | **Periodontal Procedures Planned** | **Page** |
| 7/1/08 | Moderate[13] | Intake exam | | Exhibit 14, at 1 |
| 5/12/09 | Generalized[14] | Prophylaxis | | Exhibit 14, at 3 |

[11] The grievance suggests that #12 was extracted on 3/2/10; however, the Summary Report has no 3/2 entry. In the 3/1 entry, Dr. Sanders suggested that there should be a return visit (RV) for the extraction of #12, however, there is not an entry that indicates that #12 was extracted. [Exhibit 14, Johannes' Dental Records]

[12] Dr. Sanders testified that "A root planing and scaling is a part of adult prophylaxis if it is needed" [Exhibit 4, Sanders Deposition at 312:10-13] and despite the fact that it was not documented in the Mr. Johannes' treatment record, it was done by the hygienist. He explained that the specific appropriate treatment codes were not entered to save time. [*Id.* at 335:7-22]. Combining the two procedures in the time allocated to a prophy appointment is inconsistent with performing a clinically appropriate scaling and root planning procedure. Compare with Dr. Choi's testimony (*supra*) that two quadrants of scaling and root planning, take him an hour in his private practice [Exhibit 11, at 40].

[13] The notes mention furcation involvement #14, 15, 18, and 19.

| 10/6/10 | WNL[15], moderate, advanced | Examination | | Exhibit 14, at 5 |
| 11/8/10 | Not mentioned | Prophylaxis | | Exhibit 14, at 9 |
| 12/10/10 | Advanced | Examination | | Exhibit 14, at 10 |
| 10/17/13 | WNL | Examination | | Exhibit 14, at 12 |

77.     To summarize, Mr. Johannes' grievances, supported by the clinical record of his treatment state a clear case for his having received untimely care. Even when seen by Dr. Sanders, the treatment that had been identified was often not performed. Mr. Johannes' treatment over this period has been episodic. Both the assessment of his periodontal condition and the treatment of his documented periodontal problems were inadequate since it did not employ periodontal probing (the standard of care for more than two decades) and did not perform scaling and rot planing, the generally accepted non-surgical treatment for moderate or advanced periodontal disease.

### e.  Dr. Murphy's Declaration

78.     Dr. Murphy's declaration provides his analysis and opinion about the treatment MDOC provided to Mr. Johannes – the majority of which was provided by Dr. Sanders.[16] Dr. Murphy testified that, "[a]fter the tooth extractions of #28 and #31 [on 12/7/09], the patient was able to eat. Many people can eat without a tooth or two." [R. 61-15, Murphy Declaration at ¶8.] That is disingenuous for several reasons. First, the extraction of tooth #28 and #31 also removed the bridge (that is, the replacements for tooth #29 and #30. Consequently, rather than losing the services of two teeth for chewing, he lost four teeth. Figure 4 (*supra*) is a

---

[14] "Periodontal Classification is 3 (recession and or bone loss)".

[15] Dr. Sanders testified that the 'WNL' entry was an error. [Exhibit 4, Sanders Deposition at 3-5]

[16] Although Mr. Johannes' treatment history runs from 7/1/08 to 5/16/14, Dr. Murphy did not begin to treat him until 10/17/13 – seven months of a six-year period. His testimony about the treatment he did not provide is based on his interpretation of Mr. Johannes' dental chart, which is attached as Exhibit 14.

representation of Mr. Johannes' mouth after the teeth were extracted.[17] Note that he no longer has posterior ("chewing teeth") on the right side and while he has some opposing teeth on the maxillary right side (*i.e.*, #2, 4, and 5), they do not contribute materially to chewing ***because there no teeth against which to chew***.

79.     Second, after the bridge was removed, Mr. Johannes had problems with teeth #12, 13, and 15. In fact, #13 was extracted one year later, leaving only #12, 14, and 15 in the maxillary left arch. Consequently, after 12/10/10, his chewing capacity was further diminished. Finally, from 8/17/09, he has had continual problems with tooth #12 and as a result, chewing was even more problematic than "eating without a tooth or two".

80.     Dr. Murphy's review of Mr. Johannes' treatment elides the consistent delays in receiving care. For example, "[i]n August and September, 2009, he received treatment to a maxillary left bicuspid, #12". [R.61-15, Murphy Declaration ¶6] In fact, according to the clinical record, Dr. Sanders' entries for 9/9/09 (Decay with x-ray of tooth #12. Visual inspection and x-ray revealed gross decay." [Exhibit 14, at 5]) and 3/1/10 (RV – ext. #12 & imp.) For bite splint" [*id*. at 7] were the last entries related to tooth #12. It does not appear (based on the clinical record) that the problem of tooth #12 has been resolved.

81.     Several of Mr. Johannes' periodontal assessments (Table 4, *supra*) indicated that he had moderate or advanced periodontal disease. While oral hygiene instructions are documented, he received an oral prophylaxis only twice despite many requests. Moreover, there is no record that scaling and root planning was treatment planned[18] or performed.

---

[17] No other teeth were extracted between 12/7/09 and 10/6/10 so it is a valid representation of Mr. Johannes' missing teeth.

[18] While Service Code 00150 is documented 5/6/09, there was no treatment plan [R.61-15, Murphy's Declaration, at 9]. However, more than 17 months later (10/6/10), Dr. Sanders did

82.   To summarize, Dr. Murphy presented a Potemkin tour of Mr. Johannes'
dental record. He made no mention of the untimely examinations (a 541-day wait
for a routine examination is difficult to ignore), untimely treatment, and many
appointments at which no treatment was performed. Moreover, his personal
involvement with Mr. Johannes' care was limited to seven months of a six-year
treatment record. His analysis of Mr. Johannes' chewing difficulties gives short
shrift to Mr. Johannes' problems as reflected in the HCRs and grievances and his
actual number of opposing (chewing) teeth. Moreover, Dr. Murphy fails to address
the pattern of untimely restorations and treatment of dental pain.

###   2.   **Michael Woroniecki**

83.   Mr. Woroniecki's 6/21/12 intake exam noted poor oral hygiene, heavy
calculus, and moderate periodontal disease, many unrestorable teeth, several
(restorable) teeth with decay [Exhibit 17, Woroniecki, at 1]. He kited for a
toothache 6/27/12 [*id.*] and had several teeth extracted 7/11/12 (after 14 days) [*Id.*
at 2]. He kited for a toothache 7/17/12 ("Pt. complained of toothache will schedule
at DWH") [*Id.* at 3].

84.   He kited again 10/8/12[19] ("I had teeth pulled in Quarantine + the left half a
root in my upper jaw + hurts [*sic*]") and was advised, "You will be seen as staff
and time permit. You can buy pain medication from the prisoner store to help with
the discomfort" [*Id.*].  He was seen 10/23/12 (15 days later and 98 days after his
7/17/12 kite) and several teeth were extracted [*Id.* at 4-5].

85.   He kited again 10/31/12 ("Pt. complained of pain, can't sleep, Ibuprofen
doesn't help, need teeth pulled")[20] [*id.* at 6] and 11/30/12 ("I am having a lot of

---

document a treatment plan. Despite his documenting moderate and advanced periodontal disease,
his treatment plan did mention scaling and root planning – simply a prophy.

[19] Note that 83 days passed since his 7/17/12 kite for pain without his being seen [Exhibit 17].

[20] He was advised, "You have been placed on the waiting list. You will be called out in the order
your name comes up".

pain and the meds are not working, am having trouble sleeping") [*id*.] and was seen 12/3/12 (33 days after his 10/31/12 kite) at which time several teeth were extracted [*Id*. at 6-7].[21]

86.    He kited 2/21/13 wanting his teeth cleaned, dentures, and an exam and stating that "all his teeth hurt". He was advised that, "[y]our name will be added to the cleaning list" [*Id*. at 9].[22] He kited again 3/8/13 ("Pt. complained of teeth hurting, need to be pulled, IBU not working,; list to be scheduled with an available DDS") [*Id*.]. He was examined by a dentist 5/2/13 (70 days after his 2/21/13 kite stating pain) and several teeth were extracted [*Id*. at 9-10].

87.    He kited 5/21/13 ("Pt. complained of pain in the top part of my mouth. I really need to get them pulled. Response: You will be seen as soon as we are able") [*Id*. at 12]. He was seen 5/23/13 (2 days after his kite stating pain). The dentist noted, "patient HAS NEVER HAD EXAM AND TREATMENT PLAN. NOR HAS HE EVER KITED FOR EXAM, ROUTINE CARE, OR POSSIBLE PROSTHETICS" [emphasis in original][23]. Several teeth were extracted [Exhibit 17, at 12-13].

88.    He kited 5/28/13 for a cleaning, exam and dentures and was advised, "Your name is in the cleaning and exam list. The list is long" [*Id*. at 13]. He kited 7/22/13 ("Pt. complained of pain in the bottom tooth. Constant throbbing and hard time

---

[21] The dentist noted (*inter alia*), "Exam reveals that a retained palatal root tip is present at recent (over 20 weeks ago) extraction site #3 [*id*.]". His assessment was, "Palatal cellulitis secondary to retained root tip of grossly carious tooth #3 [*id*.]". The point here is not that the palatal root of #3 was negligently left in Mr. Woroniecki's mouth but rather the 33-day delay in responding to his kite for a toothache, allowed a cellulitis to develop. Cellulitis is an acute spreading infection involving the skin and subcutaneous tissues without suppuration.

[22] Note that his pain issue was not addressed.

[23] However, text notes 10/8/12, 10/23 and report *inter alia*, "Also need to be signed up for dentures" and 10/31/12 ("Patient requested teeth cleaned, exam"), 3/6/13 ("Pt. requested teeth cleaned, exam, prosthetics, already on the list per kite 2/21/13"). Note, however, that his first request was 10/31/12. [Exhibit 17]

sleeping") and was seen that day at which time a treatment plan was performed. Among the findings was "advanced periodontal involvement" [*Id*. at 13-14]. He was prescribed an antibiotic and an analgesic and the teeth were extracted 8/1/13 [*Id*. at 14-15].

89.    His last extractions were performed 9/18/13 [*id*. at 15-16] and he kited for denture impressions 12/23/13 and was advised, "Per new policy you will not be eligible for routine treatment until 6/2014 [*Id*. at 16]. He kited 6/10/14 and was advised that he was placed on the exam list [*Id*.]. He kited 9/4/14 requesting a soft diet and was seen by Dr. Murphy who noted, "Discussed with patient and now he will stay on the normal chow line without the soft diet" [*Id*. at 16-17]. Denture impressions were made 11/24/14 [*id*. at 17] and the dentures were delivered 5/27/15 [*Id*. at 18].

90.    To summarize, Mr. Woroniecki had an initial (intake) examination 6/21/12 at which time a panoramic radiograph was taken and his mouth was charted. It was noted that he had poor oral hygiene, heavy calculus, and moderate periodontal disease. There is no documented periodontal probing (*i.e*., PSR). There was no documented treatment plan and as the result, his treatment was episodic until the 7/22/13 treatment plan (396 days after his intake exam). During that period, he had continual pain[24] and one episode of palatal cellulitis, a potentially life-threatening infection.

91.    Table 5 shows Mr. Woroniecki's periodontal assessments, which were performed without documented probing. Moreover, while he was identified as having moderate periodontal disease, the appropriate non-surgical treatment (scaling and root planning) was neither authorized nor performed. In fact, no treatment for his periodontal condition, ***not even an oral prophylaxis*** was

---

[24] His kites for pain generally resulted in untimely dental examinations.

provided.

| Table 5.  Mr. Woroniecki's Periodontal Assessments | | | | |
|---|---|---|---|---|
| Date | Periodontal Class | Reason | Periodontal Procedures Planned | Page |
| 6/21/12 | Moderate | Intake exam | | Exhibit 17, at 1 |
| 7/22/13 | Advanced | Examination | | Exhibit 17, at 1 |

92.    Furthermore, since a treatment plan was not performed at the intake examination, the moderate periodontal disease that was identified was not indicated for treatment.[25] Since periodontal probing was not documented, the extent and even the location of the periodontal lesions are unknowable from the dental chart. It is interesting to note that the 7/22/13 treatment plan noted, "advanced periodontal involvement"[26]; however, periodontal probing was not documented. At no time until the 7/22/13 treatment plan (when Mr. Woroniecki's remaining teeth were indicated for extraction), was the need for periodontal treatment charted.[27] [Exhibit 17, at 13-14] Mr. Woroniecki's care was episodic without a treatment plan. This deficiency, in conjunction with the untimely care that is consistent with understaffing and MDOC's 24-month quarantine policy was responsible for gratuitous pain.

### 3.  Phillip Turner

93.    Mr. Turner's 12/17/10 treatment plan documented several mobile teeth and he was informed that he had severe bone loss around his maxillary and mandibular

---

[25] Typically, the appropriate treatment includes an oral prophylaxis (sometimes referred to as a cleaning) and scaling and root planing.

[26] The 6/21/12 intake examination noted moderate periodontal disease.

[27] My point is not that the failure to document periodontal probing and treat Mr. Woroniecki's moderate periodontal disease timely was the proximate cause of his tooth loss but rather such policies and practices place all dentate prisoners at risk of harm. As an oral epidemiologist who has studied and written about oral disease progression, I am confident that in any population of dentate adults, untreated moderate periodontal disease can progress at varying rates over time to the point that the health of teeth in some individuals will be jeopardized.

anterior teeth "suggestive of periodontitis" ("Perio findings: moderate about posterior teeth, advanced about central incisors"). There is no documented periodontal probing (*i.e.*, PSR) of any teeth. The planned treatment comprises several fillings and a prophy – with no mention of scaling and root planing. The note states that he is on the IBC fill list since 7/26/10 [*See* attached Exhibit 18, Turner's Dental Summary, at 6]. Two teeth were filled on 2/9/11 – after waiting 218 days [*Id*. at 9].

94.    Tooth #8 and 9 was extracted on 3/9/11 due to periodontitis [*Id.* at 10-11].[28] He had an oral prophylaxis 3/16/11 ("Radiographic bone loss present"). Periodontal probing was not documented [*Id.* at 12]. Teeth #20 and 21 were filled 4/21/11 [*id*. at 13] – after 36 days. There is a 5/6/11 dentist's note ("Evaluated general perio. condition for possibility of upper partial denture. It was determined that tooth #7 would need to be removed prior to fabrication of the partial denture.") [*Id*. at 13-4]. There is no documented periodontal probing. Impressions were taken and a partial denture was delivered 12/8/11 [*Id.* at 15].

95.    He was referred from his housing unit 3/29/13 with swelling that was determined to be an abscess due to "advanced periodontal involvement" [*Id.* at 17]. Tooth #2 was extracted on 1/27/14 after being asymptomatic for several months [*Id*. at 18-19]. On 9/2/14 #25 was extracted due to advanced periodontitis [*Id*. at 20-1].

96.    Table 6 shows that Mr. Turner's full-mouth periodontal assessments made from 6/30/04 to 3/23/15. While he was consistently assessed as having moderate or advanced periodontal disease, no treatment other than oral prophylaxes were provided. While an oral prophylaxis is the first step in periodontal therapy, it is insufficient in itself to address moderate advanced periodontal disease.

---

[28] The note states -> fill list #20 mbd comp. and #21 mbd com. which I take to mean that he was placed on the filling list for these teeth.

| Table 6.  Mr. Turner's Periodontal Assessments | | | | |
|---|---|---|---|---|
| **Date** | **Periodontal Class** | **Reason** | **Periodontal Procedures Planned** | **Page** |
| 6/30/04 | Moderate | Initial exam | | Exhibit 18, Turner's Dental Records, at 1 |
| 2/2/06 | Moderate / advanced[29] | Initial exam | | Exhibit 18, at 3 |
| 6/8/07 | Moderate | Intake exam | | Exhibit 18, at 4 |
| 12/17/10 | Moderate / advanced[30] | Exam / treatment plan | Prophy | Exhibit 18, at 7-8 |
| 3/9/11 | Advanced | Exam / treatment plan | | Exhibit 18, at 11 |
| 3/16/11 | Radiographic bone loss | Prophylaxis | | Exhibit 18, at 12 |
| 9/24/14 | No pathology | Focused exam | | Exhibit 18, at 22 |

97.    He kited 1/27/14 that his partial denture was lost or stolen [Exhibit 18, at 18] and kited again on 10/3/14 [*id*. at 22]. A decision was made to make another partial denture on 10/31/14 and a try-in (the penultimate step and the last chart entry) is documented 3/23/15 [*id*. at 23]– 420 days after the 1/27/14 kite.

98.    To summarize, while Mr. Turner has been treated by MDOC dentists since 10/23/02, the first documented treatment plan does not appear until 12/17/10, more than seven years after his admission. Moreover, while moderate and advanced periodontal diseases are documented, there is no documented periodontal probing nor did he receive appropriate non-surgical treatment for moderate and advanced periodontal disease, scaling and root planning.[31]

---

[29] Mobility noted #10 (1), #7-9 (1), #10 (3), #23-26 (1), #28-29 (1).

[30] Moderate about posterior teeth and advanced about central incisors.

[31] My point is (as with Mr. Woroniecki) not that the failure to document periodontal probing, and treat Mr. Turner's' moderate and periodontal disease timely was necessarily the proximate cause of his tooth loss but rather such policies and practices place all dentate prisoners at risk of harm. As an oral epidemiologist who has studied and written about oral disease progression, I am

### 4.   Roger Stephenson

98.    Roger Stephenson is edentulous and had a set of dentures delivered 12/1/08 [*See* attached Exhibit 19, Stephenson's Dental Summary, at 8]. On 11/8/10 kited that his upper denture had broken [*Id*. at 9]. After it was repaired 12/8/10 [*id*.], he kited 1/3/11 that it broke in the same place [*id*.] and it was repaired 1/20/11 [*Id*.]. He kited 5/31/11 wanting to know if he qualifies for new dentures "because they are loose and the adhesive is not working" [*Id*. at 10]. A chairside reline of the upper denture was performed 6/6/11 [*id*.] and the lower denture was relined 7/6/11 [*Id*.].

99.    He kited 6/13/12 that the upper denture had broken and was seen 6/29/12 [*Id*. at 11]. The note states that he did not want to leave his denture for lab repair.[32] He was placed on the prosthetics list 10/25/12 [*id*.] and the dentures were delivered 6/17/14 [*id*. at 13]– after 600 days. To summarize, a 600-day wait for dentures is untimely and is consistent with understaffing."

## III.   ARGUMENTS

### A.   CONTRARY TO DEFENDANTS' CLAIM, ALL PLAINTIFFS HAVE EXHAUSTED THEIR ADMINISTRATIVE REMEDIES PROCESS.

In their motion for summary judgment, Defendants allege that under 42 U.S.C. § 1983, all plaintiffs failed to properly exhaust administrative remedies that were available to them which required (1) each Plaintiff to name any defendant in their grievance whose actions are the basis for their claims, and (2) no plaintiff,

---

confident that in any population of dentate adults, untreated moderate periodontal disease can progress at varying rates over time to the point that the health of teeth in some individuals can be jeopardized.

[32] I take 'lab repair' to mean sending the denture to an external laboratory.

except Johannes, completed the grievance process through step three prior to the filing of the original complaint.  Defendants claim that Plaintiff Johannes did not name the defendant director in his grievance. They also claim that Woroniecki (a) failed to exhaust his issues prior to Johannes filing the original complaint and (b) there is no mention of either named Defendants in his grievance (R.61-5, Pg ID 838-39). The same two issues are raised as to Turner (R.61-5, Pg ID 839).  They claim Plaintiff Stephenson did not file at all. This claim is contrary to the facts and the law.  Presenting arguments to this Court that lack factual and legal support does not entitle Defendants Director Washington and Dr. Sanders to a dismissal of this complaint for failure to exhaust the grievance process (R.116, Page ID#2286, 2292).

First, the Sixth Circuit has held that a prisoner has exhausted the grievance process even though they failed to mention the names of either defendants in the grievances if the grievance coordinators processed the grievances on the merits and did not rejected them for failure to follow policy. *See Reed–Bey v. Pramstaller,* 603 F.3d 322, 325 (6th Cir. 2010) (the Sixth Circuit has refused to enforce procedural requirements when "prison officials decline to enforce their own procedural requirements and opt to consider otherwise-defaulted claims on the merits."); *Hollins v. Curtin*, No. 1:13-CV-008, 2015 WL 1458944, at *11 (W.D. Mich. Mar. 30, 2015) (unpublished) ("the Sixth Circuit has made clear, if prison

officials decline to enforce their own procedural rules regarding the proper filing of prison grievances, and instead address a grievance on the merits, prison officials cannot later seek to enforce, in a judicial proceeding, the procedural rule in question." (citation omitted)), *see* attached Exhibit 1. These decisions are also applicable to Turner.

The Sixth Circuit has also held that a prisoner must only have exhausted the grievance process prior to the filing of the amended complaint, and not prior to the filing of the original complaint. *Curry v. Scott*, 249 F.3d 493, 501 (6th Cir. 2001) ("the district court concluded that these six plaintiffs could continue to pursue their claims in federal court because they had fully exhausted those claims prior to the filing of their amended complaint, .…"). Defendants have offered no reason why this Court is not bound to follow Sixth Circuit precedent. Finally, in *Grear v. Gelabert*, the court held that where prisoner named "health care staff" in a grievance and prison officials did not reject it for failure to identify the specific persons about whom plaintiff was complaining, court concluded that the claim was exhausted as to all health care staff, including those named in the lawsuit. *Grear v. Gelabert* , No 07–203, 2008 WL 474098, *7–8 (W.D. Mich. Feb.15, 2008), Jonker, J. (unpublished), *see* attached Exhibit 2; *see also Robbins v. Payne*, Case No. 11-15140, 2012 WL 4812495, at *3 (E.D.Mich. Oct. 10, 2012), Whalen, MJ, and cases cited, *see* attached Exhibit 3.

A case directly on point is *Riggs v. Valdez*, Case No. 1:09-cv-00010, 2010 WL 4117085 (D.Idaho, Oct. 18, 2010) (unpublished), *see* attached Exhibit 4, where the court stated:

> Refusing to allow an amendment or supplementation to an otherwise properly exhausted complaint because new claims accrued or were exhausted after the original filing date does little to further the exhaustion requirement. Assuming that administrative remedies were properly exhausted on the new claims, the prisoner would have given prison officials an opportunity to correct the problem before he haled into court. In fact, the intent of the PLRA to reduce the quantity and increase the quality of prisoner lawsuits could be undermined by such an inflexible rule. If prisoners cannot amend with newly exhausted claims and are instead directed to start a new action, the quantity of prison condition lawsuits would be increased, not decreased, and the quality of each of those piecemeal lawsuits would likely tack in a negative direction. Or, if the cases are consolidated, the same practical result is achieved as amendment but with the added time and expense of starting a new proceeding. Applying defendants' position to this case would presumably have required the filing of a different complaint under a new case number that then be consolidated, which would waste time and resources[.]

The Ninth Circuit has dealt specifically with the issue of whether a plaintiff could add new claims and still comply with the terms of the PLRA. In *Rhodes*, at the time of the first filing all the plaintiff's claims were properly exhausted. *Rhodes v. Robinson*, 621 F.3d 1002, 1005 (9th Cir. 2010). However, on remand to the district court, the plaintiff filed a second amended complaint alleging new retaliatory acts by the defendants in response to the plaintiff initiating the lawsuit.

*Id.* at 1003. The district court then dismissed those claims after interpreting the Ninth Circuit's prior decisions as requiring that claim exhaustion have to occur prior to the filing of the original complaint. *Id.* at 1004. On appeal, the Ninth Circuit clarified this, and held that the "PLRA's exhaustion requirement is satisfied so long as [plaintiff] exhausted his administrative remedies with respect to the new claims asserted in his second amended complaint before he tendered that complaint to the court for filing." *Id.* at 1007. The appellate court additionally determined that the plaintiff's second amended complaint was a supplemental complaint under Rule 15(d) because the new claims occurred after the original complaint was filed. *Id.* In sum, the Ninth Circuit reasoned, "Congress has never indicated, however, that it intended to do away with Rule 15(d) and supplemental pleadings in PLRA actions." *Id.*

Other courts have also treated an amended complaint as commencing a new action against the government when the amended complaint raises a new, exhausted claim not included in the original complaint. *See, e.g., Mackovich v. United States,* 630 F.3d 1134, 1135–36 (8th Cir.2011); *Barnes v. Briley*, 420 F.3d 673, 678 (7th Cir. 2005) (finding that a plaintiff adequately exhausted his administrative remedies via a grievance filed between his initial and first-amended complaints because "[t]he filing of the amended complaint was the functional equivalent of filing a new complaint."); *Bruce v. Ghosh*, No. 11-CV-3138, 2015

22

WL 1727318, at *7 (N.D. Ill. Apr. 13, 2015) (unpublished) ("In theory, because amended complaints are (usually) treated as new complaints, allowing a plaintiff to exhaust post-complaint but pre-amendment arguably would not conflict with the "no action shall be brought" language of § 1977e(a) (*i.e.,* because the amended complaint *would be brought* post-exhaustion)), *see* attached Exhibit 5.[33]

Because each Plaintiff had their grievance decided on the merit by the MDOC, Defendants have waived the ability to raise the exhaustion requirement. *See* R.61-9, Woroniecki's Grievance; 61-10 and Turner's Grievance; R. 61-13

As to Stephenson, Defendants' submitted an affidavit and record from the third-step grievance processor that Stephenson never filed a third step (R.61-12). However, a review of the grievance shows that Stephenson filed through Step II, where prison staff apologized "for that delay,…" It goes on to state, "No further remedy may be offered at this time." *See* attached Exhibit 7. Grievance Step II

---

[33] *See also Boone v. Nose,* Appeal No. 13–1935, 2013 WL 3481808, at *1 n. 1 (3rd Cir. July 11, 2013) (unpublished) ("prisoners may file supplemental complaints if the claims in question ... have truly accrued since the beginning of the suit and ... are exhausted per 42 U.S.C. § 1997e(a) before the supplement is filed."), attached Exhibit 6; *Smith v. Olsen,* 455 Fed.Appx. 513, 515–16 (5th Cir. 2011) (unpublished) (permitting inmate to proceed on § 1983 claims exhausted after he initiated suit, but before he raised them in an amended complaint), ; *Romano v. Secretary, DOC,* No. 2:06–cv–375, 2011 WL 1790125, at *4 (M.D.Fla. May 10, 2011) (unpublished) ("the ... PLRA only required [p]laintiff to fully and properly exhaust the new claims prior to the time he filed the amended complaint that included the new claims"), *see* attached Exhibit 8.

Response. When the MDOC has informed the inmate at the first or second step of the grievance process that it was resolved, the prisoner needs not appeal to the third step. See *Ross v. County of Bernalillo,* 365 F.3d 1181, 1187 (10th Cir. 2004) ("Once a prisoner has won all the relief that is available under the institution's administrative procedures, his administrative remedies are exhausted." (citing cases)), *abrogated in part on other grounds, Jones v. Bock,* 549 U.S. 199 (2007). *See also Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir. 2004) (additional attempts at exhaustion are unnecessary when there is "no further 'possibility of some relief.'" (quoting *Booth,* 532 U.S. at 738)); *Dixon v. Page,* 291 F.3d 485, 490–91 (7th Cir. 2002) ("requiring a prisoner who has won his grievance in principle to file another grievance to win in fact is certainly problematic," because it could lead to a "never-ending cycle of grievances" in which the prison always promises resolution but never follows through, preventing the prisoner from seeking redress from the federal courts). Further, the MDOC policy directive provides that a "grievant whose grievance is rejected may appeal the rejection to the next step as set forth in this policy." The grievance policy does not require an inmate who has prevailed on a grievance to appeal it to the next step.

WHEREFORE, this Court should reject Defendants' arguments relating to the failure to exhaust the grievance process by the Plaintiffs.

24

**B.**    **PLAINTIFF JOHANNES'S CLAIM IS NOT BARRED BY THE STATUTE OF LIMITATIONS FOR PERSONAL INJURY ACTIONS BECAUSE THE UNCONSTITUTIONAL LEVEL OF DENTAL CARE PROVIDED BY MDOC CONSTITUTES A CONTINUING VIOLATION.**

The lack of dental treatment by MDOC was, and still is, a continuing violation of the Eighth Amendment that subjected Plaintiff Johannes, as well as countless other prisoners, to cruel and unusual punishment on a continuing basis. The cumulative effect of the ongoing lack of treatment was a violation of Plaintiff Johannes's constitutional rights, and it is immaterial that some of the violations occurred outside of the statute of limitations. *See Nat'l R.R. Passenger Co. v. Morgan,* 536 U.S. 101, 117 (2002). To determine whether there was a continuing violation, the court determine whether "(1) the defendants engage in continuing wrongful conduct; (2) injury to the plaintiffs accrues continuously; and (3) had the defendants at any time ceased their wrongful conduct, further injury would have been avoided." *Hensley v. City of Columbus*, 557 F.3d 693, 697 (6th Cir. 2009).

In *Hensley*, the plaintiffs alleged a continuing violation when the government, in the process of extending a sewer line, pumped groundwater out of the plaintiffs' property. *Id.* at 695. As a result, wells on the plaintiffs' property ran dry. *Id.* However, the Sixth Circuit held that this was not an ongoing violation. *Id.* at 697-98. After one discrete action in draining the groundwater, a violation of the Fifth Amendment Takings Clause, no further injury accrued and ceasing building

the sewer line would not have prevented future injury. *Id.* Because "the damage was done," the plaintiffs could not bring their claim after the statute of limitations had run based on a continuing violations theory. *Id.* at 697.

In contrast, a series of smaller violations over a long period of time is considered a continuing violation. When the Supreme Court found a continuing violation of Title VII in an employment discrimination case, it held that a hostile work environment claim may allege facts outside of the statute of limitations period. *Nat'l R.R. Passenger Co.,* 536 U.S. at 117. "Provided that *an act* contributing to the claim occurs within the filing period, the *entire time period* of the hostile environment may be considered by a court." *Id.* In *National Railroad,* an employee filed an employment discrimination claim against his employer, stating that his employers had discriminated against him based on race. *Id.* at 105-06 & n.1 (emphasis in original). The Court stated that hostile work environment claims are based on the "cumulative effect" of many discriminatory actions, even if "a single act of harassment may not be actionable on its own." *Id.* at 115.

The Sixth Circuit also held that when a law was found to violate citizens' civil rights, the entire length of time during which the law was valid, and citizens required to obey it, constituted a violation of the citizens' civil rights. *Kuhnle Bros. v. Cnty. of Geauga*, 103 F.3d 516, 522 (6th Cir. 1997). As a result, the statute of limitations only began to run on the date on which the unlawful statute was

26

repealed. *Id.* In *Kuhnle Bros.*, a county ordinance prohibited a trucking company from using certain roads. *Id.* at 518. Two and a half years later, the state Supreme Court overturned the ordinance. *Id.* The Sixth Circuit held that the trucking company could bring a claim for violation of its right to travel intrastate, even though the time that elapsed since the company last tried to use the roads exceeded the statute of limitations. *Id.* at 522. The plaintiff had "suffered a new deprivation of constitutional rights every day that [the resolution] remained in effect," and as a result, it could bring a claim based on the continuing violation theory. *Id.*

The Sixth Circuit noted that "[c]ontinuing violations in the Section 1983 context are akin to hostile-work environment claims where the harm 'cannot be said to occur on any particular day.'" *Goldsmith v. Sharrett*, 614 Fed.Appx. 824, 828-29 (6th Cir. 2015) (unpublished) (quoting *Nat'l R.R. Passenger Co.*, 536 U.S. at 115). Thus, even if the Sixth Circuit once reluctantly applied the continuing violations doctrine in the Section 1983 context, it has since acknowledged, much like employment discrimination cases, constitutional violations can accrue over a longer period of time. *Sharpe v. Cureton*, 319 F.3d 259, 267 (6th Cir. 2003) (citation omitted) ("This Circuit employs the continuing violations doctrine most commonly in Title VII cases, and rarely extends it to § 1983 actions."). Indeed, in *Sharpe* itself the Sixth Circuit held that the doctrine applies to Section 1983

actions. *Id.* The fact that constitutional violations may accrue over time does not make the claim less legitimate.

In the instant case, Defendant Sanders was responsible for ongoing dental treatment for Plaintiff Johannes when he entered MDOC custody, and he delayed restorative treatment in favor of allowing the teeth to rot and extracting them. (R. 37, First Amended Complaint, Page ID # 369 – 74; *see also* Exhibit 24, Declaration of Jay Shulman, page 27.) From 2009 through 2013, Plaintiff Johannes requested restorative treatment for his teeth, and time and time again he was denied treatment long enough to make extraction, rather than restoration, the proper treatment alternative. (R. 37, Page ID # 370-72.) Additionally, since Defendant Sanders extracted many of Plaintiff Johannes's teeth, Plaintiff Johannes on many occasions requested dentures or partial dentures to replace his extracted teeth. (*Id.*, Page ID # 373-74.) Even when one partial denture was provided, it did not fit well, cut into Plaintiff Johannes's gums, and did not replace all of the teeth Defendant Sanders extracted. *Id.* Thus, because of Defendants' unconstitutional dental treatment policies and the delay in his treatment, Plaintiff Johannes was in ongoing pain for approximately six years.

In their summary judgment motion, Defendants attempt to argue that this near constant pain is outside of the statute of limitations because a few incidents occurred prior to tolling. (R. 116, Motion for Summary Judgement, Page ID #

2307-08.) However, the Sixth Circuit found the opposite in both *National Railroad* and *Kuhnle Bros.*, instead holding that smaller violations over the course of a longer period of time were a continuing violation of constitutional rights, allowing the plaintiffs to base their claims on *all* events and actions creating the constitutional violation. *See Nat'l R.R. Passenger Co.,* 536 U.S. at 117; *Kuhnle Bros.*, 103 F.3d at 522. Applying this precedent, this Court should find a continuing violation in the current case.

Further, Defendant Sanders pursued this course of treatment based on an MDOC Policy Directive that Plaintiffs, in this suit, allege violates the Eighth Amendment as applied. (R. 38-3, PD 04.06.150; R.37, Amended Complaint, Page ID # 388-90.) This policy, since its adoption in 2013, has prohibited MDOC dentists from providing dental treatment without regard to how basic preventative work would, in cases like Plaintiff Johannes's, save the patient numerous teeth and prevent significant pain. As a result, countless inmates have been subject to cruel and unusual punishment by having teeth extracted, pain ignored, and dentures denied for extended periods of time based on the MDOC PD 04.06.150. (*See* R. 38-3.)

In *Kuhnle Bros.*, the Sixth Circuit found that an unconstitutional ordinance was a continuing violation of the plaintiff's rights for the *entire time the ordinance was in place*. *Kuhnle Bros.*, 103 F.3d at 522. The plaintiff had altered its course of

business in compliance with the policy, thus, it continued to be injured by the unconstitutional ordinance as long as it was in effect and in the manner that it was applied. *Id.* So, too, here. For the entire time MDOC's Policy Directive has been in effect and applied, it has been continually used to deny dental treatment to Plaintiff Johannes, despite his ongoing pain and suffering, as it has to numerous other inmates. (R.37, Page ID # 373-74.) The policy remains in effect *to this day*, effectively continuing to violate the Eighth Amendment rights of MDOC inmates. As a result, the statute of limitations on this action with regard to Plaintiff Johannes has not expired; under *Kuhnle*, it has not even begun to run.

MDOC's policies and inadequate treatment are a continuing violation of Plaintiff Johannes's constitutional rights, thus, his claim is not barred by the statute of limitations. Per *Hensley*, the final factor in finding a continuing violation is the requirement that if the "defendants at any time ceased their wrongful conduct, further injury would have been avoided." *Hensley*, 557 F.3d at 697. MDOC Policy Directive 04.06.150 remains in effect, and as long as Plaintiff Johannes's treatment was dictated by that policy, his constitutional rights were violated. At any time, Defendant Washington could have chosen to discontinue this violative policy. If they had done so, further injury to Plaintiff Johannes's dental health, as well as the dental health of countless other prisoners would no longer be in jeopardy. This Court can ensure that MDOC cannot shield itself from liability for imposing an

unconstitutional policy by simply hoping that prisoners do not file their complaints within three years of their first encounter with MDOC dental staff.

Wherefore, the Court should hold that Plaintiff Johannes's claims do not fall outside of the statute of limitations because Plaintiff Johannes's constitutional rights have been continuously violated since he entered MDOC custody.

### C.    CONTRARY TO DEFENDANTS' CLAIM, PLAINTIFF HAS ESTABLISHED THAT THEIR CONSTITUTIONAL RIGHTS WERE VIOLATED.

#### 1.    Legal Standards

In order to establish an Eighth Amendment claim, an inmate must satisfy a two-prong test: (1) the deprivation alleged must be objectively serious; and (2) the official responsible for the deprivation must have exhibited deliberate indifference to the inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). In *Hunt v. Reynolds,* the Sixth Court held that Eighth Amendment deliberate indifference claims must contain both an objective component, "that [plaintiff's] medical needs were sufficiently serious," and a subjective component, "that the defendant state officials were deliberately indifferent to the plaintiff's needs." *Hunter v. Reynolds,* 974 F.2d 734, 735 (6th Cir. 1992).In order to satisfy the objective requirement, the Supreme Court requires that an inmate demonstrate evidence of a current harm or evidence of a medical complaint or condition of

confinement that "is sure or very likely to cause serious illness and needless suffering." *Helling v. McKinney,* 509 U.S. 25, 33 (1993).

Under the Eighth Amendment, inmate plaintiffs must allege, at the very least, unnecessary pain or suffering resulting from prison officials' deliberate indifference. *Id.* (prisoner alleging that he suffered pain and mental anguish from delay in medical care states a valid Eighth Amendment claim). As for the subjective element, the Sixth Circuit has held that "a determination of deliberate indifference does not require proof of intent to harm." *Weeks v. Chaboudy,* 984 F.2d 185, 187 (6th Cir. 1993). There must, however, be a showing of deliberate indifference to an inmate's serious medical needs. *Molton v. City of Cleveland,* 839 F.2d 240, 243 (6th Cir. 1988) (*citing Westlake v. Lucas,* 537 F.2d 857, 860 n. 3 (6th Cir. 1976)). In fact, "[k]nowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Horn v. Madison County Fiscal Court,* 22 F.3d 653, 660 (6th Cir. 1994) (citations omitted). The inquiry, therefore, according to the Sixth Circuit, is "[w]as this individual prison official aware of the risk to the inmate's health and deliberately indifferent to it?" *Thaddeus–X v. Blatter,* 175 F.3d 378, 402 (6th Cir. 1999) (*citing Farmer v. Brennan,* 511 U.S. 825, 837, 844 (1994)).

"A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.' " *Harrison v. Ash,* 539 F.3d 510, 518 (6th Cir. 2008) (citing *Blackmore v. Kalamazoo County,* 390 F.3d 890, 897 (6th Cir. 2004)). Dental care is one of the most important needs of inmates, *Board v. Farnham,* 394 F.3d 469, 480 (7th Cir. 2005); *Wynn v. Southward,* 251 F.3d 588, 593 (7th Cir.2001). A review of the symptoms that the named Plaintiffs suffered over the months and years of extensive pain from untreated cavities, tooth loss, and the failure to provide or replace dentures that prevented prisoners from properly chewing their food would qualify as a serious medical condition. *See Board,* 394 F.3d at 480 ("[D]ental pain accompanied by various degrees of attenuated medical harm may constitute an objectively serious medical need."); *Wynn,* 251 F.3d at 593 (concluding that inmate's allegations of bleeding, headaches, "disfigurement," and inability to chew food without dentures demonstrated a serious medical need); *Cooper v. Schriro,* 189 F.3d 781, 783-84 (8th Cir. 1999) (reversing dismissal of complaint alleging failure to treat painful, "decayed and cracked teeth"); *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir. 1998) (reversing dismissal of complaint alleging failure to provide dental care caused extreme pain, tooth deterioration, and inability to eat properly); *Hunt v. Dental Dep't,* 865 F.2d 198, 200 (9th Cir. 1989)

(reversing grant of summary judgment where prisoner produced evidence of failure to treat bleeding gums, broken teeth, and inability to eat properly).

The state of mind prong "is an extremely high standard to meet." *Gobert v. Caldwell,* 463 F.3d 339, 346 (5th Cir. 2006) (citations and internal quotation marks omitted). However, to meet that standard an inmate can show that prison personnel "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evidence a wanton disregard for any serious medical needs." *Domino v. Tex. Dep't Crim. J.,* 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Johnson v. Treen,* 759 F.2d 1236, 1238 (5th Cir. 1985)).

Courts have recognized that a prisoner can state a claim for deliberate indifference to a serious medical need if the prisoner needs **dentures** and has informed prison staff that he suffers from pain, bleeding gums, or cannot chew his food. *See Farrow v. West,* 320 F.3d 1235 (11th Cir. 2003) (stating that 15–month delay in completing inmate's dentures raised jury question as to prison dentists' deliberate indifference toward inmate's serious medical need, where there was no explanation for delay and the inmate continued to suffer from pain, bleeding, swollen gums, and weight loss); *Hunt v. Dental Dept.*, 865 F.2d 198 (9th Cir. 1989) (holding that plaintiff stated a claim for deliberate indifference when prison officials knew of and disregarded severe pain, permanent damage to his teeth, bleeding and infected gums, broken teeth, and an inability to eat properly); *Wynn v.*

*Southward*, 251 F.3d 588 (7th Cir. 2001) (holding that plaintiff stated a claim for deliberate indifference when prison officials knew that he could not eat without dentures and "suffered bleeding, headaches, and 'disfigurement'"). Further, unreasonable delay in treatment that leads to exacerbated pain and suffering can also serves as a basis for a deliberate indifference claim. *See McElligott v. Foley*, 182 F.3d 1248, 1258 n.6 (11th Cir. 1999) ("Although [the plaintiff's] needs were not so serious that a delay of a day or so would have been constitutionally intolerable, the week long delays he endured, a jury could conclude, were the product of deliberate indifference.").

In *Hunt*, the plaintiff lost his dentures in a prison riot, resulting in weight loss and pain as his remaining teeth broke off and his gums bled and became infected. *Hunt*, 865 F.2d at 199. The plaintiff first filed a kite requesting new dentures, and one month later he filed a grievance because he had not seen a dentist yet. *Id.* Three months after filing the grievance, the plaintiff finally saw a dentist and began the process of having new dentures made. *Id.* The delay in treatment, coupled with the fact that prison officials were well aware that the plaintiff was in pain and could not eat without his dentures, was sufficient to state a claim for deliberate indifference. *Id.* at 200 ("[The plaintiff] alleged that the prison officials were aware of his bleeding gums, breaking teeth and his inability to eat

properly . . . . These allegations are sufficient to state a claim of deliberate medical indifference under section 1983.").

In *Vasquez v. Dretke*, No. 05-41170, 2007 WL 756455, at *1 (5th Cir., March 9, 2007), *see* attached as Exhibit 9**,** an inmate alleged that because he had no dentures, he suffered from difficulty eating, headaches, disfigurement, severe pain, bleeding in his mouth, and blood in his stool. As a result, a doctor recommended dentures for him. *Id.* The Fifth Circuit stated these allegations were sufficient to state a claim for a serious medical need for dentures, reversing the district court's dismissal of the lawsuit as frivolous and for failure to state a claim. *Id.*; *see also Williams v. Mason*, 210 Fed.Appx. 389 (5th Cir. 2006) (unpublished) allegations that inmate suffered from cuts and bleeding taking days to heal, certain foods were very difficult to chew, he had digestive difficulties and needed dentures to chew properly; and he had not been issued a soft food pass were not frivolous).

Unnecessary extraction of decayed teeth or delayed treatment of cavities, when prison officials are aware that the prisoner has been in pain for months, has also been determined to be deliberate indifference to a serious medical need. *Chance v. Armstrong*, 143 F.3d 698 (2d Cir. 1998) *see also Hoeft v. Menos*, No. 09-2286, 2009 WL 2562748, at *1-2 (7th Cir. August 20, 2009) (unpublished) see attached as Exhibit 10; (holding that prisoner stated a deliberate indifference claim when he suffered "six months of extensive pain from untreated cavities and tooth

loss" because the prison "views cavities and partials to be routine issues for which inmates must wait their turn"), *McCarthy v. Place*, 313 Fed.Appx. 810 (6th Cir. Dec. 2, 2008) (unpublished) ("[The plaintiff], however, presented evidence that [the dentist] was deliberately indifferent to his serious medical needs by showing that [the dentist] was aware of the significant pain [the plaintiff] was experiencing due to his cavity, yet he failed to relieve this pain for over seven months.").

In *Chance*, a prison dentist recommended that the plaintiff have three teeth extracted, rather than filling cavities in those teeth to preserve them and prevent tooth loss. *Chance*, 143 F.3d at 700-01. The plaintiff refused the extraction, and after several months a second dentist filled the cavity in one of the teeth, but the cavity in the second had progressed so far as to require extraction. *Id.* at 701. The court noted that "[i]n certain instances, a physician may be deliberately indifferent if he or she consciously chooses 'an easier and less efficacious' treatment plan." *Id.* at 703 (quoting *Williams v. Vincent*, 508 F.2d 542, 544 (2d Cir. 1974)). Thus, the allegation that the dentist had recommended extraction over preserving teeth that could likely be saved by use of filling was sufficient to allege deliberate indifference and survive a motion to dismiss. *Id.* at 704.

2. **Arguments**

i. *CONTRARY TO DEFENDANTS' CLAIM, PLAINTIFFS HAVE DEMONSTRATED THAT THE DEFENDANTS WERE DELIBERATELY INDIFFERENT TO PLAINTIFFS' SERIOUS DENTAL NEEDS*.

"The focus of correctional dentistry is the control of acute and chronic dental pain, stabilization of dental pathology, and maintenance or restoration of function. Dental treatment should not be limited to extractions and should include restorations (fillings)." [*See* attached Exhibit 24, Dr. Shulman's Declaration, at ¶III.C., Paragraph 36 (citation omitted).] Managing pain is a standard part of dental practice, which involves the

> appropriate use of analgesics as well as expediting the treatment of patients whose complaints of pain are clinically validated. Among the possible non-traumatic causes of tooth pain are (a) tooth fractures (often, a tooth that has been weakened splits in the course of normal chewing), (b) pulpitis, (c) caries (decay) extending through the enamel into dentin, (d) dental (periapical or periodontal) abscess, and (e) cellulitis (a diffuse inflammation of the connective tissue caused by a spreading bacterial infection just below the skin surface).

*Id.* at paragraph 9.

Defendants discuss "[t]hree specific aspects of Plaintiffs' challenge to the current policy focus on: wait periods, an alleged 'extraction policy' and the provisions regarding dentures, …" [R.116, Pg ID 2313-2318.] As shown in Shulman's Declaration and discussed herein, questions of fact exist as to whether implementation of these three policies produces constitutionally systemic defects in dental care.

       (a)   *MDOC's Dental Policy and Procedures as applied do not provide prompt care for urgent and emergency dental needs.*

Defendants claim that the "express language of MDOC's Policy and Procedure provides prompt care and all urgent and emergency dental needs." [R. 116, Pg ID 2309-2319.] However, Defendants do not address Plaintiff's claim that, as applied, MDOC's Dental Policy and Procedures creates systemic deficiencies in providing constitutionally adequate dental care.

Defendants describe the dental intake process and state urgent care can be provided during that process. [R. 116, Pg ID. 2310-11.] However, at the intake exam, MDOC dentists do not perform periodontal probing to diagnose potential periodontal disease, which, left untreated, could lead to tooth loss and pain. *See* Exhibit 15, Deposition of Dr. Williams, at 27; Exhibit 11, Choi, at 54-55. It is true that, if urgent dental needs are found during the intake exam, the standard care provided is extraction of the affected teeth. However, the process of obtaining dentures is not started at the time the teeth are pulled.  In fact, since dentures are not designated as priority [See Exhibit 13, Protocol, at 18], the inmate is prevented from kiting requesting dentures for two years after his teeth are pulled during intake. Once that two-year quarantine period has passed, the inmate can then ask to be placed on a wait list for dentures, though it may take months or years to get the dentures.

> 118.  It is my opinion that the MDOC's untimely routine care creates a system in which prisoners unable to adequately chew their food are at risk of preventable pain and poor nutrition. MDOC policy does not address timing or monitoring of patients with chewing difficulty

who are waiting to receive dental devices, thus permitting inappropriate delays and problems in receiving a proper diet. Moreover, even when a prisoner is assigned to the Denture List, the time to fabricate the denture is inordinately long.

[Exhibit 24.]

Unlike the Defendants, Plaintiff's expert Dr. Shulman found significant shortcomings with the dental intake process that can result in inmates being subjected to needless pain.

41. Prisoners receive an initial (intake) dental examination generally on the third day at the Reception and Guidance Center ("R&GC"). Dr. Williams described the intake examination as comprising exposing a Panoral [panoramic] radiograph,[29] taking an oral health history, and performing a soft tissue examination, noting the number of decayed (from the panoramic radiograph), missing, and filled teeth, and determining whether the prisoner has any urgent[30] or emergent[31] treatment needs. [Exhibit 5, Williams Deposition 9:20 - 10:17]

42. However, the charting is deficient in at least two dimensions. First, it does not document periodontal probing [See attached Exhibit 6, Taylor Deposition at 103:5-16]. Periodontal involvement is determined using the panoramic or other radiographs to determine bone loss, and Dr. Jeffrey Taylor, the Northern Regional Dental Director, does not expect his dentists to measure periodontal pocketing[32] [Id. at 103:14-104:1-13]. Second, while a panoramic radiograph can diagnose advanced caries, a proper caries exam should employ bite wing radiographs, [Exhibit 23, Stefanac at 12], or early and moderate caries will be underdiagnosed. This is particularly problematic since per MDOC policy, these prisoners will not be eligible to *request* routine care for 24 months. However, as shown in Table 3 (*infra*), it may take a year or more to have an examination and another year to get an appointment for treatment. While incipient caries (Fig 1A, *supra*) is potentially reversible, caries that has breached the dentin tends to progress; with the rate of progression varying with factors such as saliva quality and quantity,

plaque characteristics, acidity of the oral cavity [Shulman and Cappelli at 2-3].

> 29. The Panoral (panoramic) x-ray has limited ability to identify decay [*See* attached Exhibit 5, Williams Deposition, at 25:12-26:5].
>
> 30. "Dental services determined by a Dentist to be medically necessary and generally applies to prisoners with facial swelling, oral facial trauma, profuse bleeding, or pain that cannot be controlled by mild pain medication (e.g., Tylenol). These conditions are not likely to cause death or irreparable harm, if not treated immediately." [*See* attached Exhibit 7, Policy Directive 4.06.150 (9/30/13) at ¶ B]
>
> 31. Dental services for those conditions for which delay in treatment may result in death or permanent impairment. [*Id*. at ¶ C]
>
> 32. Periodontal pocket depth is not measured at intake [Exhibit 5, Williams Deposition, at 2:3-4].

43. Prisoners are eligible to receive routine dental services after completing "24 months of uninterrupted sentenced incarceration within the MDOC CFA institutions."[33, 34, 35] Consequently, newly incarcerated prisoners with dental treatment needs that do not fall within the MDOC definition of Urgent Dental Services may not receive treatment that may prevent future painful conditions for two years (unless, of course, the initially asymptomatic problem deteriorates to the point where it causes pain ***that qualifies for urgent care*** during the 24-month waiting period). MDOC reported that as the result of implementing the 24-month waiting period, "there has been a reduction in over 40% of the routine dental services waiting list." [*See* attached Exhibit 8, MDOC BHCS Staff. November, 2013, at Bates 114-15]

During the 24-month waiting (quarantine) period, prisoners are not eligible to receive treatment for specific conditions until they become urgent care issues.[36] Moreover, even painful conditions where the pain can be controlled by over the counter ("OTC") analgesics (typically, Tylenol, Motrin, or Naproxen) are not eligible for treatment until the condition and pain progress to the point that prescription analgesics (i.e., drugs containing narcotics) are required. So a prisoner who has a toothache where the pain can be controlled by OTC analgesics will have to take them continually for two years or until the condition fulminates.[37]

> 33. This 24-month eligibility was implemented in 9/30/13. [Exhibit 7 at ¶L]

34. The 24-month wait period was retrospective. Routine Dental Services Appointment Lists were purged so that "each prisoner who subsequently kites for any Routine Dental Services must have an Intake Date which is at least 24 months old to be scheduled

35. These prisoners are not considered to be patients of record until they request routine care – which they are not eligible to do for 24 months [Exhibit 6, Taylor Deposition at 110:3-8]

36. "Not included under Urgent Dental Services are: fractured restorations, broken dentures, asymptomatic fractured or chipped teeth, and toothaches that are controllable with OTC [over the counter] pain medications and analgesics." [Exhibit 10, BHCS Dental P1 at ¶C2, at 03]

37. Long-term analgesic use is not without risks; which while low probability events, can be serious – even life-threatening. Among these risks are, peptic ulcer disease, gastrointestinal bleeding, severe hepatic reaction, and nephrotoxicity (Ibuprofen) [*Jeske* at 652]; Acetaminophen toxicity Tylenol) [*id*. at 12]; peptic ulcer disease, gastrointestinal bleeding, gastritis, severe hepatic reactions, and nephrotoxicity (Naproxen) [*id*. at 909]

[Exhibit 24, at paragraphs 41-43 (footnotes included).]

> (b)   *The policy directive imposing a two-year wait period for routine dental care subjects prisoners to prolonged pain and suffering in violation of the Eighth Amendment.*

The primary Policy Directive that Plaintiffs are challenging is the manner Defendants have applied PD 04.06.150, Dental Services, eff. 09/30/15. The evidence shows that the two-year quarantine period that this PD imposes on all inmates recently received within the prison system subjected the Plaintiffs and other inmates to pain, bleeding, loss of good teeth, loss of weight, an extraction-only policy, and chewing difficulties, to name a few. [Exhibit 24, at ¶III.A-G; *id*. at paragraph 43 ("Consequently, newly incarcerated prisoners with dental treatment needs that do not fall within the MDOC definition of Urgent Dental

Services may not receive treatment that may prevent future painful conditions for two years (unless, of course, the initially asymptomatic problem deteriorates to the point where it causes pain *that qualifies for urgent care* during the 24-month waiting period).")].

PD 04.06.150 states that "[p]risoners are eligible for routine dental services after 24 months from the first day of intake." [R. 38-3, Pg ID 408.] As discussed throughout the Declaration of Dr. Shulman, this two-year quarantine period was created to reduce the number of prisoners on the different wait lists. [Exhibit 24, at paragraph 43 ("MDOC reported that as the result of implementing the 24-month waiting period, "there has been a reduction in over 40% of the routine dental services waiting list."[34] [Exhibit 8, MDOC BHCS Staff. November, 2013, at Bates 114-15].")]. Dr. Taylor himself testified that in private practice, the standard of care requires a dentist to treat cavities "right away" to prevent tooth morbidity—a standard, it seems, that Dr. Taylor does not apply to prisoners. [Exhibit 12, Taylor, at 57-59.]

Dr. Taylor testified dental problems involving routine care can cause pain, and about 14,700 inmates were awaiting routine care before the 24-month prohibition was enacted. [*Id.* at 240-241.] These routine problems include abscesses that can cause toothaches, periodontally involved teeth that can cause

---

[34] *See also* Exhibit 11, Deposition of Dr. Choi, at 240; Exhibit 12, Deposition of Dr. Taylor, at 65-67, 74-76.

toothaches, cavities that can cause toothaches, and infections that can cause tooth pain.  [*Id.*] Routine dental problems can lead to decay, causing tooth pain and sensitivity. Inmates are subjected to unreasonably long wait times while in pain caused by these "routine" dental issues.  Some of the major deficiencies with this wait period are that even when a patient presents with cavities or fractured teeth or requires dentures, the inmate is placed on different wait lists for two years.  During those two years, care is not provided even when the inmate is in pain. Even worse, the delay in providing needed dental care to fix cavities or fractured teeth will likely result in infection to these teeth, and then they will have to be extracted. MDOC has created a de facto  extraction policy. [Exhibit 24, at n.42 ("Not only must restorations (fillings) be provided but treatment should be timely so that teeth that could be filled will not deteriorate to the point that an extraction is necessary. Systematic untimeliness in providing routine care is, in effect, a *de facto* extraction only policy and, thus, constitutionally suspect." [Shulman et al. at 56].")].

This *de facto* extraction policy is evidenced by the responses inmates receive after requesting a routine filling:

> INVESTIGATION INFORMATON:  Grievant was examined in dental clinic on April 27 and it was determined that his tooth is reparable. However, he does not qualify for a filling, which is a routine dental service because he has not been incarcerated with MDOC for 24 consecutive months. An extraction was offered to him to alleviate his pain, but he refused the offer. SUMMARY:  Grievant is grieving the policy stating he must be incarcerated with MDOC for 24 consecutive months before he

> is eligible for a filling. He refused offer of extraction to relieve
> his pain.

[*See* attached Exhibit 18, Grievance's Response to Brown, 887524, dated May 2015 (Respondent and Reviewer are both Dentists).] Further, Dr. Choi testified, in response to a question about the purpose of extraction, that "we get the major chief complaint out of patient right away, just like that day." Exhibit 11, Choi, at 324. Even though Choi admits failure to treat periodontal disease or fill a cavity can lead to tooth morbidity and extraction, MDOC continues to limit access to routine preventative care. *Id.* at 57-58, 185. Instead, MDOC allows inmates to suffer tooth pain until the tooth has so much decay that the only treatment option is extraction. In the case described above, *see* Exhibit 18, MDOC went so far as to suggests a preemptive extraction even though the tooth in question was restorable.

Defendants have claimed that a prisoner can receive emergent or urgent care at anytime through his or her incarceration. [R.116, Pg ID 2310-13.] If only this was true. Dr. Shulman found that during these two years an inmate who has complained of dental pain is often placed on non-narcotic analgesics, which could last through the two-year quarantine, and is then subject to a long wait on the wait list.[35]

---

[35] By MDOC standards, this situation would not qualify as urgent dental care. "For example, a request for care from a prisoner with a painful tooth where the pain can be controlled by an over-the-counter analgesic would be deemed to be routine care and not be expedited. This creates two problems. Assuming Mr. Johannes' delays in receiving routine care are representative of others,

> To summarize, the definition of urgent care set forth in the MDOC Dental Services Policy is too pinched and as the result, many painful conditions as well as conditions that while they are not painful, should be treated expeditiously (e.g., lost fillings and cracked teeth) to prevent further tooth morbidity.

[Exhibit 24, at paragraph 45.]   These delays, resulting in pain, are demonstrated by the months it took for Johannes to receive "routine care appointments." [*Id*. at n.39.][36]

Exhibits 18 and 19 and Paragraph 43 show the problems that exist within the MDOC with the use of the two-year quarantine list and also establish that there is likely an "extraction" policy over a policy prioritizing preservation of natural teeth.[37]

### (d) *Lengthy waits for dentures and refusal to replace broken or misplaced dentures in a timely manner*

---

prisoners with similar painful dental conditions would be subjected to prolonged exposure to medication." [Exhibit at n.38.]

[36] "Table 3 shows the median wait times in the Northern Region[57] [Exhibit 12, MDOC Emails and attachments, 2273-5][58]. The median wait times for fillings are higher in August 2014 than September 2013 while the wait time for exams has declined[59]. Since a prisoner must first have an exam before a routine procedure such as a filling or a routine extraction, the combined median wait times are of particular interest. While the August 2014 median time from kite to filling or extraction is 18, since a prisoner in 24-month quarantine may not submit a kite for an exam until the quarantine, the actual wait time may be 42 months.[60]

> 57Additional discovery will provide more comprehensive data on the dental shortage.
> 58Exhibit 12 also discusses both the shortage of staff and also the significant reduction of the number of inmates on the wait list based on the implementation of the 24-month quarantine.
> 59The distribution is wide. For example, while the August wait time for exams was 4 months, five prisons had wait times more than 10 months, with others having wait times as long as 28 and 29 months.
> 60Assuming current wait time data are similar to that from August 2014. I have not been provided with current wait time data and when I am I can revise this estimate [*See* attached Exhibit 13, Waiting Time for August 2014]."

[Exhibit  24, at paragraph 58 (including footnotes)].
[37] As this Court is aware, Plaintiff has numerous motions to compel pending before this Court that relate to the development of these two issues.

> *causes pain and suffering in violation of the Eighth Amendment.*

The final area that Defendants have mentioned as to the issues raised by Plaintiffs is dentures.  Providing of dentures when teeth are extracted and/or the replacement of dentures when they break or become useful are serious problems within the MDOC. Remarkably, Dr. Choi testified that, as Southern Dental Director of MDOC, he does not believe that prisoners need teeth to eat or function. Exhibit 11, Choi, at 335-36. As stated by Dr. Shulman.

> 30. Chewing difficulty can be caused by pain associated with decayed, broken-down, or infected teeth. This can be addressed by timely repair or extraction of the problematic teeth. Another type of chewing difficulty is the result of an inadequate number of opposing teeth.[19] This can be addressed by fabricating prosthodontic appliances (*i.e.*, dentures).[20] Tooth loss is not satisfactorily compensated for by removable prostheses since the masticatory efficiency of a denture wearer is far from matching that of a fully dentate person[21]; however, people with impaired mastication may cope with feeding by either adapting their food choices or swallowing coarse particles that make the problem a digestive one. The first type of behavior is known to induce imbalance in dietary intake, and the second may result in decreased bioavailability of nutrients and gastrointestinal disturbances. In both situations, the impaired dietary or nutrient intake may increase nutrition-induced disease risks. [*N'Gom & Woda* at 667]
>
> 31. Chewing difficulty can be caused by pain associated with decayed, broken-down, or infected teeth. This can be addressed by timely repair or extraction of the problematic teeth. Another type of chewing difficulty is the result of an inadequate number of opposing teeth.[22] This can be addressed by fabricating prosthodontic appliances (*i.e.*, dentures).
>
> 32. Tooth loss has been associated with changes in food preference and nutritional deficiency although the evidence that people whose mastication is impaired by tooth loss are more likely to be underweight is conflicting [Sheiham et al. at 703].  Individuals with limited chewing ability are at risk for nutrition problems that have different physical manifestations. First, chewing may be so painful that an individual has an

inadequate caloric intake – as evidenced by weight loss and reduced Body Mass Index ("BMI"). Second, people with a compromised dental status may avoid hard-to-chew foods and instead choose processed foods, favoring the absorption of cholesterol and saturated fatty acids, or may prefer simple carbohydrate-rich diets that are high in calories but low in dietary fiber, vitamins, and protein, thus leading to weight gain. [Sánchez-Ayala et al. at 120] In this case, weight gain would be *pathologic* and not evidence that the individual had no chewing difficulty.

34. While one might naively assume that weight gain necessarily is evidence of an absence of chewing problems, prisoners generally gain weight during incarceration [Gates and Bradford at 4]. Whether this is due to lack of physical activity, the effects of medication, stress, or commissary purchases[23] is unresolved.

19 Opposing teeth are teeth that are positioned so that they can crush or tear food between them. In the absence of opposing teeth, food is crushed against soft tissue – which can be a source of pain.

20 While prescribing a soft diet may be a short-term solution until the denture is fabricated, edentulousness can be a serious problem since it reduces chewing performance and affects food choice.

21 While the chewing efficiency of removable dentures is less than that of n1tural teeth, dentures 1) do improve chewing efficiency and 2) protect the soft tissue from abrasion from food during chewing.

22 Opposing teeth are teeth that are positioned so that they can crush or tear food between them. In the absence of opposing teeth, food is crushed against soft tissue – which can be a source of pain.

23 Food purchases from the commissary (many of which also are only an approximation of what offenders consume instead of, or in addition to, their institutional meals. Offenders sometimes engage in proxy purchases for other offenders or trade commissary goods as a form of currency. Moreover, goods from the commissaries include food items, many of which are processed high sodium and high fat content foods [Gates and Bradford at 6].

[Exhibit 24, at paragraphs 30-33 (footnotes included).] *See also* attached for a very long time indeed."  Exhibit 19 (email dated 3/25/15), where the RN states that based on how the present MDOC's policy is applied, inmates who are on the waiting list for a prosthetic "may be waiting

### ii. DEFENDANTS, IN THEIR SUPERVISORY AND DIRECTORIAL AUTHORITY OVER DENTAL CARE IN MDOC, CAN BE HELD LIABLE FOR DELIBERATE INDIFFERENCE IN THIS ACTION.

Defendants claim that they did not have the requisite personal involvement to be held liable for deliberate indifference to dental needs. [R.116, Pg ID 2319-36.]  As this Court acknowledged in its *Opinion and Order Denying Without Prejudice Plaintiffs' Motion for Class Certification*, this lawsuit is a challenge to the application of the policy to the entire prison population and not to individual inmates. [R.105] Because Plaintiffs are making a statewide challenge to the systemic failure to provide constitutionally adequate dental care, the Director of the Department of Corrections is a proper party.[38]  Courts have recognized that a supervisor may be liable if a policy he enacted is implemented in a manner that subjected individuals to a violation of their constitutional rights.

> "A supervisor may be liable if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Hansen v. Black,* 885 F.2d 642, 646 (9th Cir.1989). "Supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'" *Redman v. County of San Diego,* 942 F.2d 1435, 1446 (9th Cir.1991) (quoting *Hansen,* 885 F.2d at 646).

---

[38] It is the intent of the Plaintiffs to file a motion for leave to file another amended complaint within the next three weeks, which would add the two Regional Dental Directors and other named plaintiffs.  [R.105, at 21 n.4.]

[*See* attached Exhibit 19, *Woods v. Carey*, No. CIVS041225LKKGGHP, 2006 WL 548190, at *5 (E.D. Cal. Mar. 6, 2006) *report and recommendation adopted,* No. CIVS041225LKKGGHP, 2006 WL 2792847 (E.D. Cal. Sept. 28, 2006) *rev'd and remanded on other grds.,* 684 F.3d 934 (9th Cir. 2012). *See also Tate v. Coffee Cnty, Tenn.*, 48 Fed.App. 176 (6th Cir. 2002) (unpublished) (citing *Redman v County of San Diego*, 942 F.2d 1435, 1446-47 (9th Cir. 1991)) ((suggesting that a supervisor could be liable for instituting a "prison policy for responding to medical requests [that] was inadequate and was putting the inmates at serious risk.").] Defendant Washington, as the Director of the MDOC, is responsible for ensuring that constitutionally adequate dental care is provided to all inmates. Her failure to ensure that the constitution is followed authorizes this Court to issue an injunction against her.

Defendant Sanders is responsible for providing dental care to those prisoners confined at Adrian-North, which holds approximately 1500 inmates. Based on the unconstitutional dental services Defendant Sanders provided to Plaintiff Johannes, he likely subjects other prisoners to the same unconstitutional dental care. Defendant Sanders has established what is policy and practice is when providing dental, which ultimate is lacking and is such that Johannes was subjected to pain months after months.

### iii. CONTRARY TO DEFENDANTS' CLAIMS, THERE EXIST GEUINE QUESTIONS OF MATERIAL FACT AS TO WHETHER NAMED

### PLAINTIFFS RECEIVED CONSTITUTIONALLY ADEQUATE DENTAL CARE.

**Woroniecki:**  Defendants have claimed that because Woroniecki liked his dentist and thought the dentist was doing everything he could, Defendant Washington is not liable for Woroniecki's pain and suffering throughout his long wait for dentures. [R. 116, at 2321-23.]

A review of the summary of Woroniecki's dental records reveals that everything was not as rosy as painted by the Defendants. Woroniecki was subjected to unnecessary pain due to the long wait imposed on him before he could receive dentures.

> 83. Mr. Woroniecki's 6/21/12 intake exam noted poor oral hygiene, heavy calculus, and moderate periodontal disease, many unrestorable teeth, several (restorable) teeth with decay [Exhibit 17, Woroniecki, at 1]. He kited for a toothache 6/27/12 [*id.*] and had several teeth extracted 7/11/12 (after 14 days) [*Id.* at 2]. He kited for a toothache 7/17/12 ("Pt. complained of toothache will schedule at DWH") [*Id.* at 3].
>
> 84. He kited again 10/8/12[79] ("I had teeth pulled in Quarantine + the left half a root in my upper jaw + hurts [*sic*]") and was advised, "You will be seen as staff and time permit. You can buy pain medication from the prisoner store to help with the discomfort" [*Id.*].  He was seen 10/23/12 (15 days later and 98 days after his 7/17/12 kite) and several teeth were extracted [*Id.* at 4-5].
>
> 85. He kited again 10/31/12 ("Pt. complained of pain, can't sleep, Ibuprofen doesn't help, need teeth pulled")[80] [*id.* at 6] and 11/30/12 ("I am having a lot of pain and the meds are not working, am having trouble sleeping") [*id.*] and was seen 12/3/12 (33 days after his 10/31/12 kite) at which time several teeth were extracted [*Id.* at 6-7].[81]
>
> 86. He kited 2/21/13 wanting his teeth cleaned, dentures, and an exam and stating that "all his teeth hurt". He was advised that, "[y]our name will be added to the cleaning list" [*Id.* at 9].[82] He kited again 3/8/13 ("Pt. complained of teeth hurting, need to be pulled, IBU not working,; list to be scheduled with an available DDS") [*Id.*]. He was examined by a

dentist 5/2/13 (70 days after his 2/21/13 kite stating pain) and several teeth were extracted [*Id*. at 9-10].

87. He kited 5/21/13 ("Pt. complained of pain in the top part of my mouth. I really need to get them pulled. Response: You will be seen as soon as we are able") [*Id*. at 12]. He was seen 5/23/13 (2 days after his kite stating pain). The dentist noted, "patient HAS NEVER HAD EXAM AND TREATMENT PLAN. NOR HAS HE EVER KITED FOR EXAM, ROUTINE CARE, OR POSSIBLE PROSTHETICS" [emphasis in original][83] Several teeth were extracted [Exhibit 17, at 12-13].

88. He kited 5/28/13 for a cleaning, exam and dentures and was advised, "Your name is in the cleaning and exam list. The list is long" [*Id*. at 13]. He kited 7/22/13 ("Pt. complained of pain in the bottom tooth. Constant throbbing and hard time sleeping") and was seen that day at which time a treatment plan was performed. Among the findings was "advanced periodontal involvement" [*Id*. at 13-14]. He was prescribed an antibiotic and an analgesic and the teeth were extracted 8/1/13 [*Id*. at 14-15].

89. His last extractions were performed 9/18/13 [*id*. at 15-16] and he kited for denture impressions 12/23/13 and was advised, "Per new policy you will not be eligible for routine treatment until 6/2014 [*Id*. at 16]. He kited 6/10/14 and was advised that he was placed on the exam list [*Id*.]. He kited 9/4/14 requesting a soft diet and was seen by Dr. Murphy who noted, "Discussed with patient and now he will stay on the normal chow line without the soft diet" [*Id*. at 16-17]. Denture impressions were made 11/24/14 [*id*. at 17] and the dentures were delivered 5/27/15 [*Id*. at 18].

90. To summarize, Mr. Woroniecki had an initial (intake) examination 6/21/12 at which time a panoramic radiograph was taken and his mouth was charted. It was noted that he had poor oral hygiene, heavy calculus, and moderate periodontal disease. There is no documented periodontal probing (*i.e.*, PSR). There was no documented treatment plan and as the result, his treatment was episodic until the 7/22/13 treatment plan (396 days after his intake exam). During that period, he had continual pain[84] and one episode of palatal cellulitis, a potentially life-threatening infection.

91. Table 5 shows Mr. Woroniecki's periodontal assessments, which were performed without documented probing. Moreover, while he was identified as having moderate periodontal disease, the appropriate non-surgical treatment (scaling and root planning) was neither authorized nor performed. In fact, no treatment for his periodontal condition, ***not even an oral prophylaxis*** was provided.

| Table 5.  Mr. Woroniecki's Periodontal Assessments | | | | |
|---|---|---|---|---|
| Date | Periodontal Class | Reason | Periodontal Procedures Planned | Page |
| 6/21/12 | Moderate | Intake exam | | Exhibit 17, at 1 |
| 7/22/13 | Advanced | Examination | | Exhibit 17, at 1 |

92. Furthermore, since a treatment plan was not performed at the intake examination, the moderate periodontal disease that was identified was not indicated for treatment.[85] Since periodontal probing was not documented, the extent and even the location of the periodontal lesions are unknowable from the dental chart. It is interesting to note that the 7/22/13 treatment plan noted, "advanced periodontal involvement"[86]; however, periodontal probing was not documented. At no time until the 7/22/13 treatment plan (when Mr. Woroniecki's remaining teeth were indicated for extraction), was the need for periodontal treatment charted.[87] [Exhibit 17, at 13-14] Mr. Woroniecki's care was episodic without a treatment plan. This deficiency, in conjunction with the untimely care that is consistent with understaffing and MDOC's 24-month quarantine policy was responsible for gratuitous pain.

79 Note that 83 days passed since his 7/17/12 kite for pain without his being seen [Exhibit 17].

80 He was advised, "You have been placed on the waiting list. You will be called out in the order your name comes up".

81 The dentist noted (*inter alia*), "Exam reveals that a retained palatal root tip is present at recent (over 20 weeks ago) extraction site #3 [*id.*]". His assessment was, "Palatal cellulitis secondary to retained root tip of grossly carious tooth #3 [*id.*]". The point here is not that the palatal root of #3 was negligently left in Mr. Woroniecki's mouth but rather the 33-day delay in responding to his kite for a toothache, allowed a cellulitis to develop. Cellulitis is an acute spreading infection involving the skin and subcutaneous tissues without suppuration.

82 Note that his pain issue was not addressed.

83 However, text notes 10/8/12, 10/23 and report *inter alia*, "Also need to be signed up for dentures" and 10/31/12 ("Patient requested teeth cleaned, exam"), 3/6/13 ("Pt. requested teeth cleaned, exam, prosthetics, already on the list per kite 2/21/13").

84 Note, however, that his first request was 10/31/12. [Exhibit 17]

86 His kites for pain generally resulted in untimely dental examinations.

85 Typically, the appropriate treatment includes an oral prophylaxis (sometimes referred to as a cleaning) and scaling and root planing.

86 The 6/21/12 intake examination noted moderate periodontal disease.

87 My point is not that the failure to document periodontal probing and treat Mr. Woroniecki's moderate periodontal disease timely was the proximate cause of his tooth loss but rather such policies and practices place all dentate prisoners at risk of harm. As an oral epidemiologist who has studied and written about oral disease progression, I am confident that in any population of dentate adults, untreated moderate periodontal disease can progress at varying rates over time to the point that the health of teeth in some individuals will be jeopardized.

[Exhibit 24, at paragraphs 83-96 (including footnotes)]. As Defendants noted, Woroniecki coped with his dental pain by experimenting with different foods from the prison store to determine what he could eat most easily. [*See* attached Exhibit 22, Deposition of Woroniecki at 55.] Over the many months he spent without dentures, Woroniecki learned how to cut and soften store-bought food to consume with minimal pain. [*Id.* at 57-58.] Additionally, he bartered food items he was unable to eat with other prisoners to obtain softer foods. [*Id.* at 55.] He resorted to these tactics, and gained weight as a result of the unhealthy diet, [*id.* at 52, 58], because the Defendants refused to provide him with adequate dental care. Based upon the above, Woroniecki was subjected to pain in an unconstitutional manner.

**Stephenson**:  Defendants reference Stephenson and try to paint the delay in receiving his dentures as nothing more than "inadvertent delay in the processing of his denture." [R. 166, at Pg ID 2323-2324.]   This statement that it was an ""inadvertent delay in the processing of his denture" was made by prison staff, and not Stephenson himself. Stephenson was never given a reason why it was

"inadvertent" that he had to wait so long to get his dentures. [*See* attached Exhibit 20, Stephenson's Deposition, at 44-45.]

A review of the summary of the dental records of Stephenson shows that everything was not as rosy as painted by Defendants' counsel. Stephenson was subjected to unnecessary pain due to the long wait imposed on him before he could receive dentures.

> 98.   Roger Stephenson is edentulous and had a set of dentures delivered 12/1/08 [*See* attached Exhibit 19, Stephenson's Dental Summary, at 8]. On 11/8/10 kited that his upper denture had broken [*Id*. at 9]. After it was repaired 12/8/10 [*id*.], he kited 1/3/11 that it broke in the same place [*id*.] and it was repaired 1/20/11 [*Id*.]. He kited 5/31/11 wanting to know if he qualifies for new dentures "because they are loose and the adhesive is not working" [*Id*. at 10]. A chairside reline of the upper denture was performed 6/6/11 [*id*.] and the lower denture was relined 7/6/11 [*Id*.].
> 98.   He kited 6/13/12 that the upper denture had broken and was seen 6/29/12 [*Id*. at 11]. The note states that he did not want to leave his denture for lab repair.[] He was placed on the prosthetics list 10/25/12 [*id*.] and the dentures were delivered 6/17/14 [*id*. at 13]– after 600 days. To summarize, a 600-day wait for dentures is untimely and is consistent with understaffing.

[Exhibit 24, at paragraphs 98-99 (footnotes excluded).] Based upon the above, Stephenson was subjected to pain in an unconstitutional manner.

**Turner**:  Once again, Defendants seek to view Turner's situation through rose-tinted glasses, when the truth is nowhere as rosy.  Defendants mention Turner ordering items from the store, [R.116, Pg ID 2325-26], but intentionally omit that Turner said many of these items were purchased for bartering with other inmates [*See* attached Exhibit 21, Turner's Deposition, at 84, 110]. Some of the goods

listed by Defendants were soft items, such as summer sausage, that could be more easily eaten without dentures. [*Id*. at 103-04.] Turner also stated that many of these items are broken up, made into a candy, and then sold. [*Id*. at 106-07.] No dentist ever offered Turner a soft diet, and when he requested one he was still not given a soft diet. [*Id*. at 111.] When MDOC refused to provide Turner with much needed dentures, Turner experienced difficulty and pain eating on a regular basis. [*Id*. at 113-15.]

A review of the summary of Turner's dental records shows that everything was not as rosy as painted by Defendants' counsel. Turner experienced unnecessary pain due to the long wait before he could receive dentures.

93. Mr. Turner's 12/17/10 treatment plan documented several mobile teeth and he was informed that he had severe bone loss around his maxillary and mandibular anterior teeth "suggestive of periodontitis" ("Perio findings: moderate about posterior teeth, advanced about central incisors"). There is no documented periodontal probing (*i.e.*, PSR) of any teeth. The planned treatment comprises several fillings and a prophy – with no mention of scaling and root planing. The note states that he is on the IBC fill list since 7/26/10 [*See* attached Exhibit 18, Turner's Dental Summary, at 6]. Two teeth were filled on 2/9/11 – after waiting 218 days [*Id*. at 9].

94. Tooth #8 and 9 was extracted on 3/9/11 due to periodontitis [*Id*. at 10-11].[88] He had an oral prophylaxis 3/16/11 ("Radiographic bone loss present"). Periodontal probing was not documented [*Id*. at 12]. Teeth #20 and 21 were filled 4/21/11 [*id*. at 13] – after 36 days. There is a 5/6/11 dentist's note ("Evaluated general perio. condition for possibility of upper partial denture. It was determined that tooth #7 would need to be removed prior to fabrication of the partial denture.") [*Id*. at 13-4]. There is no documented periodontal probing. Impressions were taken and a partial denture was delivered 12/8/11 [*Id*. at 15].

95. He was referred from his housing unit 3/29/13 with swelling that was determined to be an abscess due to "advanced periodontal involvement"

56

[*Id*. at 17]. Tooth #2 was extracted on 1/27/14 after being asymptomatic for several months [*Id*. at 18-19]. On 9/2/14 #25 was extracted due to advanced periodontitis [*Id*. at 20-1].

96. Table 6 shows that Mr. Turner's full-mouth periodontal assessments made from 6/30/04 to 3/23/15. While he was consistently assessed as having moderate or advanced periodontal disease, no treatment other than oral prophylaxes were provided. While an oral prophylaxis is the first step in periodontal therapy, it is insufficient in itself to address moderate advanced periodontal disease.

| Table 6.  Mr. Turner's Periodontal Assessments | | | | |
|---|---|---|---|---|
| Date | Periodontal Class | Reason | Periodontal Procedures Planned | Page |
| 6/30/04 | Moderate | Initial exam | | Exhibit 18, Turner's Dental Records, at 1 |
| 2/2/06 | Moderate / advanced[89] | Initial exam | | Exhibit 18, at 3 |
| 6/8/07 | Moderate | Intake exam | | Exhibit 18, at 4 |
| 12/17/10 | Moderate / advanced[90] | Exam / treatment plan | Prophy | Exhibit 18, at 7-8 |
| 3/9/11 | Advanced | Exam / treatment plan | | Exhibit 18, at 11 |
| 3/16/11 | Radiographic bone loss | Prophylaxis | | Exhibit 18, at 12 |
| 9/24/14 | No pathology | Focused exam | | Exhibit 18, at 22 |

97. He kited 1/27/14 that his partial denture was lost or stolen [Exhibit 18, at 18] and kited again on 10/3/14 [*id*. at 22]. A decision was made to make another partial denture on 10/31/14 and a try-in (the penultimate step and the last chart entry) is documented 3/23/15 [*id*. at 23]– 420 days after the 1/27/14 kite.

98. To summarize, while Mr. Turner has been treated by MDOC dentists since 10/23/02, the first documented treatment plan does not appear until 12/17/10, more than seven years after his admission. Moreover, while moderate and advanced periodontal diseases are documented, there is no documented periodontal probing nor did he receive appropriate non-surgical treatment for moderate and advanced periodontal disease, scaling and root planning.[91]

88 Moderate about posterior teeth and advanced about central incisors.

89 My point is (as with Mr. Woroniecki) not that the failure to document periodontal probing, and treat Mr. Turner's moderate and periodontal disease timely was necessarily the proximate cause of his tooth loss but rather such policies and practices place all dentate prisoners at risk of harm. As an oral epidemiologist who has studied and written about oral disease progression, I am confident that in any population of dentate adults, untreated moderate periodontal disease can progress at varying rates over time to the point that the health of teeth in some individuals can be jeopardized.

90 Moderate about posterior teeth and advanced about central incisors.

91 My point is (as with Mr. Woroniecki) not that the failure to document periodontal probing, and treat Mr. Turner's' moderate and periodontal disease timely was necessarily the proximate cause of his tooth loss but rather such policies and practices place all dentate prisoners at risk of harm. As an oral epidemiologist who has studied and written about oral disease progression, I am confident that in any population of dentate adults, untreated moderate periodontal disease can progress at varying rates over time to the point that the health of teeth in some individuals can be jeopardized.

[Exhibit 24, at paragraphs 93-98 (including footnotes.)]   Based upon the above, Turner was subjected to pain in an unconstitutional manner.

**Johannes**:   Defendants are claiming that Johannes has no cause of action because most of his injury occurred either outside the statute of limitations or before PD 04.06.150 was effective in October of 2013 [R.116, Pg ID 2326-2336.] As to the statute of limitations argument, Plaintiffs assert that his claims are valid under the continuing violation doctrine.[III.A, *supra*.]

Defendants first argue they are not responsible for providing Johannes's dental care due to how bad his teeth were upon his arrival at prison. [R.116, at 2327-28.] Plaintiffs are unaware of any court ruling that an inmate with a pre-existing condition need not receive constitutionally adequate dental care.

Defendants' second argument is Johannes receive extensive dental care between July 1, 2008 through April 28, 2011. [R. 116, Pg Id. 2328-30.] Even extensive dental care violates the Eighth Amendment when it is inadequate and causes needless pain. As set forth in the Shulman's Declaration, the dental care provided to Plaintiff was anything but adequate. [Exhibit 24, paragraphs 59-77.] The waiting time that Johannes was subjected to was clearly excessive and caused him constant pain.

> 77. To summarize, Mr. Johannes' grievances, supported by the clinical record of his treatment state a clear case for his having received untimely care. Even when seen by Dr. Sanders, the treatment that had been identified was often not performed. Mr. Johannes' treatment over this period has been episodic. Both the assessment of his periodontal condition and the treatment of his documented periodontal problems were inadequate since it did not employ periodontal probing (the standard of care for more than two decades) and did not perform scaling and root planning, the generally accepted non-surgical treatment for moderate or advanced periodontal disease.

[*Id*. at 77.]

Defendants' fourth argument is that from April 28, 2011 through March 13, 2013, Johannes received appropriate treatment of his dental issues. Expert Shulman does not agree. Further, Johannes does not concede that his claim is barred as to any incidents that occurred before April 28, 2011. Johannes asserts that he is subject to the continuing violation doctrine in response to Defendants' statute of limitations defense. [III.A, *supra*.]

Defendants' fifth argument is that Johannes has received dental care from other dentists. [R.116, Pg ID 2333-36]  Defendants also complain that Plaintiff did not name any of these other dentists who provided him service. [*Id.*]. Johannes is seeking injunctive relief against the Director of MDOC for failing to provide constitutionally adequate dental care. Based on Johannes's requested relief, he is not required to name the agents of the Director of the MDOC.

Defendants' sixth argument is that the 2-year quarantine does not apply to Johannes. [R.116, Pg ID 2335.] Johannes has never claimed that it did apply to him.

Defendants' seventh argument is that Johannes's complaint of malnourishment is not supported by the record [R.116, Pg Id. 2335-37]. Johannes asserts that his malnourishment claim is well-supported. Notwithstanding, this is a non-issue because Johannes has suffered, as evidence by Dr. Shulman's report, sufficient injury to state a claim against Defendants regardless of any malnourishment.

A review of the Declaration of Shulman that is set forth in the Statement of Facts, *supra*, shows that Plaintiff has never been provided constitutionally adequate dental care, and he was subjected to unreasonable pain and suffering for years.

## CONCLUSION

WHEREFORE, for the reasons stated above, the case law, and the exhibits, this Court should find that there exists a genuine issue of material fact and deny Defendants' motion for summary judgment.

Respectfully submitted,

s/ Daniel E. Manville_____
Daniel E. Manville, (P 39731)
Director, Prisoners' Rights Clinic.

Anne Puluka
Charnita Johnson
Clinical Law Students

Co-Counsel for Plaintiffs
610 Abbot Rd.
East Lansing, MI.  48823
(517) 913-9690
daniel.manville@law.msu.edu

### PROOF OF SERVICE

I, Daniel E. Manville certify, under penalty of perjury, that on December 4 2015, I caused a copy of the above document to be served by efiling on Defendants' counsel.

/s/ Daniel E. Manville
Daniel E. Manville