UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOEY DEARDUFF, NICHOLAS
BAILEY, MELVIN BROWNES,
TIMOTHY BROWNWELL, TIMOTHY          No. 2:14-cv-11691
FLESSNER, JAMES GUNNELS, LEON
MEANS, JOHN PORTER, ANTHONY         HON. LAURIE L. MICHELSON
RICHARDSON, CAROL ROMAN,
BRYAN SLONE, and TINA STOLL, on     MAG. MONA K. MAJZOUB
behalf of themselves all others similarly
situated,
        Plaintiffs,
v
HEIDI WASHINGTON, Director,
Michigan Department of Corrections,
JONG CHOI, Dental Regional Director,
they are sued in their official capacities,

        Defendant.

_____/

Daniel E. Manville (P39731)           Rock Wood (P41181)
Attorney for Plaintiffs               A. Peter Govorchin (P31161)
Michigan State University College of Law   Lisa C. Geminick (P60964)
P.O. Box 1570                         Assistant Attorneys General
East Lansing, Michigan 48826          Attorneys for Defendants
517.336.8088, ext. 1137               Civil Litigation, Employment & Elections
                                      Division
Robert Gittleman (P14025)             P.O. Box 30736
Tracie Gittleman (P45176)             Lansing, Michigan 48909
Attorneys for Plaintiffs              517.373.6434
31731 Northwestern Hwy, Ste. 101E
Farmington Hills, Michigan 48334
248.737.3600

_____/

**ANSWER OF DEFENDANTS WASHINGTON AND CHOI TO
PLAINTIFFS' FOURTH AMENDED COMPLAINT**

PRELIMINARY STATEMENT

Defendants Heidi Washington, Director of the Michigan Department of

Corrections (MDOC) and Jong Choi, Southern Region Dental Director and Acting

Northern Region Dental Director (hereafter "Defendants") who are being sued in

their official capacity only, answer Plaintiffs' Fourth Amended Complaint as

follows:

Defendants admit that the MDOC's Dental Services policy, PD 04.06.150

was amended effective September 30, 2013 in two material areas relevant to this

suit:

First, to more effectively balance the MDOC's dental resources to the

prisoner population's serious dental needs, the dental services policy prioritized

urgent dental needs over routine/non-serious dental needs and instituted a two-year

qualification period before prisoners could request routine/non-serious dental care.

Second, the revised policy created a dental stabilization center at the

Reception and Guidance Center so newly arriving prisoners could be assessed to

determine if they had any serious dental needs at intake.

In addition, simultaneously, and improved from time to time since

September 30, 2013, a state wide Routine Dental Appointment List (RDAL) was

created so that, after serving two continuous years of incarceration, prisoners

requesting routine/non-serious dental care could be scheduled and provided service

2

in as fair a manner as practical. The RDAL is a dynamic list with additions and removals from the RDAL happening potentially at every dental clinic on every day that the dental clinics are open. The RDAL may be retrieved on a location served basis at any time by the dental clinic staff.

A further clarification provided that a prisoner with an urgent/serious dental condition would be seen at any time the condition presented, whether the condition presented during the first two years of incarceration or later, while a prisoner was on the RDAL, or at any other time. When an urgent condition was made known to dental staff, the dental staff have endeavored to clinically address the urgent/serious dental condition within three days or less themselves or by referral to health care.

## PARTIES AND FACTS

1.      Defendants admit that Plaintiff **Dearduff** #732738 is a prisoner who has been in the continuous custody of the MDOC since approximately May 17, 2013 to the present. At the intake dental screening, Dearduff reported that he had not been to a dentist in 2-5 years, possibly going back to his previous incarceration. Over the next seven months, Dearduff received a series of exams and urgent dental services including extractions of teeth #1 and #2, with tooth #2 having been broken for two years and being tender to percussion and the extraction, as unrestorable, of

3

teeth #7, #8, #9 and #10 by September 2013. In October 2013, Dearduff had tooth #16 extracted as unrestorable.

Dearduff's dental record indicates he requested prosthetics on December 13, 2013 which request was denied as prosthetics are a routine dental service addressing a routine dental need – in Dearduff's case, he was then missing 8 of 32 teeth (## 1, 2, 4, 7, 8, 9, 10, 16). Plaintiff Dearduff was seen on March 13, 2014 for a complaint about pain in tooth #3. Plaintiff Dearduff's chart indicates that his tooth #14 had been treated with a root canal prior to his return to incarceration but was noted to be unrestorable at his June 3, 2013 screening. Plaintiff was seen on April 29, 2014 about Tooth #14 described as occasionally painful but was not then in an emergency condition. Dearduff was scheduled for extraction, which occurred on June 4, 2014.

Plaintiff Dearduff received a full dental exam (as compared to a focused exam that focuses on the complaint being presented) on December 3, 2015. Dearduff was scheduled for periodontal debridement, which was provided on December 10, 2015. Since December 2015, Plaintiff Dearduff has received regular periodontal care, restorations, and additional extraction but still has too many remaining useable teeth to qualify for a denture. On September 26, 2016 Plaintiff Dearduff requested that the dentist extract six additional teeth so he would qualify for a denture. Plaintiff Dearduff's request was denied as the dentist declined to

4

extract teeth for a non-medically necessary reason. Between September 26, 2016 and January 16, 2018, Plaintiff Dearduff did not request any dental services. As to any other allegations in this averment, they are denied as untrue.

2.      Defendants admit that Plaintiff **Bailey** #970872, 24 years old, is presently incarcerated in the MDOC, having arrived approximately April 15, 2016. At Plaintiff Bailey's intake dental screening on April 25, 2016, it was noted that Bailey had 21 present but unrestorable teeth due to dental carries; that teeth #2, #3, #13, #14, and #15 had been restored (had amalgam fillings) and that teeth #6, #20, #22, and #24 had no observed problems. Only tooth #32 was missing.

Bailey complained of pain on May 11, 2016 and teeth #1, #2, #4, #26, #27, #28, #29, #30 and #31 were extracted. On June 1, 2016 Bailey explained that he had a Cradle Rock and Mountain Dew addiction and it was noted that Bailey's teeth ##17-25 should be extracted as unrestorable. The extraction of these teeth occurred on June 9, 2016. On July 8, 2016 Bailey's teeth #10, #11, and #12 were extracted as unrestorable. On August 4, 2016 Bailey's teeth ##13-16 were extracted as unrestorable. On August 30, 2016 Bailey's teeth ##3-9 were extracted.

On September 30, 2016 Bailey submitted a kite complaining of difficulty eating without teeth. Dental services responded that Bailey had agreed to the extractions on June 1, 2016 after it had been explained that he would not be eligible for dentures until 2018 and he had consented to the extractions. On

5

October 5, 2016 Bailey was offered a soft diet. A soft diet was offered again on November 2 and November 22, 2016. Bailey declined the detail for a soft diet explaining that the food served was already soft.

Bailey was offered a soft diet again on February 16, 2017 and May 17, 2017. On June 26, 2017 a remaining root tip from tooth #15 was extracted. A pureed diet was ordered for Bailey. On July12, 2017 Bailey informed dental that he no longer wanted the pureed diet so a regular diet was ordered for him.

On November 14, 2017 Bailey complained that he could not eat. He was weighed in at 182 pounds that date, compared to his weight on arrival at the Reception Center of 165.8 pounds on April 21, 2016. Bailey was offered the pureed diet but refused. Bailey will be eligible to request dentures as of April 15, 2018.

As to any other allegations in this averment, they are denied as untrue.

3.      Defendants admit that Plaintiff **Brownell** #656313 has been incarcerated with MDOC since approximately August 9, 2007. As pertaining to Plaintiff Brownell's claim in this suit, after having seen the dentist in February, April, June, and November, 2016 for various restorative and periodontal treatment care, Brownell requested an exam. This is routine care and a prisoner may request an exam annually after having been incarcerated for two continuous years. Brownell received his exam on January 11, 2017 where he received a treatment

plan for a teeth cleaning, filling for tooth #15 and an assessment of tooth #14. Brownell's teeth cleaning was completed on February 23, 2017, noting that his personal oral hygiene was poor.

On May 26, 2017, Brownell was seen for an urgent kite received on May 25, 2017. The issue turned out to be a fracture of tooth #31, which was restored that day with glass ionomer. Tooth #31 had no apparent pupal involvement. Tooth #14 was also examined and shown to have gross decay and abscess. Brownell accepted the restoration of tooth #31 but refused the recommended extraction of tooth #14. Brownell requested a root canal but that particular treatment to address the issue is not offered in the MDOC. An extraction resolves the condition by alleviating associated pain and greatly reducing the risk of infection. On June 29, 2017 Brownell agreed to the recommended extraction, which resolved the discomfort associated with the infected tooth.

As to any other allegations in this averment, they are denied as untrue.

4.     Defendants admit that Plaintiff **Bownes** #172328 (misidentified, according to Plaintiffs' counsel, in the Fourth Amended Complaint) is serving on his sixteenth felony conviction resulting in incarcerations going back to 1983. Plaintiff Bownes was most recently discharged from custody on October 11, 2013 and returned to his present custodial placement on March 23, 2016.

Having been out of prison for nearly two and a half years, Plaintiff Bownes

received his intake dental screening on March 25, 2016. Bownes had no urgent

dental issues. On May 2, 2016 Bownes kited for a routine dental exam. Bownes

was informed that he was eligible to request a routine dental exam after two years

of current continuous incarceration. Bownes kited for the same routine dental exam

in July and August 2017 and was informed of the eligibility criteria. Bownes will

be eligible to request a dental exam after March 23, 2018. Between August 23,

2017 and January 16, 2018 Bownes did not submit any additional kites and

complained to dental of no dental problems. As to any additional allegations in

this averment, they are denied as untrue.

5. Defendants admit that Plaintiff **Flessner** #703698 has been

incarcerated since August 17, 2015. On August 27, 2015 Flessner was seen for his

intake dental screening. His oral hygiene was poor and his calculus was heavy.

Flessner was referred to the Duane Waters Dental Stabilization clinic. He was

seen on September 23, 2015 the dentist noted that two of Flessner's teeth were

severely decayed, being teeth #22 and #29. Tooth #22 had pulpal involvement but

#29 did not appear to have pulpal involvement. The dentist recommended

extractions but Flessner refused, signing a release of responsibility.

Nineteen months later, on April 10, 2017, Flessner kited saying he had a

sore lower right tooth. Flessner was scheduled for the next clinic day and he

8

agreed to wait until then. Flessner was seen on April 14, 2017. The clinical exam revealed rampant decay with periodontal disease. Flessner was advised to complete the exam and the dentist would attempt to restore the tooth but Flessner would have to have teeth with pulpal involvement removed. Patient left but was told to kite if pain exacerbates. Flessner left and did not kite for any dental care from April 14, 2017 through January 16, 2018.

6.      Defendants admit that Plaintiff **Gunnels** #186011 returned to MDOC custody on October 20, 2016 with his eighth felony. He was seen for his intake dental screening on October 24, 2016 and presented without teeth or dentures. Gunnels had been issued dentures during a previous incarceration on June 4, 2010. Gunnels reported during his intake exam that he had not been to a dentist for between five and ten years. Gunnels requested dentures on December 9, 2016 and was informed that dentures are a routine dental service and he would not be eligible until October, 2018. There was no indication as to how long Gunnels had been without his 2010 dentures or any observable problem with Gunnels' edentulous condition.

On March 2, 2017 Gunnels was informed that if he had dentures before he came to prison he could have them mailed in to him for his use.

On November 28, 2017 Gunnels kited for dentures and was told he was not eligible. There are no other entries indicating any problems for Gunnels up through January 16, 2018.

As to any other allegations in this averment, they are denied as untrue.

7. Defendants admit that Plaintiff **Means** #131310 returned to MDOC custody on July 1, 2015 on his tenth felony conviction. Means was seen in 2009 in preparation for dentures but was released from prison before they could be made. When Means returned to prison and was seen for his intake exam on July 6, 2015 he was noted to be edentulous and there is no indication he had dentures with him. Means did not kite dental again until October 4, 2016 asking about dentures. He was not yet eligible for the routine/non-serious dental care. On July 6, 2017 Means kited to get on the prosthetic list.

On September 11, 2017 Means was seen for a full exam and a treatment plan for prosthetics. His final impression (the first formal step for production of dentures) was taken. On November 30, 2017 Plaintiff Means received his full dentures.

8. Defendants admit that Plaintiff **Porter** #154033 has been incarcerated with the MDOC since May 29, 1978. Plaintiff Porter is now just over 80 years old. Defendants also admit that Porter received an upper and lower partial denture on November 6, 2014. Since receiving his upper and lower partial dentures, Porter

10

had tooth #27 extracted on April 6, 2015, tooth #9 extracted on July 12, 2016, and teeth #7 and #10 extracted on April 25, 2017.

Defendants admit that the dental clinic received a kite from Porter on May 8, 2017 complaining that Porter's partial denture was broken. A broken denture may be repaired before the five-year period to replace an existing denture.  Porter was seen the next day, on May 9, 2017, but he did not bring his broken denture to the clinic to have it repaired.  At his visit, Porter claimed he had lost his denture and did not want to return to his housing unit to get it.  Porter was told he would need a new dental exam but refused the exam because he said he did not want to pay the $5 co-pay. Porter was told that he was not eligible for a new fabrication of his dentures because of the five-year period (which is true if his condition has not materially changed).

Porter returned to the clinic on May 17, 2017 where a final impression was taken to try a partial upper and lower repair (The "lost" dentures having apparently been found) by attempting to add in the missing teeth. The attempt to add in the missing teeth failed. Porter was given a 180-day soft mechanical diet and told he could not receive a new denture under the dental policy because it had been less than five years since he received his partials.

Defendants believe this conclusion is a mistaken interpretation of the dental services policy and have clarified that issue with the clinic.  Porter's dental

11

condition has most likely changed so much that making partial dentures for him now is more like providing new dentures for his current condition than replacing his existing partials.

Porter was called back to the clinic to receive an exam, preparatory to taking the final impressions for fabricating new partials to address Porter's changed dental condition. Porter will be charged the mandatory $5 co-pay for the necessary exam, but the exam will determine the need for a new partial denture to account for the four teeth extracted since his 2014 dentures were provided. The exam is also necessary to ensure that Porter's dental condition is sufficiently stable to for new partials. On February 22, 2018 Porter went to the dental clinic where it was explained that he needed an exam to get the process started for new partials. Porter refused the exam as, in the past, he did not want to pay the mandatory $5 co-pay for an exam. Therefore, Porter has refused the offered dental care that Porter claimed he wanted, which amounts to a release.

As to any other allegations in this averment, they are denied as untrue.

9. Defendants admit that Plaintiff **Reeves** #717138 is serving his most recent incarceration beginning January 6, 2017. Defendants admit that Reeves was seen for his intake dental screening exam on January 10, 2017 and that the exam noted that Reeves oral hygiene was fair, his calculus was moderate and his perio condition was "early". Reeves needed no stabilization referrals.

On July 3, 2017 Reeves kited for a teeth cleaning stating he had never had his teeth cleaned. Reeves was first incarcerated in October 2009, paroled December 28, 2010, returned to MDOC custody September 1, 2011, paroled July 24, 2014, returned from parole September 16, 2014, was released on parole October 16, 2014. Reeves returned to MDOC custody on May 20, 2015, was released on parole June 19, 2015, returned to MDOC custody August 20, 2015. Reeves was paroled again on March 29, 2016, returned on April 29, 2016, was released on May 6, 2016 and then has returned for his current custody to the MDOC on January 6, 2017.

On October 24, 2017 Reeves kited again requesting the routine, non-serious teeth cleaning saying his teeth were sensitive. Reeves was again informed that he would be eligible for routine dental care on January 6, 2019. There are no further contacts from Reeves to dental services as of January 16, 2018.

As to any other allegations in this averment, they are denied as untrue.

10.    Defendants admit that Plaintiff **Richardson** #235980 has been incarcerated with the MDOC since March 3, 1994. Defendants admit that Richardson has received regular periodontal care and treatment for many years. Notably, since 2014, Richardson received perio scaling per dental arch on April 15, 2014 and was educated by demonstrating proper brushing and flossing techniques.

13

A little more than one year and four months later Richardson kited on August 25, 2015 requesting a dental exam and cleaning. Richardson received the periodontal scaling of his maxillary and mandibular arch on September 23, 2015.

On February 2, 2016 Richardson was examined in response to his kite about bleeding gums. The exam revealed bleeding around teeth #1 and #2 and Richardson was treatment planed for the extraction of those two teeth. Richardson refused consent for the extractions and was issued pain medications instead. On June 9, 2016 dental service received a kite from Richardson complaining about pain in his upper right rear teeth. On June 15, 2016 when Richardson showed up at the dental clinic he refused the recommended extraction but his refusal to sign the Release of Responsibility was noted.

On November 16, 2016 Richardson had his teeth cleaned. On February 8, 2017 Richardson's periodontal condition was generalized but evaluated as early. On March 14, 2017 Richardson received another teeth cleaning.

On July 12, 2017 and November 27, 2017 the dental service received kites from Richardson requesting additional teeth cleanings and he was informed that he could only get one routine teeth cleaning per year. Richardson will be eligible to request another tooth cleaning on March 14, 2018.

Since March 14, 2017 through January 16, 2018 there were no other requests for dental service from Richardson.

14

As to any other allegations in this averment, they are denied as untrue.

11.    Defendants admit that Plaintiff **Roman** #250050 has resided in the MDOC on his most recent incarceration since January 19, 2017.  Defendants also admit that Roman's perio condition was described at his intake screening exam on October 29, 2004 as early. On January 25, 2007, Roman's perio condition was described as mild.  At his exam on February 5, 2009 Roman's perio condition was described as mild moderate.  Roman was discharged from MDOC custody on August 4, 2012.  When he returned to MDOC custody and had his most recent intake screening exam on January 23, 2017 his perio condition was described as early moderate.

On June 12, 2017 dental services received a kite from Roman asking for a teeth cleaning.  He was advised to kite again for the routine treatment on January 19, 2019.  Roman promptly sent another kite which was received on June 20, 2017 asking for a teeth cleaning.  On January 16, 2018 Roman submitted a kite saying he needed a cavity re-done on his lower left side teeth. On January 19, 2018 Roman was seen in the dental clinic, bite wing x-rays taken and treatment planned for filling.  The filling was re-done on January 30, 2018. Roman is projected for parole release on March 20, 2018.

Defendants point to Plaintiff Roman's situation as an example of reasonably good self-care with one's oral hygiene significantly slows the progress of a

15

periodontal condition, such that Roman has experienced only slight change in his condition in the more than 13 years since he was first described in the MDOC as having early perio condition.

As to any other allegations in this averment, they are denied as untrue.

12.     Defendants admit that Plaintiff **Slone** #296250 has been incarcerated on his most recent commitment to the MDOC as of March 15, 2013.

Defendants admit that dental services received a kite from Slone complaining of pain from a broken tooth on February 25, 2014. Slone was examined and tooth #18 was identified as being fractured and unrestorable. Slone was given antibiotics and pain meds and tooth #18 was scheduled for extraction. The extraction was performed on February 27, 2014.

Also, on February 27, 2014 Slone was noted to have a cavity in tooth #19. Slone was given a sedative and a temporary filling in tooth #19. On September 25, 2014 dental services received a kite from Slone where he complained of pain. Slone was seen on October 1, 2014 and described tooth #19 as a source of sensitivity/discomfort. Slone's tooth #19 was restored that day with an amalgam filling. Two and one-half years later, Slone had a complete exam, perio scaling and was scheduled for another restoration on Tooth #19, which was fractured. The restoration of Slone's tooth #19 was completed on April 17, 2017.

On June 7, 2017 Slone kited dental saying he bit into a bone chip in the

chow hall and broke his tooth.  On June 8, 2017 Slone was examined and it was

determined that his tooth #19 and #21 fillings had fractured.  Both fractured

fillings were re-done on June 8, 2017.  Since that date there has been no further

contact with dental services by Slone for tooth #19. Defendants note that the above

history shows that Slone received timely treatment in the form of restorations to

address his symptoms of discomfort, promptly to the complaints of that discomfort,

despite restorations for dental conditions that do not cause pain being considered

routine. Slone did need to wait until he had served two years in the MDOC before

he could request restorations which he began receiving after he requested them on

March 19, 2015.

As to any other allegations in this averment, they are denied as untrue.

13.    Defendants admit that Plaintiff **Stoll** #875525 began her incarceration

with the MDOC on June 10, 2013. When Stoll arrived in MDOC custody her oral

condition was poor, her perio condition was advanced, tooth #16 was impacted,

and five teeth were missing (## 1, 15, 17, 18, and 19).  Stoll had unrestorable roots

tips remaining for teeth ## 2, 4, 7, and 13.  Stoll had unrestorable carries in teeth

## 3, 6, 10 and 28.  Stoll had decay on three surfaces of tooth #8 and two surfaces

of tooth #9 and one surface on tooth #5.  On August 22, 2013 Stoll did request a

teeth cleaning and was placed on the list, as the September 30, 2013 dental services

17

policy establishing the two years of continuous incarceration as the qualifier for routine/non-serious dental care was not then in place. After the September 30, 2013 policy took effect, Stoll was not qualified for routine dental care until June 19, 2015. However, Stoll would need and receive a significant amount of other dental care before that date.

On February 14, 2013 the remaining root tips for teeth #2 and #4, extracted and the unrestorable tooth #3 extracted.

On May 20, 2014 dental services received a kite complaining of pain in Stoll's lower right side of jaw. On May 22, 2014 Stoll was examined and found to have gross decay of teeth #5, #6 and #7 root tip. These teeth were extracted on May 27, 2014.

Dental services received a kite from Stoll complaining about pain in tooth #13 on June 11, 2014. Stoll was seen the same day and gross decay of #13 was observed. Stoll was informed that day of the hopeless condition of her remaining upper teeth but only wanted the troublesome tooth (#13) extracted then. Tooth #13 was extracted on June 13, 2014.

Defendants note that a patient's dental condition must be stable before dentures (full or partial) can be fabricated because the dentures are intended to last for five years. Stoll's condition was not stable in June, 2014 and she knew it because the chance of keeping her upper teeth was hopeless and even though they

were not hurting her, there would be no good reason to fabricate a denture to fit those hopeless teeth, knowing they could need extraction at any time, making the denture no longer workable.

On February 18, 2015 dental services received a kite complaining of toothache and pain. Stoll was told about the effect of sugary foods on decayed teeth, including the tooth #14 being pointed to, but it was noted that no urgent treatment was required at that time. Stoll would kite again on May 18, 2015 about tooth #14 and Stoll was put on the schedule for extraction but Stoll still had not agreed to the extraction.  On June 18, 2015 Stoll did agree to the recommended extraction of #14 and it was removed.

On July 7, 2015 Stoll refused her exam and teeth cleaning signing a release of responsibility.  On July 21, 2015 a bone spicule was removed from the #14 site. On August 3, 2015 Stoll was examined and found to have swelling in the areas of #10 and #13. Stoll was prescribed medications and scheduled for the removal of teeth ## 8-12.  These teeth were extracted on August 21, 2015.

On September 10, 2015 dental services received a kite from Stoll complaining of broken and decayed tooth pain. Stoll was examined that same day and teeth #28 and #29 were observed to be unrestorable.  These teeth were planned for extraction and then extracted on September 22, 2015. Stoll's recovery required antibiotics and pain medications on October 1, 2015 which were issued.

Stoll received a debridement treatment on February 9, 2016 and then was seen on February 29, 2016 and treatment planned for the extraction of teeth ## 20, 21, 22, 23, 24, 25, 26, and 27. These teeth were extracted on March 9, 2016. Stoll received follow up care during her recovery from these extensive extractions on March 22, 2016.

Stoll kited for dentures on May 9, 2016. Stoll was informed on June 8, 2016 that she was on the list for dentures. After all healing was complete and a patient's mouth has settled into its post extraction shape, the fabrication of dentures can rationally begin. Stoll received her "final Impression" (the first of seven steps in the actual denture fabrication process) on June 23, 2016.

Stoll received her full dentures on January 13, 2017, which was 10 days earlier than six-months from when her final impression was taken, and this period of denture fabrication was the first time in Stoll's incarceration that she could reasonably have been fitted with dentures given the constant alteration in her dentition.

As to any other allegations in the averment, they are denied as untrue.

14.     Defendants admit that **Heidi Washington** is the director of the MDOC and has held that position since July 1, 2015. Since the retirement of Dr. Taylor on March 1, 2017, Director Washington had only one regional dental director. Defendant Washington, as the Director of the MDOC does oversee the

20

management, through a number of other MDOC employees, of the MDOC correctional facilities.

15.     Defendants admit that **Jong Choi**, D.D.S. is the Southern Region Dental Director and Acting Northern Region Dental Director and that all actions taken by him have been in the course of his employment and in the furtherance of his duties in those positions.

## JURISDICTION

16.     Admitted.

17.     Admitted.

18.     Defendants admit that Plaintiffs seek class certification based on the four class claims and the purported class representatives set forth in their Fourth Amended Complaint. Defendants deny that Plaintiffs' have appropriate class representatives or have otherwise met the criteria for class certification.

## VENUE

19.     Admitted.

## FACTUAL ALLEGATIONS

20.     Defendants admit that Heidi Washington is the Director of the MDOC and that in her official capacity as the Director is responsible for and does actually ensure constitutionally sufficient dental care to the prisoner population.

21

21.   As of March 24, 2018 there will be 29 MDOC Correctional Facilities and 34 dental clinics in those correctional facilities housing approximately 39,000 prisoners. Some facilities have East and West side clinics or North and South side clinics, which results in a few more clinics than facilities. Defendants admit that the MDOC is obligated to make dental care available to the prisoner population that does not subject that population to cruel and unusual punishment but denies that the MDOC has any obligation to operate its dental clinics in the manner of the for-profit dental industry.

22.   Denied. Dr. Choi is currently the Regional Dental Director for the Southern Region of MDOC and is also the Acting Dental Director of the Northern Region of the MDOC. Dr. Choi is charged with ensuring dental services are delivered in accord with the MDOC Dental Services Policy Directive, dated March 14, 2017 (currently under proposed revision). A new Dental Services Operating procedure is under development and should be issued soon. The former dental services protocol was rescinded December 19, 2017. A new Dental Services Manual was issued that same date as a guide to the MDOC Dental Services practitioners.

23.   The numbers vary of course, but Defendants will accept the assertion that there are approximately 8,000 prisoners who enter or are returned to prison as parole violators per year (2017/2018). Defendants admit that these prisoners are

22

not eligible to receive routine dental care for their first two years of current continuous incarceration but deny that such prisoners are denied dental care to address painful conditions. All newly arriving prisoners are eligible for a dental screening exam shortly after their arrival at the Reception and Guidance Center at the Egeler Correctional Facility. If these prisoners are found to have urgent conditions they are referred to the dental stabilization clinic at the Duane Waters Health Center (DWHC). There the prisoners' urgent conditions are examined and treated or, if the prisoner is transferred before their urgent and stabilization treatment can be treated they are eligible for prompt care at the receiving facility dental clinic, under a stabilization referral.

If the prisoner is referred to the stabilization clinic and has dental issues that are not quite urgent but are thought likely to become urgent in the near future, they are provided a stabilization referral that entitles their condition to be treated, at the prisoner's request, at the receiving facility as if it was an urgent complaint. This means the prisoner with a stabilization referral will be seen promptly if they kite for treatment of the issue for which they have a stabilization referral, even if the issue is not urgent at the moment.

A prisoner's symptoms, rather than the dental service used to address the condition determines whether the prisoner has an urgent condition or not. Any condition that is not urgent, other than a stabilization referral from the stabilization

clinic at DWHC, is considered routine. Dental services made available by the

MDOC's dental service commonly used to respond to routine dental issues are

often described as routine dental care, but these same services may sometimes be

the dental service response to an urgent dental need.  As to any other allegations in

this averment, they are denied as untrue.

24.     Denied for the reason that his averment is not true.  Please see

response to No. 23 above.

25.     Except as described above in response to No. 23, if a plaintiff had a

non-urgent (meaning non-serious) dental condition within the first two years of

their incarceration after September 30, 2013, and the condition remained non-

urgent, that prisoner would not be provided routine dental care for that routine

(non-urgent) dental condition, until they requested such dental service after they

had served two years of continuous incarceration.  Of course, if that same prisoner

had an urgent dental condition or a non-serous dental condition became serious,

and that prisoner requested dental care, if would be provided promptly.

26.     Defendants admit that prior to September 30, 2013 access to dental

care in the MDOC was on a chaotic, first come first served basis with an injection

of dentist/dental staff discretion, that may have occasionally appeared arbitrary to

the prisoner patient population.  Defendants further admit that an effort was made

to rationalize the available chair time so that it could be available to serious dental

24

need cases as a priority, with any extra chair time being made available for dental issues that were not urgent, but which could benefit from attention. This method of making urgent care available on demand and non-urgent care as time allows after two years of continuous incarceration has allowed the MDOC dental service to provide timely urgent care and left dental service time available to still provide non-urgent care to thousands of prisoners annually.

27.    See response to No. 26 above.  In addition, Defendants admit that after the September 30, 2013 Dental Services Policy Directive took effect, the Dental appointment list, which was a confused amalgam of non-serious requests with some urgent requests and contained over 8,000 persons, was reduced to under 6,000 persons by September 30, 2013.  There were two primary factors in this reduction: first, those prisoners who had not been incarcerated for two or more continuous years, were removed from the Dental Appointment List and the new list was now called the Routine Dental Appointment List, so any prisoner with an urgent dental condition would not be placed on the list but would be called out promptly for clinical attention.

By the end of 2015, the RDAL for non-urgent patients was down to 3,744. As of February 18, 2018, the RDAL is at 3,378 cumulatively over the 35 dental clinic locations.

As to any other allegations in this averment, they are denied as untrue.

28.     Defendants admit that the new policy directive did not define routine dental care as that care meant to address a painful condition. That type of condition would be considered urgent and is expressly available on request. Also, prisoners were instructed on proper oral hygiene when they went through the intake dental screening upon arrival to reduce the risk of dental conditions worsening in the first two years of incarceration (see discussion of Plaintiff Roman above) or for however many years of incarceration the prisoner may serve. As to any other allegations in this averment, they are denied as untrue.

29.     Denied for the reason that this averment is not true. Please refer to responses to Numbers 23-28 above.

30.     Denied for the reason that his averment is not true. Defendants, through the Intake Dental Screening process look for signs of serious periodontal disease and when identified, provide debridement and/or root planning and scaling dental care to address the condition. Defendants do also provide patient education on proper oral hygiene but if the condition is not urgent at the time of the examination or believed likely to become urgent in the near future, there is no serious dental need. The Defendants admit that prisoners do not receive clinically provided preventive care for conditions that are not observed to be urgent at the time of observation in the first two years of continuous incarceration.

31.     Denied for the reason that this averment is not true. The MDOC is obligated to provide dental care to address conditions that if not then attended to would result in cruel and unusual punishment in violation of the 8th Amendment. Defendants look for periodontal conditions at the intake screening exam that are at the time of the exam serious/urgent and provide care as warranted.

32.     Denied for the reason this averment is not true.

33.     Denied for the reason this averment is not true.  First, system wide, there are more restorations performed than extractions.  Second, any time a prisoner has an urgent dental need (e.g. pain, swelling, infection, excessive bleeding), the prisoner may request dental care and receive prompt (usually within 3 days) clinical care to address or stabilize the dental situation.

34.     Denied for the reason that this averment is not true. It is accurate to state that after a prisoner has been continuously incarcerated for two or more years, they may kite for routine care.  Regardless of the issue the prisoner mentions, the prisoner is placed on the RDAL as of the date their kite is received in the dental clinic, if the condition is not perceived to be urgent. For those on the RDAL, when the prisoner is called out, the prisoner is usually offered an exam and teeth cleaning after discussing whatever the prisoner's complaint is. Often, the prisoner has no specific complaint but has only requested an exam and/or teeth cleaning.

Currently, there is an approximate 80% turnover of the prisoners on the RDAL every four months.

35.    Denied for the reason this averment is not true.

36.    Denied for the reason that this averment is not true. Being without a few, several, many or all of one's teeth is not, in and of itself, an urgent dental condition. A soft diet may be prescribed on request but many times, prisoners will say the food served in the prison cafeteria is already soft enough.  Dentures made by the MDOC dental services are intended to last at least five years and once issued, may be replaced after five years.

As to any other allegations in this averment, they are denied as untrue.

37.    Denied for the reason that this averment is not true.

## CLASS ACTION ALLEGATIONS

### A.    24 months No Routine Dental Care – Class I

38.    Defendants admit that named Plaintiffs Bailey, Bownes, Flessner, Gunnels, Means, Reeves, Roman and Slone present themselves as proposed class representatives of a class of prisoners who challenge the MDOC Dental Service Policy of making routine dental services available, if requested, only after the prisoner has served two continuous years of incarceration.  Defendant denies that these named Plaintiffs are adequate class representatives for this proposed class. The following proffered class representatives did not exhaust on this claim:

28

Bailey, Bownes and Slone.  The following proffered class representative's claims

are moot: Means and Flessner.  The remaining proffered Plaintiffs have failed to

state a claim on which relief can be granted. (See above responses to their

individual allegations).

    (1)    **Fed. R. Civ. P. 23 (a)(1)**

39.    Defendants admit that the number of prisoners admitted or returned

to MDOC custody and who have served less than two continuous years of their

current incarceration is so numerous that joinder would be impractical.

40.    Defendants admit that prisoners must request non-urgent dental care

before they are placed on the RDAL. All dental services are initiated by the

prisoner, whether for an urgent or a routine dental condition. Not all prisoners

request routine dental care once they are eligible. Routine dental care is provided

in the approximate order a prisoner is listed on the RDAL, sorted by the

facility/side where the prisoner is located.  Defendants deny that this process, in

essence a digital rope line for non-urgent dental care requests, causes a violation of

a prisoner's right to not be subjected to deliberately indifferent health care.

41.    It may be possible to identify at any given moment, the prisoners who

have been incarcerated less than two years on their current incarceration.

    (2)    **Fed. R. Civ. P. 23 (a)(2): Commonality**

42.     Defendants admit that it is possible to posit common questions of fact and law to apply to those prisoners incarcerated for less than two continuous years and who have requested routine dental care. Defendants deny that such questions would or do state a claim on which relief may be granted.

      a.     Defendants deny that the two years of continuous incarceration before eligibility for routine dental care question states a claim upon which relief may be granted.

      b.     Defendants deny that the manner of conducting Intake Dental Screenings states a claim upon which relief may be granted.

43.     Denied for the reason that this averment is not true.

44.     This averment proposes a hypothetical and as such need not be factually responded to. In so far as this averment attempts to assert a certainty, it is denied as untrue.

45.     Denied for the reason that his averment is not true because the intake screening method used is not inadequate to identify an urgent dental condition.

46.     Denied for the reason that this averment is untrue. PSRs are an out dated method of avoiding high dose radiation during the x-ray process. Modern x-ray techniques, even those used in the MDOC clinics for bite wing radiographs are more useful than probing for identifying the degree of bone loss – the primary indicator of periodontal disease.

47.     Defendants deny that appropriate dental care is not provided to urgent dental conditions, if found, during the first two years of continuous incarceration.

48.     Defendants' question whether this averment is true as searching for the absence of a finding among a large number of persons without first identifying some distinguishing characteristic associated with the absence is not the same as being able to identify a population characteristic directly.

49.     Admitted.

**(3)     Fed. R. Civ. P. 23 (a)(3): Typicality**

50.     Admitted, if the typicality is described as prisoners who do not need urgent care but instead may request dental care for routine/non-serious dental concerns.

51.     (No averment assigned to this number).

**(4)     Fed. R. Civ. P. 23 (a) (4): Adequacy of Representation**

52.     Defendants contend that the proffered Plaintiffs have failed to state a claim on which relief can be granted and some have claims that are moot, that have not been exhausted or do not meet the description of the class.  Therefore, Defendants deny that the proffered Plaintiffs will be adequate class representatives for proposed Class I.

**(5)     Fed. R. Civ. P. 23 (b)**

31

53.    Defendants admit that the proposed Class I, as described, would meet the Rule 23 (b) (1) criteria.

54.    Defendants admit that the proposed Class I, as described, meets the criteria of Rule 23 (b), but denies that prospective injunctive relief is warranted.

**B.    Periodontal Evaluation and Treatment – Class II**

55.    Denied for the reason that Defendants are not aware that the dental policy or dental services practices under the policy violate the prisoner class' constitutional right to be free from deliberately indifferent health care.

56.    Defendants admit that the proffered Plaintiffs seek to represent themselves and similarly situated individuals who challenge their care for periodontal disease.  Defendants deny that the proffered Plaintiffs have claims that warrant the grant of relief.  Bownes, Flessner and Slone did not exhaust their available administrative remedies.  None experienced an urgent/serious medical need due to an alleged periodontal condition being allegedly unattended to. (See responses to the proffered Plaintiff's individual claims, above).

**(1)    Fed. R. Civ. P. 23 (a)(1); Impracticality of Joinder**

57.    Defendants deny that this description of the proposed Class II as being all current and future prisoners is non-sensical, unless Plaintiffs are contending that all individuals have periodontal disease that needs urgent attention at all times. Therefore, Defendants cannot concur with the posited size of this class.  If a person

with an urgent periodontal condition that is identified and not treated is considered to be the class, then the class would likely number less than a dozen and possibly as few as zero.

58.      Defendants note that this averment presents a hypothetical which is meaningless without discussion of self-maintained oral health, a time frame of years (See Plaintiff Roman's dental history, described above) and certain other factors.  Defendants deny that prisoners are denied appropriate treatment for periodontal disease if their condition is urgent or, if merely non-urgent (routine), and they are eligible for routine dental care.

59.      Defendants do not believe this averment to be true without a better description of the characteristics that would be used to search.

(2)    **Fed. R. Civ. P. 23 (a)(2): Commonality**

60.      Defendants are unable to provide a factual response as the description of who may be in the class is so vague as to make it impossible for Defendants to know if there could be common questions of fact or law.

    a.      Defendants contend that this purported common question of fact cannot apply to the proposed class of all Prisoners incarcerated now or in the future.

    b.      See response to a. above.

61.     Defendants admit this is most likely true, if a common question of fact or law is asserted for an identifiable and meaningful Class.

### (3)     Fed. R. Civ. P. 23 (a)(3):  Typicality

62.      Defendants deny that the claims of the proffered Plaintiffs are typical of the class as described.

### (4)     Fed. R. Civ. P. 23(a)(4): Adequacy of Representation

63.     Denied for the reason that Bownes, Flessner and Slone did not exhaust their available administrative remedies and none of the proffered Plaintiffs have stated a claim on which relief may be granted.

### (5)     Fed. R. Civ. P.23 (b)

64.     Defendants admit that if the proposed class consisted of 39,000 prisoners, it would meet the criteria of Rule 23 (b) (1) but suggest the actual class that could state a claim for relief concerning a request for treatment of urgent condition periodontal disease that is not treated is actually less than a dozen, and, to Defendants' knowledge, is more probably closer to zero.

65.     Defendants admit that, excepting professional dentist discretion and judgment in determining when a periodontal condition is urgent, the policy applied to treatment of routine dental needs is applied for all prisoners.

### C.     DENTURES – CLASS III

66.     Denied for the reason that this averment is not true.

34

67.    Defendants admit that the proffered Plaintiffs assert that they are similarly situated to other proposed members of proposed Class III but Defendants deny that they are all so situated.  Baily and Flessner did not exhaust.  Means, Stoll and Porter's claims are moot, having received their dentures timely to their dental conditions or, in Porter's case, having refused the necessary exam for the new partials. Porter's claim, as set forth in the fourth Amended Complaint, was unusual as it represented a mistaken application of policy to his dental condition, which changed significantly through the loss of at least four teeth from the time of his initial issuance of upper and lower partial dentures in 2014.  Porter was offered, with a new exam, a new set of partials to accommodate his changed dentition. Defendants contend the initial rejection of Porter's request for new partials after the repair of his old ones failed was an erroneous application of the Dental Services Policy. Porter's refusal to allow a dental exam and have the  $5 co-pay assessed against his prisoner account, is a refusal of the offered partial dentures. Therefore, Porter's claim for partial dentures must be considered moot. As to the remaining proffered plaintiffs, see the response to their individual claims above.

## (1)    Fed. R. Civ. P. 23 (a)(1): Impracticality of Joinder

68.    Defendants contend that the assertion that the Class III Plaintiffs consist of 39,000 prisoners because the entire prisoner population needs dentures is not possibly true.  Defendants cause approximately 250 - 400 dentures (partial and

full) to be fabricated per year, so if the Plaintiffs are challenging the provision of dentures to the prisoner population with an urgent need for dentures, the size of the affected class must be much lower, likely a small subset of the numbers of prisoners who actually receive a full or partial denture. The number of prisoners with an urgent denture need that is not treated is unlikely sufficient to make joinder impractical.

69.     Defendants admit, as explained in the response to the proffered Plaintiffs' individual allegations above, that some of the proffered Plaintiffs have requested dentures, some have received them, one is being offered (after a new exam to ensure his current dentition is stable) a new set of dentures.  None of the proffered Plaintiffs has requested dentures after being assaulted by another prisoner, nor has it been alleged that staff broke or lost any of their dentures, so, these proffered Plaintiffs are not adequate to represent a claim based on those allegations.

70.     Denied for the reason that this averment is not true.

71.     Defendants are uncertain if prisoners who allege they are being denied dentures are identifiable unless other affirmative identifying characteristics are used to describe the subject.

    **(2)    Fed. R. Civ. P. 23 (a)(2): Commonality**

72.     Defendants deny, based on the proffered Plaintiffs claims, that there are common questions of law or fact regarding the provision of dentures to those with an urgent need for them, as none of the proffered Plaintiffs meet that criteria, Means, Stoll and Porter all having received their dentures as part of their routine dental care and Bailey having failed to exhaust.

        a.     Denied for the reason that his averment is not true.

        b.     Denied for the reason that this averment is not true.

73.     If a denture claim is recognized, it is admitted that Defendants will raise a common defense.

**(3)     Fed. R. Civ. P. 23 (a)(3): Typicality**

74.     Denied for the reason that this averment is not true.

**(4)     Fed. R. Civ. P. 23 (a)(4): Adequacy of Representation**

75.     Defendants deny that the proffered Plaintiffs meet the offered criteria for Class III or that those not disqualified would represent the interests of the Class as described.

**(5)     Fed. R. Civ. P. 23 (b)**

76.     Defendants deny that there are 1,000 persons who would meet the description of Class III but admit that there are likely more than 40 prisoners who may claim that they would like dentures, even to respond to non-urgent dental conditions, and that number would be sufficiently numerous to warrant

consideration of their claims as a class, if that is what is meant by Plaintiffs' class

claims description.

77.     Defendants admit that in defending any claim so certified, they

would present a common defense, consistent with the requirements of Rule 23 (b)

(2).

D.     **Waiting List – Class IV**

78.     Denied for the reason that this averment is not true. Defendants do

have a Routine Dental Appointment List (RDAL) that is maintained state wide so

that prisoners do not lose their date/place in line for non-urgent, routine dental

care, when they transfer from one facility to another. Defendants deny that

prisoners with urgent dental symptoms are placed on the RDAL instead of being

seen promptly as an urgent dental case.

79.     Defendants admit that proffered Plaintiffs Dearduff and Brownell

present themselves as representing persons on the RDAL to receive dentures for

their routine condition, however Defendants deny that Dearduff is similarly

situated to the claim as presented as his dispute with dental service – that he be

given cosmetic dentures even though he has adequate dentition to chew and

maintain his health, is not related to the operation of the RDAL.  Similarly,

Brownell (see response above to his individual allegations) does not comport with

the asserted description of the Class IV members.  Therefore, Plaintiffs have failed

to identify any class representatives meeting the definition of Class IV, requiring Class IV to be disallowed.

### (1)    Fed. R. Civ. P. 23 (a)(1): Impracticality of Joinder

80.    It is possible that if all of the prisoners on the RDAL would be members of the Class IV, that those 3,300 prisoners would make it impractical to join all of their individual claims. However, lacking any appropriate class representatives and defining the problem with the RDAL as waiting for dentures while on the RDAL, those numbers are much lower, likely only a few dozen at any one time, making the class of any prisoners experiencing an unreasonable delay even another factor smaller. This means that joinder would probably be possible for any cognizable claim as Plaintiffs describe.

81.    Denied for the reason that this averment is not true.

82.    Denied for the reason that this averment is not true.

83.    Denied for the reason that this averment is not true.

84.    Individuals who are placed on the RDAL requesting dentures are identifiable.

### (2)    Fed. R. Civ. P. 23 (a)(2): Commonality

85.    Defendants admit that there could be could be common questions of law and fact concerning the use of the RDAL's to provide routine, non-urgent dental care to the prisoners requesting same in as fair a manner as practical.

    a.     Defendants deny that they operate the RDAL in a manner that results in a constitutional violation of a prisoner's right to be free from cruel and unusual punishment.

    b.     Defendants deny that they operate the RDAL in a manner that results in a constitutional violation of a prisoner's right to be free from cruel and unusual punishment.

86.    If a class was certified regarding the operation of the RDAL to provide fair access to routine, non-urgent dental care, Defendants admit that they would raise common defenses of law and fact.

**(3)    Fed. R. Civ. P. 23 (a)(3): Typicality**

87.    It could be that the claims of prisoners placed on the RDAL are typical of other prisoners placed on the RDAL but the proffered Plaintiffs are not typical of those claims as described by Plaintiffs in this Fourth Amended complaint.

**(4)    Fed. R. Civ. P. 23 (a)(4): Adequacy of Representation**

88.    Denied.  As explained above neither of the proffered named Plaintiffs presents a case similar to that described in the proposed Class IV, therefore this class claim should be dismissed.

**(5)    Fed. R. Civ. P. 23 (b)**

40

89.    A prisoner is listed on the RDAL based on their request for routine dental care. At any one time in the past year and a half, the RDAL has contained approximately 3,500 prisoner listings. In 2017, approximately 75 -80% of the RDAL turned over in four months. Defendants admit that if placement on the RDAL is the criteria for being in proposed Class IV then there are too many potential class members to make joinder practical.

90.    Defendants admit that if Class IV is certified as challenging how the RDAL's are used to make routine dental services available in a fair manner to prisoners based on their requests, the Defendants' defenses will be similar. Defendants deny that the use and operation of the RDALs violates the prisoners' constitutional rights to be free from cruel and unusual punishment that would be included in class IV (if certified).

## EIGHTH AMENDMENT VIOLATION

91.    Defendants re-assert and incorporate by reference all of their responses to Plaintiffs' Fourth Amended Complaint paragraphs 1-90 as if set forth here in full.

92.    Denied for the reason that this averment is not true. Some dental health needs are serious medical needs and some dental conditions for which dental science has created a remedy, are not serious medical needs. Dental care provided by the MDOC is applied first to the urgent dental health conditions to

41

alleviate unnecessary pain, infection, swelling (usually a consequence of

infection), uncontrolled or excessive bleeding and loss of the ability to function –

meaning the ability to take in nutrition adequate to maintain one's health.

93.     Denied for the reason that this averment is not true.

94.     Denied for the reason that this averment is not true.

95.     Denied for the reason that this averment is not true.

96.     Denied for the reason that this averment is not true.

97.      Denied for the reason that this averment is not true.  There is a

difference between not being provided the ability to chew certain tough or hard

foods and being denied the ability to maintain proper nutrition.

98.     Denied for the reason that this averment is not true.

## Relief Requested

WHEREFORE, for all of the above stated reasons and also for those in the

accompanying Affirmative Defenses, Defendants respectfully request that this

court dismiss Plaintiffs Fourth Amended Complaint, deny all of Plaintiffs' requests

for relief as set forth in Plaintiffs' prayer for relief Items A-E and sub-items 1-10,

along with items F and G, and award Defendants their taxable costs for defending

this action.

Respectfully submitted,

BILL SCHUETTE
Attorney General

*s/A. Peter Govorchin*
A. Peter Govorchin (P31161)
Rock Wood (P41181)
Lisa C. Geminick (P60964)
Assistant Attorneys General
Attorneys for Defendant
P.O. Box 30736
Lansing, Michigan  48909
517.373.6434
Email:  govorchinp@michigan.gov
(P31161)

Dated:  February 22, 2018

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2018, I electronically filed the foregoing
paper with the Clerk of the Court using the ECF system which will send
notification of such filing of the foregoing document as well as via US Mail to all
non-ECF participants.

*s/A. Peter Govorchin*
A. Peter Govorchin (P31161)
Assistant Attorney General
Attorney for Defendant
P.O. Box 30736
Lansing, Michigan  48909
517.373.6434
Email: govorchinp@michigan.gov
P31161

43

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOEY DEARDUFF, NICHOLAS
BAILEY, MELVIN BROWNES,
TIMOTHY BROWNWELL, TIMOTHY
FLESSNER, JAMES GUNNELS, LEON
MEANS, JOHN PORTER, ANTHONY
RICHARDSON, CAROL ROMAN,
BRYAN SLONE, and TINA STOLL, on
behalf of themselves all others similarly
situated,

     Plaintiffs,

v

HEIDI WASHINGTON, Director,
Michigan Department of Corrections,
JONG CHOI, Dental Regional Director,
they are sued in their official capacities,

     Defendant.

No. 2:14-cv-11691

HON. LAURIE L. MICHELSON

MAG. MONA K. MAJZOUB

**DEFENDANTS
AFFIRMATIVE DEFENSES
TO THE PLAINTIFFS'
CLAIMS SUBMITTED IN
PLAINTIFFS' FOURTH
AMENDED COMPLAINT**

_____/

Daniel E. Manville (P39731)
Attorney for Plaintiffs
Michigan State University College of Law
P.O. Box 1570
East Lansing, Michigan 48826
517.336.8088, ext. 1137

Robert Gittleman (P14025)
Tracie Gittleman (P45176)
Attorneys for Plaintiffs
31731 Northwestern Hwy, Ste. 101E
Farmington Hills, Michigan 48334
248.737.3600

Rock Wood (P41181)
A. Peter Govorchin (P31161)
Lisa C. Geminick (P60964)
Assistant Attorneys General
Attorneys for Defendants
Civil Litigation, Employment & Elections
Division
P.O. Box 30736
Lansing, Michigan 48909
517.373.6434

_____/

## DEFENDANTS' AFFIRMATIVE DEFENSES TO THE PLAINTIFFS' CLAIMS SUBMITTED IN PLAINTIFFS' FOURTH AMENDED COMPLAINT

Pursuant to Fed. R. Civ. P. 8(c0, Defendants assert the following affirmative defenses:

1.    Named Plaintiffs have failed to exhaust their available administrative remedies and are therefore barred from pursuing this suit. Specifically, the Plaintiffs' failures to exhaust are identified as follows:

a.    Plaintiff Bailey is proffered as a class representative for proposed class claims I and III, but failed to exhaust his available administrative remedies as to both claims.

b.    Plaintiff Bownes is proffered as a class representative on proposed Class claims I and II, but did not exhaust his available administrative remedies as to either of these claims.

c.    Plaintiff Flessner is proffered as a class representative on proposed class claims I and II but failed to exhaust his available administrative remedies as to Class II. (Defendants admit Plaintiff Flessner exhausted as to proposed Class claim I).

d.    Plaintiff Slone is proffered as a class representative as to proposed Class Claims I and II but failed to exhaust as to proposed Class claim I (Defendants contend Slone failed to exhaust and this Court has found there is a question of fact as to whether Slone did exhaust his

2

claim regarding the two-year qualification period for routine dental

care – see R. #209, Pg. ID  #5752 and as to proposed Class claim II –

See R. #209, Pg. ID #5752 finding that Slone did not exhaust his

available administrative remedies as to periodontal diagnosis and

treatment and dismissing that claim).

2.    Named Plaintiffs' claims are moot making them unsuitable as class

representatives.  Specifically:

   a.    Plaintiff Means is proffered, for the first time, as a class representative

      for proposed Class claim I.  Means has been incarcerated since July 1,

      2015 and had passed his two years of continuous incarceration as of

      July 1, 2017, rendering any relief to be granted regarding shortening

      or eliminating the two year qualification period for being able to

      request and receive routine dental care moot as to him.  Plaintiff

      Means' claim was mooted at the time of the filing of the Fourth

      Amended complaint, rendering his claim on Proposed Class claim I

      moot and making Plaintiff Means unsuitable as a Class representative

      for proposed Class I.

   b.    Plaintiff Means is also proffered for the first time as a class

      representative for proposed Class claim III.  However, Means

      received his dentures on October 26, 2017, prior to filing the Fourth

3

Amended Complaint, rendering his claim moot and making him
unsuitable to serve as a class representative.

c.  Plaintiff Stoll is proffered as a proposed class representative as to
proposed Class III – dentures. Stoll received her dentures on January
13, 2017 making her claim for prospective injunctive relief regarding
dentures moot and making her unsuitable as a class representative for
proposed Class III.

d.  Plaintiff Flessner was added to the Fourth Amended Complaint and is
proffered as a proposed class representative on proposed Class claim
I.  Flessner began his incarceration on August 17, 2015.  He
completed his two years of continuous incarceration as of August 17,
2017.  Flessner's claim as to the alleged constitutional violation
caused by the two year qualification period is moot as to him.  Any
prospective injunctive relief regarding the two-year qualification
period will have no effect on him.

3.  Plaintiffs have failed to state a claim on which relief can be granted.

4.  Plaintiffs' challenge to the use and operation of the Routine Dental
Appointment Lists (RDAL) for scheduling routine dental care lacks the
commonality and typicality required to support class certification as to

4

Plaintiffs' proposed Class IV. *Wal-Mart Stores, Inc. v Dukes, et al*, 564 U.S. 338 (2011).

5.   Plaintiffs' claims are barred by release.

6.   Plaintiffs have presented no viable class representatives for proposed Class IV as they have not identified anyone who has allegedly suffered harm by having a routine dental issue become urgent while they were on the RDAL.

7.   Some of, Plaintiffs' claims, to the extent that they accrued before January 16, 2015 are barred by the applicable three-year period of limitations.

8.   Some of Plaintiffs' claims are barred by the doctrine of laches.

9.   Defendant relies upon all relevant provisions of the Prison Litigation Reform Act, 42 U.S.C. § 1997e.

10.   Some Plaintiffs lack standing to pursue the asserted Class claims because they did not themselves seek the service the fourth amended complaint alleges was denied and/or they have failed to allege an injury as a result of the alleged denial of dental service that could meet the requirements of an Eighth Amendment claim.

11.   Plaintiffs' claim(s) regarding proposed Class II – periodontal disease stage diagnosis and treatment should be barred as they inevitably revolve around individualized professional judgment of the dentist and are amount to disputes over the manner of dental care and not deliberate indifference to a

5

serious medical need. Thus, this proposed Class II claims lack the commonality and typicality required for a class action. *Wal-Mart Stores, Inc. v Dukes, et al*, 564 U.S. 338 (2011).

12. Plaintiffs cannot show that the proposed class is so numerous that joinder of all members is impractical as to Class III – dentures, as there is no basis in law for defining denture fabrication within 90 days as a matter of constitutional obligation, over the generally accepted 180 days. Nor is there even an independent constitutional obligation to fabricate dentures at all since the absence of teeth does not, in and of itself, create a serious medical condition.

13. Plaintiffs cannot show that they will fairly and adequately protect the interest of the proposed class.

14. Plaintiffs cannot show that this proposed class action would fit into any of the three established categories of class actions under Fed. R. Civ. P. 23(b)(1)-(3).

15. Oral health care being in large part a matter of self-care through proper oral hygiene, and subject to diet (voluntary and non-voluntary), Plaintiffs may bear at least some of the responsibility for their oral health, to the extent that Plaintiffs or potential class members not engaging in consistent healthy oral

hygiene are in the situation of the non-complaint patient and have caused or contributed to their own adverse dental condition.

16. Plaintiffs have failed to mitigate their alleged injuries.

17. Plaintiffs alleged injuries may have been the result of pre-existing or subsequently occurring conditions and events that were neither caused nor aggravated by the events referred to in Plaintiffs' Fourth Amended Complaint.

18. Many of Plaintiffs' allegations supporting their proposed class claims are in the nature of hypotheticals or mere possibilities and rely on few, if any, allegations of actual harm that can be attributed to the alleged wrongful policy or conduct of the Defendants.

19. Plaintiffs' class claims for proposed Class Claim II is barred because the class members are likely incapable of ascertainment as the claim is presently alleged.

20. Plaintiffs' class claims should be dismissed because there is insufficient detail alleged to indicate that some or all of the named Plaintiffs have actually suffered any harm because of the allegations against the Defendants.

21. Defendants are protected from liability by the Eleventh Amendment to the United States constitution for any claim for money damages, if one should be asserted.

22.   Defendants, in their official capacity, are protected from liability by the doctrine of qualified immunity.

23.   Defendants, in their official capacity, are not persons subject to suit pursuant to 42 USC 1983 as, in their official capacity, Defendants are the equivalent of the state and, as such, are not persons for purposes of liability for damages.

24.   Defendants, sued in their official capacity, are protected from personal liability by the doctrine of governmental immunity.

25.   Defendants reserve their right to raise further defenses or assert other matters revealed by their continuing investigation and discovery, including all defenses available under Fed. R. Civ. P. 12 and 56.

Respectfully submitted,

BILL SCHUETTE
Attorney General

*s/A. Peter Govorchin*
A. Peter Govorchin (P31161)
Rock Wood (P41181)
Lisa C. Geminick (P60964)
Assistant Attorneys General
Attorneys for Defendant
P.O. Box 30736
Lansing, Michigan  48909
517.373.6434
Email:  govorchinp@michigan.gov
(P31161)

Dated:  February 22, 2018

8

**CERTIFICATE OF SERVICE**

I hereby certify that on February 22, 2018, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing of the foregoing document as well as via US Mail to all non-ECF participants.

> *s/A. Peter Govorchin*
> A. Peter Govorchin (P31161)
> Assistant Attorney General
> Attorney for Defendant
> P.O. Box 30736
> Lansing, Michigan  48909
> 517.373.6434
> Email: govorchinp@michigan.gov
> P31161