UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOEY DEARDUFF,
NICHOLAS BAILEY,
TIMOTHY BROWNELL,
MELVIN BOWNES,
TIMOTHY FLESSNER,
JAMES GUNNELS,
LEON MEANS,
JOHN PORTER,
KENNETH REEVES,
ANTHONY RICHARDSON,
BRYAN SLONE, and
TINA STOLL, on behalf of themselves and
all other similarly situated,

       Plaintiffs,

v.

HEIDI WASHINGTON, Director, Michigan
Department of Corrections, and
JONG CHOI, Dental Regional Director, in
their official capacities,

       Defendants.

Case No. 2:14-cv-11691
Honorable Laurie J. Michelson
Magistrate Judge Mona K. Majzoub

---

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR CLASS CERTIFICATION [241]

On behalf of themselves and other prisoners in the custody of the Michigan Department of

Corrections, Plaintiffs claim that the MDOC is deliberately indifferent to their serious dental

problems in violation of the Eighth Amendment. Plaintiffs ask the Court to certify four classes of

MDOC prisoners. Some of the proposed classes include every prisoner in the MDOC's custody.

But in a group that size—about 37,000 individuals—the dental-health diversity is presumably

great. It is likely that some have had few dental issues and are at low risk of any serious ones in

the foreseeable future. For these prisoners, the alleged deficiencies in the MDOC's dental care

probably do *not* subject them to a substantial risk of serious harm. On the other hand, in a group of 37,000, some undoubtedly have frequent, serious dental needs. For these prisoners, the alleged deficiencies in the MDOC's dental care probably *do* subject them to a substantial risk of serious harm. It is thus difficult to address the Eighth Amendment claims of all 37,000 prisoners in "one stroke." *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Yet that is a requirement for class certification. *See id.* On the other hand, there are smaller, less dentally-diverse groups of prisoners whose claims can, at least in significant part, be efficiently litigated at once. For these reasons and those set out below, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' motion for class certification. Attached as an appendix to this opinion is a summary chart of the Court's rulings.

## I.

In this section, the Court sets forth the definitions for each proposed class and the legal claims of each proposed class.

## A.

Plaintiffs claim that the MDOC's requirement that a prisoner be incarcerated for two years before receiving "routine" dental care is unconstitutional. To better understand this Eighth Amendment claim, some background on the MDOC's dental services is necessary.

The MDOC divides dental services into three categories: emergency, urgent, and routine. Emergency dental services are "for those conditions for which delay in treatment may result in death or permanent impairment." (ECF No. 246, PageID.7017.) Urgent dental services are for conditions "unlikely to cause death or irreparable harm if not treated immediately" but are "medically necessary" in the opinion of a dentist (or other qualified medical professional). (*Id.*) "Generally," prisoners "with facial swelling, oral facial trauma, uncontrolled postoperative

bleeding, or significant pain or discomfort" are deemed to require urgent dental services. (*See id.*) Routine dental services are everything else: "any condition which requires non-Urgent or non-Emergency health care contact with a prisoner." (ECF No. 246, PageID.7024.) This includes regular dental exams, "[p]eriodontal procedures," and prosthetic fabrication. (*Id.*) (An earlier version of the MDOC's dental policy further provided that treatment for pain that could be controlled by over-the-counter pain medication (like Tylenol) was routine care. (*See* ECF No. 38, PageID.407.))

In 2013, the MDOC instituted a policy of providing prisoners routine dental services only after two years of "uninterrupted sentenced incarceration within the MDOC institutions." (ECF No. 246, PageID.7024.) The motivation for this policy is not entirely clear. But the record hints at two possible reasons: half of all new MDOC prisoners are released in two years (ECF No. 246, PageID.7010) and the two-year rule reduced the wait list for dental care from 8,000 to 2,000 inmates (ECF No. 236, PageID.6274). The two-year rule only bars routine care; every prisoner is eligible for emergency and urgent dental services regardless of time served. In fact, the MDOC's "Dental Services Manual" provides that "Emergency Dental Services shall be immediately provided upon receiving knowledge, in any manner, of a patient's need for Emergency Dental Services." (ECF No. 246, PageID.7023.) That manual also provides, "Urgent dental condition/complaint offenders will not be placed on appointment lists and must be seen for the condition/complaint to be evaluated and treated, if necessary, as soon as possible." (*Id.*) Defendants claim (albeit with no supporting evidence) that "the MDOC dental service provides clinical response to urgent dental conditions within 3 calendar days of receipt of the kite [i.e., request for care] more than 96% of the time, with a median clinical response time of one calendar day." (ECF No. 246, PageID.6975.)

Several of the plaintiffs claim that the two-year rule has harmed or will harm them. For instance, Plaintiff James Gunnels, who has no teeth, returned to the MDOC's custody in October 2016. (ECF No. 246, PageID.6981.) In December 2016, Gunnels kited (i.e., informed officials via writing) that he had a stomach-ulcer issue; he also explained that there were many foods that he could not eat without dentures. (ECF No. 242, PageID.6442.) In response to his kite, Gunnels was advised that he would not be eligible for routine dental services until October 2018. (ECF No. 242, PageID.6442.) As another example, Plaintiff Melvin Bownes was diagnosed with moderate periodontal disease at his April 2016 intake exam. (ECF No. 242, PageID.6441.) The two-year rule, however, apparently bars treatment for periodontal disease unless the symptoms are urgent or emergent. Thus, Plaintiffs' dental expert, Dr. Jay D. Shulman, has opined, "It is more likely than not that [Bownes'] periodontal condition will worsen during the [two-year period] and result in gratuitous pain, loss of bone, and tooth loss." (ECF No. 242, PageID.6441.) Shulman also more generally explains that the two-year rule presents an "MDOC prisoner's dilemma": prisoners must either have a painful tooth extracted (a treatment provided during the first two years of incarceration) or live with the pain for two years and hope that, after this lapse in time, the tooth is still salvageable. (ECF No. 242, PageID.6433; ECF No. 236, PageID.6295.)

*Class I Definition.* Plaintiffs seek to represent all prisoners who are subject to the two-year rule. (*See* ECF No. 236, PageID.6279; ECF No. 242, PageID.6365.) (In fact, not all 12 named plaintiffs seek to represent those subject to the two-year rule; but, unless necessary for clarity, the court will use the general term "Plaintiffs.") Proposed Class I is more precisely defined as, "All prisoners who have less than 24 months of uninterrupted incarceration within an MDOC correctional facility starting from the prisoner's first day at the reception center." (*See* ECF No.

246, PageID.7024.) This group of prisoners constitutes about half of MDOC's population, about 19,000 inmates. (ECF No. 246, PageID.6973.)

*Class I's Claim.* Each potential member of this proposed class claims that the MDOC's requirement that he or she be incarcerated for two years before becoming eligible for routine dental care exposes him or her to a substantial risk of serious harm of which Defendants are aware. (*See* ECF No. 236, PageID.6279.)

**B.**

Plaintiffs also challenge how the MDOC diagnoses and treats periodontal disease and caries. (ECF No. 242, PageID.6368.) The Court begins with Plaintiffs' concerns about how periodontal disease and caries are diagnosed in the MDOC and then turns to the alleged deficiencies in treating periodontal disease.

Periodontal disease attacks structures securing a tooth; these structures include the gums, the tooth ligament, and the alveolar bone. (ECF No. 242, PageID.6412.) The stages of this progressive disease are gingivitis (no alveolar bone loss), early periodontitis (slight bone loss), moderate periodontitis (noticeable bone loss), or advanced periodontitis (severe loss of bone support). (ECF No. 242, PageID.6434.) As periodontal disease progresses, the "pocket" or gap between tooth and gum increases. (*See* ECF No. 242, PageID.6411–6412, 6434.) Bacteria can form in this pocket leading to an abscess. And if periodontal disease progresses too far, the tooth may be permanently lost. (ECF No. 242, PageID.6436.) Someone with periodontal disease may be unaware that the disease is progressing because "[p]eriodontal conditions are generally painless (until they progress to an abscess)." (ECF No. 242, PageID.6435.) The following is an illustration of the effects of periodontitis:



(ECF No. 242, PageID.6412.)

According to Plaintiffs' expert, Dr. Shulman, there are two standard tools for assessing the severity of periodontal disease that the MDOC does not use: periodontal probing (to measure pocket depth in millimeters) and intra-oral x-rays (x-rays taken inside the mouth to visualize alveolar bone loss). (*See* ECF No. 242, PageID.6417–6418.) Regarding probing, Shulman points out that the Federal Bureau of Prisons and several state correctional facilities probe and chart periodontal disease. (ECF No. 242, PageID.6413 & n.12.) Shulman also asserts that the type of x-ray that the MDOC uses—extra-oral (i.e., outside the mouth or panoramic)—"does not have the fine detail necessary to diagnose caries or document periodontal bone loss." (*See* ECF No. 242, PageID.6416, 6434.) Shulman also says, "a treatment plan [for periodontal disease] that is made without clinically appropriate radiographs and periodontal probing is below accepted professional standards." (ECF No. 242, PageID.6419.)

At their depositions in 2015, two dental directors for the MDOC testified that they did not, at intake at least, use the tools that Shulman believes are necessary for assessing periodontal disease. Dr. Jong Choi, then the southern-region dental director, testified that periodontal probing

was not performed during a prisoner's intake exam. (ECF No. 242, PageID.6729.) He also explained that bone loss was the most important part of assessing periodontal disease and that extra-oral (panoramic) x-rays allowed for an assessment of bone loss. (ECF No. 242, PageID.6729.) Dr. Jeffrey Taylor, then the northern-region dental director, similarly testified that periodontal probing was not necessary for assessing periodontal disease. (ECF No. 242, PageID.6597.)

Shulman asserts that the MDOC's reliance on extra-oral x-rays can also lead to not properly diagnosing at least two other dental problems. One is caries (i.e., tooth decay, including cavities). (ECF No. 242, PageID.6417–6419.) In fact, says Shulman, those at a high risk of caries should have intra-oral x-rays taken every 6 to 18 months and, for those at a low risk of caries, every 24 to 36 months. (ECF No. 242, PageID.6419.) Shulman also indicates that intra-oral x-rays are "useful" for identifying periapical disease (inflammation or abscess at the tooth's root). (ECF No. 242, PageID.6417.)

The MDOC's means of diagnosing dental conditions aside, there is also the issue of treating the conditions. Shulman has opined that when an MDOC prisoner is diagnosed with periodontal disease during his intake exam, dentists do not come up with a "treatment plan." (ECF No. 242, PageID.6448.) Similarly, when periodontal disease is diagnosed at a routine exam (presumptively after two years of incarceration), "a treatment plan . . . is rarely produced." (ECF No. 242, PageID.6449.) According to Shulman, "Typical non-surgical treatment of individuals identified with moderate or severe periodontal disease is a deep cleaning called 'periodontal scaling and root planing' ('SRP') followed by periodic re-evaluation." (ECF No. 242, PageID.6420.) It appears that Shulman believes that the MDOC has a regular practice of not providing treatment plans

consisting of scaling and root planing and the associated follow-up reevaluation. (*See* ECF No. 242, PageID.6437 & n.76, 6415.)

Several of the plaintiffs claim that dental staff at the MDOC did not properly treat their periodontal disease. For instance, it appears that in July 2012, Plaintiff Anthony Richardson was provided with a periodontal scaling. (ECF No. 242, PageID.6446.) But he continued to have periodontal disease and, in September 2015, was diagnosed with "localized moderate" periodontal disease. (*Id.*) By early 2016, Richardson's gums around tooth #1 and tooth #2 were inflamed and bleeding and he was diagnosed with moderate-to-advanced periodontal bone loss. (ECF No. 242, PageID.6447.) The recommended treatment was to extract the two teeth. (*Id.*)

More generally, Shulman states, "in my opinion, based on a reasonable degree of dental certainty, MDOC's policies, procedures, and practices for diagnosing periodontal disease at periodic and comprehensive examinations and treating periodontal disease are below accepted professional standards and subject prisoners to substantial risk of serious harm by delaying diagnosis and treatment." (ECF No. 242, PageID.6449.) He further opines that "treatment plans rarely include periodontal treatment other than oral prophylaxis [i.e., dental cleaning,] [thereby] increasing the likelihood of . . . disease progression. MDOC's failure to ensure that treatment plans include appropriate non-surgical periodontal treatment [e.g, scaling and root planing] will subject prisoners to risk of preventable pain, tooth morbidity and tooth mortality." (*Id.*)

Although it is unclear when Shulman authored his expert report (it is undated), in April 2018, the MDOC revised its policies for tracking and, apparently, treating periodontal disease. In particular, Choi, who had since become the MDOC's dental director, authored a memorandum to the MDOC's dental supervisors. Via the memo, Choi advised that prisoners who had "stable" moderate periodontitis (or better) did not need any periodontal treatment during their first two

years of incarceration. (ECF No. 246, PageID.7050.) But, said Choi, prisoners with "unstable" moderate periodontitis (or worse) should be given stabilizing treatment. (*Id.*) Choi also informed the dental supervisors of new dental codes for tracking each prisoner's periodontal health in the MDOC's electronic dental-records system. (ECF No. 246, PageID.7051.)

Plaintiffs have not clearly demarcated the boundaries of proposed Class II. Plaintiffs assert, "Class II: The MDOC's practice of inadequate diagnosis of periodontal disease as the result of failing to use appropriate x-rays and document periodontal probing routinely; and not prescribing and performing appropriate periodontal treatment (such as root planing and scaling), even when periodontal disease is diagnosed, subjects prisoners to a preventable risk of progression of periodontal disease, with associated loss of teeth and unnecessary pain." (ECF No. 241, PageID.6359.) But this is more a statement about alleged wrongful conduct (improper diagnoses and treatment) than a statement about which prisoners are members of proposed Class II. Plaintiffs similarly state, "The MDOCs failure to require documented periodontal probing at initial and periodic examinations . . . places many inmates at risk of suffering preventable pain and tooth morbidity by underdiagnosing and failing to appropriately monitor periodontal disease. Moreover, even when moderate or advanced periodontal disease is identified, the appropriate non-surgical procedure is neither ordered nor performed." (ECF No. 242, PageID.6368.) This again is a statement of alleged wrongful conduct. Finally, in their brief (but not in their motion or in their fourth amended complaint), Plaintiffs include the following in their definition of Class II: "[T]he policy or practice of diagnosing caries at intake using a panoramic radiograph . . . subjects them to risk of harm due to caries progression." (ECF No. 242, PageID.6368.) But caries, i.e., tooth decay and cavities, is a different condition from periodontal disease. (*See* ECF No. 242, PageID.6409–6411.)

The Court is not bound by Plaintiffs' description. It has "broad discretion to modify class definitions." *Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007). Reading Shulman's expert report, Plaintiffs' motion for class certification, and Plaintiffs' brief in support of class certification together, the Court believes that via proposed "Class II" Plaintiffs in fact seek to certify two classes of prisoners.

*Class IIA Definition.* As noted, Plaintiffs believe that because the MDOC does not use probing and intra-oral x-rays to assess periodontal disease, prisoners in the MDOC's custody are at risk of having undiagnosed periodontal disease and at risk of having the severity of their periodontal disease underestimated. They likewise believe that because the MDOC does not use intra-oral x-rays, prisoners are at risk of having undiagnosed or underdiagnosed caries. Although all prisoners are at some non-zero risk of periodontal disease and caries (and, perhaps, periapical disease), not all prisoners are adversely affected by the alleged deficiencies in the MDOC's diagnostic tools. For instance, some prisoners may have only ever had one or two cavities and occasional gingivitis. And they may be serving short prison terms. For these prisoners, any diminished ability to diagnose caries, periodontal disease, or periapical disease may, essentially, be of no concern. On the other hand, some prisoners may have a long history of frequent caries or severe periodontitis. For these prisoners, the risk that the MDOC will not detect or underestimate caries or periodontal disease may be of great concern.

So where to draw the line? Shulman provides that once caries reach the dentin, treatment should be scheduled. (ECF No. 242, PageID.6410.) As for periodontal disease, Shulman indicates that gingivitis is not visible via x-rays, but that early periodontitis "may be visible" on an x-ray. (ECF No. 242, PageID.6434.) Thus, subject to revision, the Court defines "Class IIA" as "All prisoners incarcerated in an MDOC correctional facility who have caries that have reached the

dentin or have early (or worse) periodontitis." (Although it may not be perfectly clear who is in this class, the ascertainability requirement does not apply to Rule 23(b)(2) classes—the type of class that Plaintiffs ask the Court to certify. *See Cole v. City of Memphis*, 839 F.3d 530, 542 (6th Cir. 2016).)

*Class IIA's Claim.* The Court understands Plaintiffs to be claiming, on behalf of themselves and those in proposed Class IIA, that the MDOC's failure to use periodontal probing and intra-oral x-rays exposes them to a substantial risk of serious harm of which Defendants are aware.

*Class IIB Definition.* Plaintiffs also apparently maintain that the MDOC has a policy or practice of not providing appropriate treatment for periodontal disease. As all prisoners are at some non-zero risk of periodontal disease (indeed, it is likely that half have some variety of the disease, *see* Centers for Disease Control and Prevention, *Periodontal Disease*, https://bit.ly/2RFnAoH ("47.2% of adults aged 30 years and older have some form of periodontal disease")), the Court defines "Class IIB" as "All prisoners incarcerated in an MDOC correctional facility." (*See* ECF No. 236, PageID.6284 (suggesting that proposed Class II consists of "persons who are now, or will in the future be diagnosed with periodontal disease and not be provided appropriate treatment").)

*Class IIB's Claim.* The Court understands Plaintiffs to be claiming, on behalf of themselves and those in proposed Class IIB, that the MDOC's failure to provide appropriate periodontal treatment either subjects them to serious harm of which Defendants are aware (e.g., those that already have advanced periodontitis) or places them at a substantial risk of serious harm of which Defendants are aware (e.g., those that may progress to advanced periodontitis).

## C.

Plaintiffs also claim that "MDOC has a practice of not timely providing dentures to prisoners who have unserviceable dentures or have pain and difficultly when eating." (ECF No. 236, PageID.6287.)

According to Shulman, people requiring dentures can suffer in several ways. The mere act of chewing without enough teeth can be painful. (*See* ECF No. 242, PageID.6424.) Also, without an adequate number of opposing teeth (or, more precisely, adequate chewing surface area), chewing certain foods can be difficult or even impossible. And the inability to chew food (whether due to pain or lack of chewing surface area) can lead to dietary changes. (*See* ECF No. 242, PageID.6424–6425.) This in turn can have several negative effects, including weight loss and, according to Shulman, weight gain. In particular, "people with a compromised dental status may avoid hard-to-chew foods and instead choose processed foods, favoring the absorption of cholesterol and saturated fatty acids, or may prefer simple carbohydrate-rich diets that are high in calories but low in dietary fiber, vitamins, and protein, thus leading to weight gain." (ECF No. 242, PageID.6425.) Thus, even if a person with chewing difficulties increases their calories, there is still a risk of poor nutrition. Shulman also informs that those who cannot adequately chew their food may experience "gastrointestinal disturbances." (ECF No. 242, PageID.6424.)

Plaintiffs believe that Defendants are prolonging or exacerbating these chewing-related issues by not providing dentures in a timely fashion. For example, Plaintiff Tina Stoll requested dentures in May 2016. She informed prison staff that she had "all [her] teeth pulled 2 months ago" and that she was having "a hard time eating." (ECF No. 242, PageID.6455.) The next month, Stoll wrote, "I am having a hard time eating. When I do my gums get shredded. I am swallowing food [w]hole and feeling sick every time I eat. I need teeth." (*Id.*) Later that month, an impression was

taken. (*Id.*) Yet, in September 2016, Stoll kited, "I am hav[ing] a hard time eating. It's tearing my gums and making me sick because I can't chew my food." (*Id.*) According to Shulman (who reviewed Stoll's records), Stoll did not receive her dentures until November 2016. (ECF No. 242, PageID.6456.) This was more than 5 months after she had her impressions taken. (ECF No. 242, PageID.6456.)

Defendants explain that during this litigation they have shortened the time for delivery of dentures. A study spanning late 2015 to early 2016 revealed that MDOC was delivering dentures within 180 days of final impression only about 61% of the time. (ECF No. 246, PageID.7054.) MDOC thus created the "DentTrak" data system. (*Id.*) And the DentTrak shows that for data between March 1, 2017 and February 28, 2018, the MDOC delivered dentures within 180 days about 83% of the time—a 22% improvement. (ECF No. 246, PageID.7055.) Of course, 180 days is not short. But Defendants suggest that a 180-day turnaround is reasonable given that there are seven steps from final impression to final delivery, including six shipments "between the facility clinics and the [denture fabrication lab]." (ECF No. 246, PageID.6978.)

*Class III Definition*. In their motion for class certification, Plaintiffs provide, "Class III: The MDOC's practice of routinely not providing partial and complete dentures to prisoners no longer subject to the two-year quarantine period. These prisoners, who request dentures to address chewing difficulty, replace worn or otherwise unserviceable dentures, or to replace dentures lost due to extenuating circumstances, are subjected to gratuitous pain as well as major issues concerning chewing and nutrition." (ECF No. 241, PageID.6359.) And in the brief in support of their motion, Plaintiffs say, "The third proposed class involves those Plaintiffs and class members who have requested dentures due to loss of teeth, old dentures being broken or damaged, dentures lost by prison staff, and failure to provide dentures pursuant to extenuating circumstances." (ECF

No. 242, PageID.6370.) Taking all of this together, the Court defines "Class III" as follows: "All prisoners incarcerated in an MDOC correctional facility who have requested dentures and who satisfy the criteria for dentures in Sections 15 and 16 of Chapter VI of the MDOC's Dental Services Manual." Sections 15 and 16 list criteria for complete and partial dentures. (ECF No. 246, PageID.7040.) For example, to be eligible for a partial denture, the prisoner must have less than three pairs of posterior teeth in functional occlusion (i.e., three pairs of upper and lower molars make contact during chewing) and the prisoner's remaining teeth must have good alveolar bone support. (ECF No. 246, PageID.7040.)

*Class III's Claim.* The Court understands Plaintiffs to be claiming, on behalf of themselves and those in proposed Class III, that the time it takes for the MDOC to provide dentures exposes them to serious harm or, at least, a substantial risk of serious harm, of which Defendants are aware.

**D.**

Plaintiffs also claim that the MDOC has a "practice of placing prisoners not subject to the two-year quarantine who complain of dental pain on long wait lists." (ECF No. 241, PageID.6359.) Plaintiffs allege that when a prisoner who has served two years requests a dental exam or cleaning, he is placed on a waitlist. (ECF No. 236, PageID.6291.) Once the prisoner comes up for his exam or cleaning, a treatment plan is created; but then the inmate is placed on another waitlist to receive the planned treatment. (ECF No. 236, PageID.6291.) The delay in treatment allegedly "lead[s] to unnecessary tooth pain, unnecessary progression of decay and/or unnecessary tooth los[s]." (ECF No. 236, PageID.6291.) Plaintiffs assert that the delay can be "6–18 months" and is caused by "the MDOC having too few dentists." (ECF No. 242, PageID.6365.)

Timothy Brownell is one of the plaintiffs that says he was adversely affected by the alleged long wait lists. In January 2017, a dentist noted that tooth #14, which had a deep filling, was

occasionally achy and "sensitive to percussion." (ECF No. 246, PageID.7199.) The dentist noted that if the tooth became too uncomfortable, an extraction should be considered. (*Id.*) On May 26, 2017, Brownell was seen for urgent dental service; his chief complaint was tooth #14. (ECF No. 246, PageID.7200.) It was determined that the tooth had "irreversible pulpitis abscess" and extraction was recommended. (*Id.*) Brownell, however, wanted a root canal; but that is not a procedure the MDOC normally provides. (*See* ECF No. 246, PageID.7201.) Ultimately, the tooth was extracted on June 29, 2017, about a month after extraction had been indicated. (*Id.*) Brownell also had an issue with tooth #15 around the same time period. At least by June 29, 2017, Brownell was on the routine list for a filling for tooth #15. (*See* ECF No. 246, PageID.7202.) The tooth was not filled until three months later. (*See id.*) Shulman states, "the longer the interior portion of a tooth is exposed to the oral environment, the greater the likelihood that the tooth will suffer irreversible damage." (ECF No. 242, PageID.6458.)

*Class IV Definition.* In their brief for class certification, Plaintiffs say, "The fourth proposed class involves those Plaintiffs and class members who have been confined for more than two-years and request dental care due to dental/tooth pain, inability to sleep, bleeding gums, or seek routine dental care but are placed on long wait lists before they can receive such care." (ECF No. 242, PageID.6372.) Plaintiffs' fourth amended complaint describes the class slightly differently, adding waitlisted prisoners who are unable to "chew or eat hard foods." (ECF No. 236, PageID.6290.) And in their motion for class certification, Plaintiffs say, "Class IV: The MDOC's practice of placing prisoners not subject to the two-year quarantine who complain of dental pain on long wait lists. . . . Additionally, inmates who request routine dental services often face substantial treatment delays." (ECF No. 241, PageID.6359–6360.)

For their part, Defendants believe that Plaintiffs are complaining about time spent on something called the Routine Dental Appointment List (RDAL). According to Defendants, "[a] prisoner requesting routine dental services (an exam, a teeth cleaning, a restoration, an extraction, or a protheses) is placed on a state-wide list." (ECF No. 246, PageID.6977.) Defendants explain that each of the MDOC's 33 dental clinics can then work through the list by treating the inmates at their facility. (*Id.*) Defendants say that 90% of the over 3,000 prisoners on the RDAL in June 2017 were no longer on the list by November 1, 2017—suggesting that for 90% of prisoners on the RDAL, their wait is five months. (ECF No. 246, PageID.6978.) As noted earlier, if MDOC identifies a prisoner as seeking urgent dental service, it does not place that prisoner on the RDAL.

Taking all the foregoing, it appears that Plaintiffs seek to certify two "waitlist" classes. The first, which the Court will refer to as "Class IVA," consists of "All prisoners on the Routine Dental Appointment List." The second proposed class appears to be those who have sought care for urgent or debatably-urgent conditions ("dental/tooth pain, inability to sleep, bleeding gums," or an inability to "chew or eat hard foods"), but are placed on a waitlist. It seems that some of these prisoners would be placed on a waitlist for urgent care—not the RDAL. And it appears that these prisoners can be readily identified; Defendants claim that urgent dental conditions are responded to within 3 days 96% of the time, so, apparently, Defendants can identify prisoners waiting for urgent care. So the second waitlist class might be defined as those MDOC has identified as waiting for urgent dental services. One possible issue with this definition is that Plaintiffs apparently believe that the MDOC places prisoners on the RDAL who, in fact, have urgent conditions. While this second waitlist class should include these prisoners, it is not readily apparent to the Court how to ascertain who is in this group. Thus, subject to revision, the Court defines "Class IVB" as "All prisoners that the MDOC has identified as waiting for urgent dental services."

*Class IVA's Claim*. The Court understands Plaintiffs to be claiming, on behalf of themselves and those in proposed Class IVA, that the time it takes the MDOC to provide them with routine care (e.g., five months) exposes them to a substantial risk of serious harm.

*Class IVB's Claim.* The Court understands Plaintiffs to be claiming, on behalf of themselves and those in proposed Class IVB, that the time it takes the MDOC to provide them with urgent care (e.g., three days) causes them serious harm or, at least, exposes them to a substantial risk of serious harm.

## II.

Having defined (or redefined) the proposed classes, and having recited the corresponding Eighth Amendment claims, the Court turns to the law governing class certification.

In a class action, the plaintiff not only seeks to forward her own cause, but also the cause of others. *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979). But representative litigation only makes sense when the "others" are similarly situated to both the plaintiff and to each other. When that is the case, a single class action ensures that similar issues will be decided similarly. This consistency enhances faith in the law and the judicial system. *See* 1 Newberg on Class Actions § 1:10 (5th ed.). And when the plaintiff and those she seeks to represent raise a common issue, a class action is much more efficient than repeatedly deciding that issue in separate suits. But a class action has a potential downside: it forces class members to give up control over the litigation yet be bound by its outcome. Thus, a class action is only fair to class members if their representative vigorously advocates for them. For at least these three reasons (consistency, efficiency, and fairness), certification is only proper when (1) there is one question of significance "common" to the class, (2) when the representative's claims are "typical" of the claims of the class, and (3) when

the representative (and their counsel) will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

The Supreme Court provided guidance on Rule 23(a)'s commonality requirement and, to a lesser extent, typicality and adequacy, in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). *See id.* at 350 n.5 (noting that commonality, typicality, and adequacy-of-representation requirements "tend to merge"). There, the Supreme Court clarified that it is not enough that a class raises common questions—even in "droves." *Id.* at 351. "What matters to class certification," said the Court, was whether a class action would "generate common *answers* apt to drive the resolution of the litigation." *Id.* (internal quotation marks and citation omitted). In other words, Rule 23(a) demands not only that each class member's claim "depend upon a common contention," but that the common contention "is capable of classwide resolution—which means that determination of [the contention's] truth or falsity will resolve an issue that is central to the validity of each one of the [member's] claims in one stroke." *Id.* at 350.

Given that *Wal-Mart* requires that there be at least one significant issue underlying each class member's claim that the Court or jury can resolve in "one stroke," it is worthwhile to examine how the issues underlying an Eighth Amendment claim might differ. For an Eighth Amendment claim to warrant future-looking relief (the relief that Plaintiffs seek in this case), a prisoner must show that he is presently suffering "serious harm" or is at a "substantial risk" of suffering serious harm and that prison officials are indifferent to the plight. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994); *see also Baynes v. Cleland*, 799 F.3d 600, 618 (6th Cir. 2015). This means that Prisoner A's and Prisoner B's Eighth Amendment claim might differ in three ways that bear on the issue of commonality. First, setting aside the risk and the harm, the two prisoners might be affected by two different prison officials (or two different sets of officials) such that one official's state of mind

says little about the other's. *Cf. Wal-Mart*, 564 U.S. at 355–56 ("In [a company using a system of discretion], demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's."). Prisoner A and B's Eighth Amendment claims might also differ in the amount of risk: there might be less than a 1% chance that Prisoner A will experience serious harm but a 20% chance that Prisoner B will experience serious harm. Perhaps the former is not "substantial" in the Eighth Amendment sense but the latter is. Third, even if Prisoner A and B are at similar risk of harm and from the same prison officials, Prisoner A's harm (if it arises) might be very minor while Prisoner B's (if it arises) might be "serious" in the Eighth Amendment sense. *See Baynes*, 799 F.3d at 618 (providing that "serious harm" is either a condition "diagnosed by a physician as mandating treatment" or "one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention").

The Ninth Circuit Court of Appeals has provided some guidance on how these possible differences in prisoners' Eighth Amendment claims impact class certification. In *Parsons v. Ryan*, a group of prisoners claimed that the Arizona Department of Corrections' "policies and practices governing medical care, dental care, and mental health care" exposed all ADC prisoners to a substantial risk of serious harm. 754 F.3d 657, 663 (9th Cir. 2014). The challenges varied. One challenge was to a practice of "employ[ing] insufficient health care staff," another was to a practice of not providing "timely emergency treatment," another was to a practice of not providing "necessary mental health treatment," and yet another was to the provision of "substandard dental care." *Id.* at 664. In all, the challenges numbered 17. Yet the district court certified a single class: "[a]ll prisoners who are now, or will in the future be, subjected to the medical, mental health, and dental care policies and practices of the ADC." *Id.* at 672. On appeal, the Ninth Circuit (the late Judge Stephen Reinhardt writing for the panel) found that the class members' claims satisfied *Wal-*

*Mart*'s "one stroke" requirement. The Court explained, "What all members of the putative class . . . have in common is their alleged exposure, as a result of specified statewide ADC policies and practices that govern the overall conditions of health care services[,] . . . to a substantial risk of serious future harm to which the defendants are allegedly deliberately indifferent." *Id.* at 678. It was not preclusive of certification that prisoners might suffer different future harm, and that some might not even suffer harm at all. *See id.* The Court explained, "[A]ny [prisoner] could easily fall ill, be injured, need to fill a prescription, require emergency or specialist care, crack a tooth, or require mental health treatment. It would indeed be surprising if any given inmate did not experience such a health care need while serving his sentence. Thus, *every single ADC inmate faces a substantial risk of serious harm* if ADC policies and practices provide constitutionally deficient care for treatment of medical, dental, and mental health needs." *Id.* at 678–79 (emphasis added).

At least six judges of the Ninth Circuit disagreed with this reasoning. In particular, Judge Sandra Ikuta, with five judges joining her, authored a dissent from the denial to rehear *Parsons en banc*. (It may be that there were not enough votes for rehearing *en banc* because the case settled after the panel opinion issued. *See Parsons v. Ryan*, 784 F.3d 571, 574 n.3 (9th Cir. 2015) (Ikuta, J.) (acknowledging that the case was moot due to settlement).) Judge Ikuta believed that there was not a key question, capable of a single answer, underlying the claims of all prisoners in the Arizona Department of Corrections. One problem was that the class "include[d] healthy prisoners who do not have an Eighth Amendment claim." *Id.* at 579. As for the panel's statement that any prisoner "could easily fall ill," Judge Ikuta responded, "this risk is too attenuated for an Eighth Amendment claim." *Id.* at 577. "Second," said Judge Ikuta, "even those prisoners who are not healthy do not have the sufficiently similar serious medical needs necessary to raise a common Eighth

Amendment issue under [*Wal-Mart*]." *Id.* at 579. Judge Ikuta explained that the "diversity of needs" among the prisoners meant that the question of whether ADC's practices and policies violated the Eighth Amendment could not "be answered in a single stroke." *Id.*

The Seventh Circuit has also addressed the interplay between the issues that make up an Eighth Amendment claim and *Wal-Mart*'s "one stroke" rule. In *Phillips v. Sheriff of Cook County*, the district court had certified a class of "all detainees" at a jail who had to wait more than seven days for treatment for dental pain. *See* 828 F.3d 541, 544 (7th Cir. 2016). The certification came at a point in the litigation when the jail had only one dentist; but as the litigation progressed, the jail hired seven dentists, two hygienists, and seven dental assistants. *Id.* at 544, 545. (This level of staffing was considered "optimum" by Shulman, *id.* at 545, the dental expert in *Parsons*, *Phillips*, and this case.) Given the changes in staffing and a consent order between the jail and the U.S. Department of Justice, the defendants moved to decertify the class. *See id.* at 545. The district court found commonality lacking and decertified the class. *Id.* at 548. On appeal, the plaintiffs argued that there were at least two common questions: whether the jail's failure to provide a face-to-face exam within 24 hours of a complaint of dental pain resulted in gratuitous pain and whether the jail's failure to provide timely "return to clinic" appointments resulted in gratuitous pain. *Id.* at 555. The Seventh Circuit reasoned that both of these questions concerned treatment delay. And that meant that there was good reason to question commonality: "the length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment" and "[t]he more significant the dental pain, the more immediate is the need for treatment." *Id.* Thus, regarding the first asserted common question, the Seventh Circuit found that "simply establishing that detainees at the Jail consistently wait more than twenty-four hours does not advance materially any individual's claim of deliberate indifference." *Id.* at 556. As for the second, the Court reasoned,

"to determine whether a return visit is 'timely,' a court must look at evidence that will be unique to each individual class member." *Id.* And because a week's wait might affect one detainee differently than another, the detainees needed to explain "how the court [could] define a 'timely' return visit without looking at the circumstances of each individual case." *See id.* at 556. Because the detainees had not provided any such explanation, the district court had also reasonably decided that the return-visit question did not satisfy *Wal-Mart*'s "one stroke" rule. *See id.*

While split, these authorities provide some helpful guidance. The panel in *Parsons* found that the challenged policies and practices placed "every single" Arizona Department of Corrections prisoner at a "substantial" risk of "serious" harm. 754 F.3d at 678–79. So, in the panel's view, there was no need to examine each prisoner's health or specific medical needs. Thus, one way to read the panel opinion is that by aggregating the various risks that each prisoner was exposed to, each prisoner was at a substantial risk of some type of serious harm. But Judge Ikuta thought that healthy prisoners were not at a substantial risk of serious harm even if the ADC had healthcare deficiencies across the board (medical, mental health, and dental). And she thought that even unhealthy prisoners could vary significantly in their medical need, such that deciding whether one unhealthy prisoner was at a substantial risk of serious harm would say little about another unhealthy prisoner's situation. Similarly, the Seventh Circuit in *Philips* found that a claim of 24-hour delay in dental care could not unite a class of prisoners because that 24 hours might well result in serious harm to one prisoner but might well not result in serious harm to another.

So in examining Plaintiffs' proposed classes, the Court will be looking for proof, i.e., evidence, that the policy or practice challenged by the class exposes nearly every class member—

no matter their dental health—to similar risk of harm.[1] If that is the case, then the Court can resolve at least one key issue underlying almost every class member's Eighth Amendment claim without looking at each prisoner's circumstances. But without sufficient reason to believe that almost every member of a proposed class—even those with strong dental health—is at a similar risk of harm, the door to individualized inquiry would be left ajar. The Court would thus be confronted with classes that would not satisfy Judge Ikuta or the Seventh Circuit in *Philips*.

## III.

With the class definitions and the law in hand, the Court separately examines whether each of the proposed classes satisfies Rule 23's requirements for certification.

### A.

#### 1.

As set out above, proposed Class I consists of all prisoners who have less than two years of continuous incarceration within the MDOC. These prisoners claim that the MDOC's two-year wait for routine dental services exposes them to a substantial risk of serious harm.

Given the breadth of this proposed class and the nature of the class claim, it does not satisfy *Wal-Mart*'s one-stroke requirement. This proposed class encompasses about half of the prisoners in the MDOC, about 19,000 individuals. (ECF No. 246, PageID.6973.) Even though the prison population has poorer dental health on average than the overall population (*see* ECF No. 246, PageID.6412 n.8), in a group of 19,000 prisoners one would still expect a wide-spectrum of dental

---

[1] Slight over-inclusiveness is not problematic, efficiency would still be gained by resolving a key issue for the overwhelming majority of the proposed class. Further, whether the risk is "substantial" and the harm "serious" in the Eighth Amendment sense is a merits issue. At this stage the question is whether a proposed class contains similarly-situated prisoners (even if all are at similarly low risk of harm). At a later stage the question is whether those similarly-situated prisoners have or do not have a viable Eighth Amendment claim.

health. At one end of the spectrum would be those prisoners who historically had very few dental issues, received cleanings and examinations up until their incarceration, and continue to practice good oral hygiene during their incarceration. At the other end of the spectrum are those prisoners who have dental issues that, without routine care for even, say, six months (let alone two years), are at great risk of serious harm. For instance, Shulman opines that "[p]eriodontal conditions are generally painless (until they progress to an abscess), and . . . it is more likely than not that many prisoners will suffer progression while waiting out the [two-year] clock." (ECF No. 242, PageID.6435.) And, presumably, the class includes prisoners whose "dental fitness" falls everywhere in between.

Given that a class of 19,000 prisoners likely encompasses prisoners whose risk of sustaining serious dental harm is very low and prisoners whose risk of sustaining serious dental harm is very high, the Court will not certify that class. *Cf. Parsons*, 784 F.3d at 580–81 (Ikuta, J., dissenting from denial of rh'g *en banc*) (faulting the panel's "one-size-fits all model of Eighth Amendment jurisprudence" where the record established "the diversity of the prisoners' medical needs"). The Court acknowledges that Shulman has opined that the two-year rule "pose[s] a substantial risk of serious harm to MDOC prisoners by delaying routine treatment." (ECF No. 242, PageID.6444.) But it is not clear that Shulman believes that nearly *all* of the 19,000 prisoners subject to the two-year rule are at "a substantial risk of serious harm" from the lack of routine dental care. Indeed, he says, "[w]hile not all . . . prisoners [subject to the two-year rule] will suffer pain and dental injury, in my experience from research and writing about the epidemiology of caries and periodontal disease, I expect that *many* will." (ECF No. 242, PageID.6445 (emphasis added).)

**2.**

The Court's decision not to certify a class of all prisoners subject to the two-year rule is not intended to be preclusive of another lawsuit attempting to certify that or a similar class. But in this Court's view, such an attempt would have to establish that the dental-health diversity of all 19,000 prisoners is not so great, i.e., that all 19,000 prisoners are at a similar risk of a similar degree of harm. This might be possible with stronger statements from Shulman. Or the class might be narrowed (or stratified) such that every person in the class (or classes) are, intuitively, similarly situated with respect to the two-year rule.

The Court's decision not to certify a class of all prisoners subject to the two-year rule likewise does not preclude Plaintiffs in this case from pursuing their claim that—on its face—the two-year rule violates the Eighth Amendment. (*See* ECF No. 242, PageID.6379.) As opposed to an as-applied challenge to the two-year rule, a facial challenge requires no individualized inquiry. Indeed, by definition, a facial challenge asserts that the law, or here, policy, is unconstitutional regardless of how it is applied. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."); *Speet v. Schuette*, 726 F.3d 867, 871–72 (6th Cir. 2013) ("A facial challenge to a law's constitutionality is an effort to invalidate the law in each of its applications[.]" (internal citations omitted)). And, as this Court suggested in its earlier opinion, to the extent Plaintiffs make a facial challenge, a class of all prisoners subject to the two-year rule would likely pass Rule 23 requirements. *See Johannes v. Washington*, No. 14-CV-11691, 2015 WL 5634446, at *6 (E.D. Mich. Sept. 25, 2015) ("[I]f the legal claims in this case are merely challenges to the constitutionality of MDOC's dental policies in the abstract, there would be no difference between

any class member's claims and thus a victory or defeat for any member would at once dispose of all others' claims in the same way.").

That said, the Court declines to certify a class for purposes of a facial challenge at this time. Because a facial challenge asserts that the two-year rule is unconstitutional as applied to every prisoner, only a single prisoner need challenge the policy. In fact, as also indicated in the Court's prior opinion, certification would favor Defendants more than Plaintiffs: a finding that the two-year rule does not, on its face, violate the Eighth Amendment would likely preclude all prisoners in the putative class from making the same facial challenge in the future. *Johannes*, 2015 WL 5634446, at *1 n.1. In contrast, if no class is certified, this Court's ruling on the facial constitutionality of the two-year rule would bind only the one plaintiff who pursued the claim. If Plaintiffs nonetheless seek to certify classes to assert that certain policies (including the two-year policy) are unconstitutional on their face, the Court will entertain a limited motion to that affect.

### B.

What was said about Class I also applies to Class IVA: "All prisoners on the Routine Dental Appointment List." According to Defendants, 3,000 prisoners are on the RDAL at any given moment. While 3,000 is much less than 19,000, it still seems likely that prisoners on the RDAL have very diverse dental needs. It is likely that some prisoners on the RDAL have no dental issues and are merely seeking a standard cleaning and checkup. For them, a five-month wait on the RDAL might not expose them to harm (let alone serious harm). Others, however, have conditions that are likely to progress to the level of serious harm in five months. For instance, Shulman opines that "a delay of 114 days [to replace a filling] is unreasonable because . . . the longer the interior portion of a tooth is exposed to the oral environment, the greater the likelihood that the tooth will suffer irreversible damage." (ECF No. 242, PageID.6458.) And it is likely that the RDAL contains

prisoners with dental needs across the urgency spectrum. Absent evidence that virtually all prisoners on the RDAL are at a similar risk of harm, the Court is not convinced that these 3,000 prisoners' claims have a key issue that can be productively litigated at once.

## C.

The potential members of Class IIB claim that the manner in which the MDOC treats periodontal disease exposes them to a substantial risk of serious harm. It appears that for early-stage periodontal disease (gingivitis and early periodontitis) appropriate treatment consists of a dental cleaning and oral-hygiene instruction. (*See* ECF No. 242, PageID.6420–6421; *see also* ECF No. 246, PageID.7050.) But by moderate periodontitis, a prisoner requires a treatment plan consisting of scaling and root planing and follow-up care. (*See* ECF No. 242, PageID.6421–6422.) Scaling and root planing may also be suitable for advanced periodontitis, but if the disease is too advanced, the tooth may need to be extracted. (*See* ECF No. 242, PageID.6421–6422; ECF No. 246, PageID.7050.)

The Court begins with Plaintiffs' claim that the MDOC does not provide constitutionally sufficient treatment to those with moderate or advanced periodontitis. The Court is not convinced that the MDOC has a policy or systemwide practice of not creating an appropriate treatment plan (including scaling and root planing) for prisoners with moderate or advanced periodontitis. Plaintiffs point to no written policy that categorically precludes a treatment plan for moderate or advanced periodontitis or one that categorically precludes scaling and root planing. Shulman does state that periodontal treatment plans "rarely" include anything other than dental cleanings and that "even when periodontal treatment is provided, it is desultory." (*See* ECF No. 242, PageID.6449.) But it appears that Shulman's belief about the MDOC's failure to create a proper treatment plan for moderate or advanced periodontitis is based on the dental records of only 12

prisoners. (*See* ECF No. 242, PageID.6437 n.76, PageID.6440–6441.) And of those 12, two (James Gunnels and Leon Means) had no teeth and, thus, could never receive scaling or root planing. And Shulman did not comment on the periodontal treatment of four others (Anthony Richardson, Joey Dearduff, John Porter, and Timothy Brownell). So it appears that Shulman's opinion that the MDOC has a system-wide practice of not providing necessary scaling and root plaining is based on the dental histories of six prisoners. And it appears that one and possibly two of those six *did* receive scaling and root planing once or twice. (*See* ECF No. 242, PageID.6447, 6448.) That a handful of prisoners did not receive an appropriate treatment plan for moderate or advanced periodontitis does not establish a standard practice across all MDOC correctional facilities. *Cf.* *Wal-Mart*, 564 U.S. at 358 ("Even if every single one of [the 120] accounts [of discrimination] is true, that would not demonstrate that the entire company operate[s] under a general policy of discrimination, which is what respondents must show to certify a companywide class" (internal quotation marks and citations omitted)).

It is true that periodontal treatment is classified as "routine" dental care and so the two-year rule might amount to a system-wide policy of not creating periodontal treatment plans for those with moderate or advanced periodontitis and who have been incarcerated for less than two years. But in April 2018, Choi, the MDOC's dental director, authored a memo to the MDOC's dental supervisors. In the memo, Choi provides that if a prisoner is diagnosed with "unstable" moderate periodontitis at intake, the prisoner should receive "stabilization care sufficient to attempt to change the condition from unstable to stable." (ECF No. 246, PageID.7050.) And Defendants' counsel (although without citing evidence) has explicitly told the Court, "Within the range of identifiable stages of periodontitis, as determined by degree of bone loss, those with moderate stage periodontitis whose condition is unstable *will* receive stabilization referral for

periodontal treatment, as appropriate, including debridement and/or *root planing and scaling, with follow up sufficient to stabilize the condition*." (ECF No. 246, PageID.6977 (emphasis added).) The Court accepts Defendants' proffer that those with moderate periodontitis will receive appropriate treatment whether during their first two years of incarceration or after. Should Plaintiffs prove that Defendants' claim about the provision of root planing and scaling (with follow-up care) is not accurate, the Court will revisit this issue.

On the current record then, the Court is not persuaded that the MDOC has a policy or systemwide practice of not providing appropriate treatment for those with moderate or advanced periodontal disease. Instead, it appears that the decision whether to provide scaling and root planing is left to the discretion of each dentist. This in turn means that if a class member were to ask, "Did I not receive scaling and root planing and re-evaluation for my periodontitis because of deliberate indifference?," the Court would have to examine the particular dentist's state of mind at the time she was treating (or should have been treating) the class member. That individualized inquiry precludes claim aggregation. *See Wal-Mart*, 564 U.S. at 352 ("Without some glue holding the alleged reasons for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*.").

On the other hand, the MDOC may well have a policy of not providing any treatment (at least during the first two years of incarceration) to those with healthy gums to "stable" moderate periodontal disease. In the same April 2018 memo to dental supervisors, Choi wrote,

> The slow rate of progression of periodontitis, when coupled with appropriate self-care, means that as a practical matter, there is no harm done by not specifically treating, beyond self-care, early stage periodontal conditions during the first two years of incarceration. Similarly, moderate periodontitis, if stable with self-care, will not require intervening dental care in the first two years of incarceration to prevent the condition from becoming advanced.

(ECF No. 246, PageID.7050.) Thus, as to prisoners with healthy gums, gingivitis, early periodontitis, and "stable" moderate periodontitis, it may not be necessary to determine on a case-by-case basis why those prisoners were not given periodontal treatment—there is apparently a system-wide policy of not providing periodontal treatment to these prisoners (at least during their first two years in prison).

And unlike the other proposed classes so far discussed, the risk profile among these prisoners is not so disparate as to preclude certification. In the MDOC's opinion at least, prisoners with healthy gums, gingivitis, early periodontitis, and "stable" moderate periodontitis are all at a similarly low risk of serious periodontal injury. So if, for example, a prisoner with healthy gums and a prisoner with "stable" moderate periodontitis were each to ask, "Does the MDOC's failure to provide me with periodontal treatment expose me to a substantial risk or serious harm?," it is likely that the Court's answer to both questions will be the same. In other words, the risk spectrum among this group of prisoners is narrower than the classes discussed so far. Thus, the Court finds that by limiting Class IIB to "All prisoners incarcerated in an MDOC correctional facility with healthy gums, gingivitis, early periodontitis, and stable moderate periodontitis," the Court can likely answer each class member's claim that the lack of periodontal treatment exposes him or her to a substantial risk of serious harm in "one stroke."

Turning to the remainder of Rule 23's certification requirements, the Court believes that Melvin Bownes is an adequate class representative. *See* Fed. R. Civ. P. 23(a)(4). To understand why, some additional background is necessary.

When Bownes was incarcerated in April 2016, he was diagnosed with moderate periodontal disease. (ECF No. 242, PageID.6441.) In August 2017, still well shy of two years' incarceration, Bownes grieved the lack of dental treatment. Bownes wrote, "I'm having problems

[with] my teeth (cavity) and was told I'll see the dentist when I get to another facilit[y], to this day I haven't been called out!!! And I'm still having issues [with] my teeth." (ECF No. 249, PageID.7079.) This grievance was rejected for several reasons, including that it was "vague, illegible or it contain[ed] multiple unrelated issues/extraneous information, or raise[d] issues that [were] duplicative of those raised in another grievance/filed by" Bownes and that it was "unclear as to what the main issue is or who [Bownes was] grieving." (ECF No. 249, PageID.7242.) Bownes appealed to Step II, asserting in part that his "complaint [was] clear," that his grievance had requested a dental evaluation because of "problems [with] [his] teeth." (ECF No. 249, PageID.7243.) Bownes added, "I'm told by (RMI Dental) that I must wait 2-yrs before any issues would be addressed." (*Id.*) The MDOC upheld the Step I rejection. (ECF No. 249, PageID.7244.) Bownes then filed a Step III grievance. He wrote in part, "there is nothing vague about the issue. The issue is point blank that I am being denied dental service [t]o have several fil[l]ing and/or removal of the teeth that has decayed beyond repair." (ECF No. 249, PageID.7243.) The MDOC again upheld the rejection at Step III. (ECF No. 249, PageID.7245.)

Defendants say that Bownes cannot serve as a class representative because he did not exhaust his administrative remedies before joining this lawsuit. (*See* ECF No. 246, PageID.6980.) In support of this assertion, Defendants point out that all three steps of Bownes' grievance were rejected on procedural grounds. (*Id.*) And Defendants imply that rejected (as opposed to denied) grievances do not exhaust the issues they contain. *See Woodford v. Ngo*, 548 U.S. 81, 93 (2006) (providing that exhaustion under the PLRA means "proper" exhaustion and proper exhaustion means complying with the prison system's "critical procedural rules").

The Court believes that a reasonable fact finder could find that Bownes' grievance was unjustifiably rejected. Bownes stated in his Step I grievance that he had issues with his teeth, that

he wanted to see a dentist, and that he had not been called out for a dental appointment. Bownes also stated that he had gone to "health care" on several occasions in an attempt to resolve the issue. *See Calhoun v. Hill*, No. 07-11613, 2008 WL 4277171, at *3 (E.D. Mich. Sept. 17, 2008) ("The magistrate judge correctly noted that the Court may excuse a prisoner's failure to identify by name a particular defendant in a grievance when it is obvious from the facts alleged in the grievance that the defendant was involved."). A reasonable jury could find that Bownes' grievance gave prison officials reasonable opportunity to address his issue: he wanted to see a dentist but the RFI dental or health care staff refused to schedule him for an appointment. *See Woodford*, 548 U.S. at 93 ("The PLRA . . . seeks to affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." (internal quotation marks and citation omitted)). Thus, the Court is not now persuaded that Bownes should be dismissed from this case for failure to exhaust.

True, Bownes' grievance did not capture the precise claim of proposed Class IIB—that the MDOC has a policy of not providing adequate periodontal care. Indeed, Bownes specifically mentioned cavities and fillings. But he also stated more generally "I'm still having issues [with] my teeth" and that he had "problems [with] [his] teeth." It may well be that the problems that Bownes complained of were not due to decay but due to periodontal disease. The cause of tooth pain is not something necessarily within a lay person's knowledge. And given Bownes' moderate periodontitis at intake, Shulman predicted that "[i]t [was] more likely than not that [Bownes'] periodontal condition [would] worsen during the [two-year wait] and result in gratuitous pain, loss of bone, and tooth loss." (ECF No. 242, PageID.6441.)

The Court also finds that Bownes' claim is typical of the claims of the class he seeks to represent. *See* Fed. R. Civ. P. 23(a)(3). Bownes was diagnosed with moderate periodontal disease

at intake. And the record before the Court does not indicate whether he has received treatment for that condition. Thus, on this record, Bownes' claim is presumably similar to the claims of the class he seeks to represent.

All that said, the Court recognizes that Bownes is not the ideal class representative for Class IIB (because he might not have exhausted the proper claim (or any claim) and because he might have received periodontal treatment). But that fact is not overly concerning. It seems that in identifying class representatives, Plaintiffs' counsel sought prisoners who were in fact suffering serious harm. But it would suffice to identify a prisoner who maintains that he or she is at a substantial risk of suffering serious harm. For redefined Class IIB, that would include any prisoner with healthy gums, gingivitis, early periodontitis, or stable moderate periodontitis—there are likely thousands of such prisoners. Even if none of these prisoners are suffering serious harm from the lack of periodontal treatment, they each could represent the class because the claim is that the lack of periodontal treatment subjects each class member to a substantial *risk* of serious harm. In short, the Court has no doubt that Plaintiffs' counsel can identify many prisoners who could represent proposed Class IIB.[2]

Having found commonality, typicality, and that Bownes is an adequate class representative, the Court turns to the competency of class counsel. *See* Fed. R. Civ. P. 23(a)(4). Daniel Manville directs the Civil Rights Clinic at Michigan State University College of Law. He

_____

[2] The Court recognizes that Defendants may claim that any prisoner who seeks to represent this class must have administratively exhausted a claim that the MDOC's policy of not providing periodontal treatment to those with stable moderate periodontitis (or healthier) is unconstitutional. That is not necessarily true. If at least one class member has exhausted that claim, it seems that any class member could serve as a representative. The aim of exhaustion is to allow the MDOC to self-correct, i.e., to change their policy on periodontal treatment; so if one prisoner were to grieve the policy, and the MDOC were to deny that grievance, the MDOC would have had its fair opportunity. *See Woodford*, 548 U.S. at 93; *Johnson v. Johnson*, 385 F.3d 503, 522 (5th Cir. 2004) ("[T]he primary purpose of a grievance is to alert prison officials to a problem[.]").

has considerable experience in litigating prisoner civil rights cases. (*See* ECF No. 242, PageID.6383.) And he has previously litigated a class action. (*Id.*) Robert and Tracie Gittleman have handled numerous cases centered on dental care. (*Id.*) Defendants have not questioned Plaintiffs' counsel's ability to successfully navigate a class action. The Court trusts that Plaintiffs' counsel will harness all necessary resources to competently represent this class. *See* Fed. R. Civ P. 23(a)(4).

Remaining is Rule 23(b). Plaintiffs (in their motion at least) assert that their proposed classes are of the (b)(2) variety. That part of Rule 23 requires Plaintiffs to show that Defendants "ha[ve] acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Here, Defendants are alleged to have acted on grounds that apply to each class member: there is a memorandum from MDOC's dental director advising dental supervisors that prisoners with stable moderate periodontitis (or healthier) do not need periodontal treatment. As for Rule 23(b)(2)'s single-injunction requirement, if Plaintiffs are correct, the resulting injunction could, for example, require the MDOC to provide dental cleanings on an annual basis. The Court thus finds Rule 23(b)(2) satisfied. *See Parsons v. Ryan*, 754 F.3d 657, 687 (9th Cir. 2014) ("'[I]t should be noted that a common use of Rule 23(b)(2) is in prisoner actions brought to challenge various practices or rules in the prisons on the ground that they violate the constitution.'" (quoting Wright & Miller, 7AA Fed. Prac. & Proc. Civ. § 1776.1 (3d ed.))); 2 Newberg on Class Actions § 4:40 (5th ed.) ("Historically, Rule 23(b)(2) class actions have been used as a vehicle to vindicate civil rights violations.").

In sum, the Court certifies the following class as Class IIB: "All prisoners incarcerated in an MDOC correctional facility with healthy gums, gingivitis, early periodontitis, and stable

moderate periodontitis" insofar as these prisoners claim that the MDOC's failure to provide them with periodontal treatment exposes them to a substantial risk of serious harm.

**D.**

Proposed Class IIA also meets Rule 23's requirements.

Start, again, with commonality. As redefined, this class consists of any MDOC prisoner who has caries that have reached the dentin or who has early periodontitis (or worse). Thus, each prisoner in Class IIA is already past the earliest stage of a progressive disease (an incipient lesion in the case of caries or gingivitis in the case of periodontal disease). And it is at least plausible that if caries that have reached the dentin or early periodontitis is not accurately diagnosed (via periodontal probing and intra-oral x-rays), each class member's condition will soon progress to a stage of the disease that is "serious" in the Eighth Amendment sense. Indeed, Shulman suggests that caries that have reached the dentin are already constitutionally "serious" in that they require professional dental treatment. *See* (ECF No. 242, PageID.6410); *Baynes v. Cleland*, 799 F.3d 600, 618 (6th Cir. 2015) (providing that "serious harm" includes conditions "diagnosed by a physician as mandating treatment"). And, for one plaintiff who had "moderate" periodontal disease at intake, Shulman opined, "It is more likely than not that his periodontal condition will worsen during the [two-year] quarantine and result in gratuitous pain, loss of bone, and tooth loss." (ECF No. 242, PageID.6441.) And for another plaintiff who had "early-moderate" periodontal disease at intake, Shulman opined, "It is more likely than not that his periodontal disease will progress during his two-year quarantine period." (ECF No. 242, PageID.6443.) So in deciding whether the MDOC's failure to conduct periodontal probing and failure to take intra-oral x-rays exposes each member of Class IIA to a substantial risk of serious harm, the Court may be able to avoid examining each member's dental records. Instead, it seems possible to resolve the Eighth Amendment claim based

on just the following information: the class member's stage in the progressive disease process (which, by definition, is at least caries to the dentin or early periodontitis), evidence relating to how that disease generally progresses, and evidence relating to the accuracy of the MDOC's current diagnostic methods (e.g., visual inspection and panoramic x-rays). In other words, it is at least plausible that the Court will be able to decide a key issue underlying each member's Eighth Amendment claim in "one stroke." At a minimum, the Court could decide the common question of whether caries and periodontal disease can be reliably diagnosed absent probing and intra-oral x-rays.

Turning to Rule 23(a)(3) and (a)(4), the Court has already found that Bownes, who was diagnosed with moderate periodontal disease at intake, can represent Class IIB—those with stable-moderate periodontal disease. For similar reasons, the Court finds that Bownes will adequately represent those who have early or moderate periodontal disease and claim that, without probing and intra-oral x-rays, the severity of their conditions will be underestimated. While this is not the entirety of Class IIA, in pursuing his claim that intra-oral x-rays were necessary to have accurately diagnosed his moderate periodontal disease, Bownes will be advancing the more general claim that intra-oral x-rays are necessary for proper caries and periodontal disease diagnoses. And that is the claim of all members of Class IIA. Moreover, Anthony Richardson appears to be an adequate class representative for Class IIA. In September 2015, he was diagnosed with moderate periodontal disease yet, less than five months later, the periodontitis around his first and second teeth was so severe that the recommended treatment was to extract tooth #1 and #2. (ECF No. 242, PageID.6446–6447.) Perhaps probing or intra-oral x-rays in September 2015 (or earlier), might have avoided extraction.

As for the remaining Rule 23 requirements, they too are met. Although the precise number of prisoners with caries that have reached the dentin or early (or worse) periodontitis is not known, in a prison population of 37,000, it is undoubtedly hundreds. That is too many for joinder. *See Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001) ("No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."); 1 Newberg on Class Actions §§ 3:12, 3:13 (5th ed.) ("As a general guideline . . . a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone. . . . [A] good-faith estimate of the class size is sufficient when the precise number of class members is not readily ascertainable"). And for reasons similar to those provided above for Class IIB, the Court finds that it could craft a single injunction that gives relief to all in Class IIA. *See* Fed. R. Civ. P. 23(b)(2). As an example, the Court could order that the MDOC conduct probing and take intra-oral x-rays at intake and then every two years thereafter.

**E.**

Proposed Class III likewise satisfies Rule 23's requirements.

Start with commonality. As redefined, this proposed class consists of all prisoners who have requested dentures and who satisfy the criteria for dentures set out in Sections 15 and 16 of Chapter VI of the Dental Services Manual. Given that the class definition is premised on the MDOC's own criteria for dentures, all prisoners in this class medically need dentures. (*See* ECF No. 246, PageID.7040.) Thus, all of these prisoners are at *some* risk of one or more of the following: not chewing, chewing in pain, weight loss, weight gain, malnutrition, or digestive problems. True, as this Court has said with other classes, certain prisoners in this class are likely resistant to these symptoms and so their risk of experiencing any one of these symptoms would be

low. But it is plausible that—in aggregating the numerous risks—even the healthiest prisoner who has a medical need for dentures will be at a substantial risk of some variety of serious harm. *See Harter v. Davis*, No. 06-13657, 2008 WL 786742, at *7 (E.D. Mich. Mar. 24, 2008) (noting that delay in denture provisions, with attendant symptoms, may implicate a serious medical need and citing cases). Accordingly, on the record as it stands, this class clears Rule 23(a)'s commonality hurdle.

Turning to the other Rule 23(a) requirements, Defendants argue that none of the named plaintiffs will fairly represent this class. Although there are five plaintiffs that want to represent this class, Defendants say that two received their dentures before they became plaintiffs in this case, one has not exhausted his administrative remedies, another does not qualify for dentures under the MDOC's criteria, and the fifth, James Gunnels, is still under the two-year rule. (ECF No. 246, PageID.6981.)

But some time has lapsed between the filing of Defendants' response brief and the issuance of this opinion. And Gunnels, who has no teeth, cleared the two-year bar less than four months ago, on October 20, 2018. (ECF No. 246, PageID.6981.) As it appears that the time to fabricate dentures is around six months, it is likely that Gunnels has not yet received his dentures. So it appears that Gunnels' claims are typical of the class member's claims and that he is an adequate representative. *See* Fed. R. Civ. P. 23(a)(3), (4).

True, the Court is not certain about the status of Gunnels' dentures. But this uncertainty is again not a major concern because there are again many who could represent this class. As explained, Plaintiffs' counsel need not find a representative suffering serious harm; it would be sufficient for counsel to find any prisoner allegedly at a substantial *risk* of suffering serious harm who is willing to serve as a class representative. Here, that would be any prisoner who has cleared

the two-year hurdle and needs dentures to chew effectively—presumably a group of thousands. So even if Gunnels is not a proper representative, there are many who would be.

That leaves Rule 23(b)(2). Defendants are alleged to have acted on grounds that apply to each class member: Plaintiffs say that they are without dentures for too long and that delay exposes each class member to a substantial risk of serious harm. As for Rule 23(b)(2)'s second requirement, if Plaintiffs are correct, the resulting injunction could require the MDOC to provide all class members dentures in, say, five months. Or it might require the MDOC to expand their dental or fabrication staff. In all events, a single injunctive order could grant each class member relief. The Court thus finds Rule 23(b)(2) satisfied.[3]

## F.

The remaining proposed class for evaluation is Class IVB. That proposed class consists of all prisoners whom the MDOC has identified as awaiting urgent dental care. These prisoners assert that the time it takes MDOC to provide them with treatment results in serious harm or, at least, exposes them to a substantial risk of serious harm.

This class satisfies Rule 23(a)'s commonality requirement. True, delay in treatment may harm some prisoners more than others. *See Phillips v. Sheriff of Cook County*, 828 F.3d 541, 555 (7th Cir. 2016) ("[T]he length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment."). But the decertified class of prisoners in *Phillips* consisted

---

[3] The Court recognizes that this class may need alteration and sub-classing. The Court's definition uses the MDOC's denture-eligibility criteria. But Shulman believes that chewing surface area, rather than number of teeth in functional occlusion, is the proper way to identify those who need dentures. So, perhaps, the class definition might be altered to be based on surface area. As for sub-classing, the Court's definition includes those prisoners who medically need dentures but are not entitled to them either because of the MDOC's rule that prisoners are only entitled to dentures once every five years or because they have not yet served two years in prison. (*See* ECF No. 246, PageID.7039.) As the "delay" to these prisoners is due to a rule (rather than a waitlist or fabrication time), these prisoners might be better placed in a separate class or subclass.

of all detainees at the jail. And so the risk of harm from delay would have varied greatly, i.e., the risk spectrum was wide. Here, in contrast, each member of Class IVB has an urgent dental need. In other words, this is not a situation where delay will result in no suffering to some class members but great suffering to others. Delay plausibly subjects each class member to a similar risk of similar harm because each class member has a dental condition that, by definition, requires near-immediate attention.

The Court further finds that Timothy Brownell is an adequate class representative and that his claims are typical of those in Class IVB. Defendants have not argued that Brownell has not exhausted administrative remedies. And a review of Brownell's dental records reveals that on July 13, 2017, he sent an "urgent" request for dental care. (ECF No. 246, PageID.7202.) He was not seen until four days later when an x-ray revealed that tooth #3 had an abscess. (*Id.*) The tooth was extracted. (*Id.*) Thus, Brownell waited four days for urgent dental services and his treatment is typical of that complained of by all other class members. *See* Fed. R. Civ. P. 23(a)(3), (4).

So far the Court has not needed to address numerosity in detail (either because the other classes failed Rule 23's commonality requirement or obviously cleared the numerosity requirement). Although the Court does not know how many prisoners are waiting for urgent dental services at any given time, it is safe to assume that among 37,000 prisoners, there are at least 100 waiting. That suffices. *See Stewart*, 275 F.3d at 226–27; 1 Newberg on Class Actions §§ 3:12, 3:13 (5th ed.).

Proposed Class IVB also fits within the category of classes set out in Rule 23(b)(2). The time it takes the MDOC to process requests for urgent dental care applies to each class member. And a single injunction could provide each class member with relief. For instance, the Court could order that the wait time for urgent dental services be reduced to two days.

Accordingly, Class IVB warrants certification.

**IV.**

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' motion for class certification. (ECF No. 241.) The attached appendix summarizes the Court's rulings.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Date: February 13, 2019

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served upon counsel of record on February 13, 2019, using the ECF system.

s/William Barkholz
Case Manager to
Honorable Laurie J. Michelson

| Class | Definition | Size | Legal Claim | Representative (if certified) |
|---|---|---|---|---|
| Proposed Class I | All prisoners who have less than 24 months of uninterrupted incarceration within an MDOC correctional facility starting from the prisoner's first day at the reception center | 19,000 (approximate) | Each class member claims that the MDOC's requirement that he or she be incarcerated for two years before becoming eligible for routine dental care exposes him or her to a substantial risk of serious harm of which Defendants are aware | |
| Class IIA | All prisoners incarcerated in an MDOC correctional facility who have caries that have reached the dentin or have early (or worse) periodontitis | Hundreds | Each class member claims that the MDOC's failure to use periodontal probing and intra-oral x-rays exposes him or her to a substantial risk of serious harm of which Defendants are aware | Melvin Bownes and Anthony Richardson |
| Class IIB[4] | All prisoners incarcerated in an MDOC correctional facility with healthy gums, gingivitis, early periodontitis, and stable moderate periodontitis | Thousands | Each class member claims that the MDOC's failure to provide him or her with periodontal treatment exposes him or her to a substantial risk of serious harm of which Defendants are aware | Melvin Bownes |
| Class III | All prisoners incarcerated in an MDOC correctional facility who have requested dentures and who satisfy the criteria for dentures in Sections 15 and 16 of Chapter VI of the MDOC's Dental Services Manual[5] | Hundreds or Thousands | Each class member claims that the time it takes for the MDOC to provide dentures exposes him or her to serious harm or, at least, a substantial risk of serious harm, of which Defendants are aware | James Gunnels |

---

[4] The Court here refers to Class IIB as certified. The version of Class IIB that was not certified consisted of all MDOC prisoners and asserted that the MDOC's periodontal treatment plans (including the lack of scaling and root planing) exposed them to a substantial risk of serious harm.

[5] As noted, this class may be subject to redefinition or sub-classing.

| Class | Definition | Size | Legal Claim | Representative (if certified) |
|---|---|---|---|---|
| Proposed Class IVA | All prisoners on the Routine Dental Appointment List | 3,000 (approximate) | Each class member claims that the time it takes the MDOC to provide him or her with routine care (e.g., five months) exposes him or her to a substantial risk of serious harm | |
| Class IVB | All prisoners that the MDOC has identified as waiting for urgent dental services | Hundreds | Each class member claims that the time it takes the MDOC to provide him or her with urgent care (e.g., three days) causes him or her serious harm or, at least, exposes him or her to a substantial risk of serious harm | Timothy Brownell |