UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MELVIN BOWNES,
ANTHONY RICHARDSON,
TIMOTHY BROWNELL, and
JAMES GUNNELS,
*on behalf of themselves and those
similarly situated*,

      Plaintiffs,

v.

HEIDI WASHINGTON and
JONG CHOI,

      Defendants.

Case No. 14-11691
Honorable Laurie J. Michelson
Magistrate Judge Jonathan J.C. Grey

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [363] AND
DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [366]**

---

Plaintiffs Melvin Bownes, Anthony Richardson, James Gunnels, and Timothy Brownell each claim that they have not received adequate dental care while in the custody of the Michigan Department of Corrections. In fact, they maintain that Defendants MDOC Director Heidi Washington and MDOC Dental Director Jong Choi are deliberately indifferent to their serious dental problems. In Plaintiffs' view, this makes their incarceration the type of "cruel and unusual punishment[]" prohibited by the Eighth Amendment of the U.S. Constitution.

And Plaintiffs say they are not unique in this regard. In fact, each represents a class of hundreds if not thousands of inmates who have dental conditions like theirs

and who believe they too are not being provided dental care that comports with the Constitution.

Primarily, Plaintiffs challenge three aspects of MDOC's dental care. One is MDOC's policy that inmates are not eligible for routine dental care during their first two years of imprisonment. Plaintiffs also claim that MDOC neither adequately diagnoses nor adequately treats periodontal disease (gum disease). And, they say, MDOC does not adequately diagnose or treat caries (tooth decay). Due to these alleged deficiencies in dental care, Plaintiffs say that MDOC inmates will experience serious harm like an abscess or tooth loss or, at a minimum, they are at substantial risk of experiencing those serious harms.

As relief, Plaintiffs do not seek damages. Instead, they seek to improve the dental care provided by MDOC going forward. Or in legal terms, they seek a prospective injunction. They ask the Court to order MDOC to change its dental policies and practices so that they are no longer subject to cruel and unusual punishment.

After nine years of litigation, this case has finally reached the summary-judgment stage. Both sides seek summary judgment in their favor. Defendants argue that no reasonable factfinder could conclude that they have violated the Eighth Amendment. While Defendants have made a strong case for summary judgment, and while certain claims will be dismissed, the Court will deny their motion for the most part. And Plaintiffs' motion for summary judgment will be denied. The Court justifies these rulings, in painstaking detail, below.

# I. Background

Because this case centers on the two-year rule, the treatment and diagnosis of periodontal disease, and the treatment and diagnosis of caries, a thorough understanding of these concepts is necessary.

## A. The Two-Year Rule

In 2013, about a year before this suit was filed, MDOC instituted a policy that made inmates ineligible for "routine" dental care until they completed two years of uninterrupted incarceration. *See* (ECF No. 363-10, PageID.9536); MDOC Dental Service Manual at 4 (eff. Dec. 19, 2017), *available at* (ECF No. 363-2, PageID.8858). Generally speaking, 15 to 20 percent of MDOC's inmates serve less than two years in prison or, at least, have a minimum sentence of two years or less. (*See* ECF No. 363-10, PageID.9507; ECF No. 384, PageID.15415.) Before the two-year rule was implemented, there were almost 15,000 inmates on the waitlist for dental care. (ECF No. 363-10, PageID.9534.) Following implementation of the rule, the waitlist dropped to about 6,700 inmates. (ECF No. 363-10, PageID.9534.)

Inmates subject to the two-year rule are still entitled to "emergency" and "urgent" dental services; but they do not receive "routine" dental services. "Generally," urgent needs include "facial swelling, oral facial trauma, uncontrolled postoperative bleeding, or significant pain or discomfort." MDOC Policy Directive 04.06.150 ¶ D (eff. May 1, 2018) *available at* (ECF No. 363-3). In contrast, "routine" dental services include "[l]imited diagnostic, restorative, periodontal, prosthetic, and non-urgent oral surgical procedures." *Id.* at ¶ C. Dental care for urgent (and

3

emergent) needs are provided to inmates at any point during their incarceration—even if they have served less than two years. *Id.* at ¶ L.

Three aspects of the two-year rule should be highlighted.

First, prisoners are required to serve two years before requesting a "complete" dental exam. When an inmate enters the correctional system, MDOC performs an "intake" or screening dental exam, which is not as thorough as a complete exam. At the intake exam, a dentist reviews the new inmate's dental-health history, completes a visual inspection for (among other things) periodontal disease and caries, and instructs on oral hygiene. Policy Directive 04.06.150 ¶ J. If the intake exam reveals an urgent dental need, the inmate is referred to MDOC's stabilization clinic where the urgent need can be addressed. *Id.* at ¶ K. In contrast, in a complete exam, dentists take more detailed "bitewing" x-rays and create a treatment plan. MDOC Dental Services Manual at 11 (eff. Dec. 19, 2017); (ECF No. 363-10, PageID.9446).

Although inmates become eligible for a complete exam after serving two years, they are not provided that exam at the two-year mark but are instead placed on a waitlist. Thus, about 50% of inmates do not receive their complete exam until after 28 months in prison and about 25% of inmates wait even longer for their complete exam, 34 months. (ECF No. 384, PageID.15446.) After the first complete exam, an inmate is eligible for one "periodic" exam each year. Dental Services Manual at 17.

Second, inmates are not eligible for a periodontitis treatment called "scaling and root planing" until they serve two years in prison. *See* Policy Directive 04.06.150 ¶ M.3; (ECF No. 363-10, PageID.9414–9415 (Choi discussing ¶ M.3)). If the intake

4

exam reveals urgent periodontitis, the stabilization clinic will only provide a "debridement," which is a different type of cleaning than a scaling and root planing. (*See* ECF No. 363-5, PageID.8988–8989, 9010–9011; ECF No. 374-7, PageID.12862.) During the two-year period, inmates can make an urgent care request and so it is possible that a dentist could prescribe a scaling and root planing in connection with that request. But neither party has indicated how often this occurs.

A third aspect of the two-year rule is particularly relevant to the pending motions: many (if not most) inmates will not receive fillings for their cavities until they serve two years in prison. See Policy Directive 04.06.150 ¶ M. According to Carla Maxwell, a dentist that conducts intake examinations and provides treatment at the stabilization clinic, if a cavity is too shallow to be urgent, a filling is not provided; and if the cavity is so deep that the tooth is not restorable, the tooth is extracted.  (*See* ECF No. 363-5, PageID.9040, 9058.) But, says Maxwell, there are circumstances where, during the two-year period, the cavity is deep enough to be urgent, but not so deep to warrant extraction, and so a filling is provided. (ECF No. 363-5, PageID.9042, 9059; *see also* ECF No. 363-10, PageID.9340 (Choi describing when a filling would be provided at the stabilization clinic).)

## B. Periodontal Disease

### 1. What is Periodontal Disease?

For purposes of this case, periodontal disease consists of periodontitis and gingivitis.

Basically, gingivitis causes inflammation of the gums. (*See* ECF No. 366-6, PageID.10833.) One way to diagnose gingivitis is to touch the gums with a dental probe; in patients with gingivitis, the gums will bleed. (ECF No. 374-8, PageID.12942; ECF No. 366-6, PageID.10791.) Gingivitis is reversible and painless. (ECF No. 384, PageID.15383, 15422–15423.) Treatments for gingivitis include good oral hygiene and a gingivitis-specific cleaning that removes calculus—essentially bacteria that has hardened itself—from above and below the gumline. (ECF No. 374-8, PageID.12943; ECF No. 366-2, PageID.9865–9866.)

Periodontitis is a disease that attacks the alveolar bone and periodontal ligament, which are structures that hold the tooth in place. (ECF No. 384, PageID.15380–15381.) This drawing shows a healthy alveolar bone, ligament, and tooth and those same structures attacked by periodontitis:



(ECF No. 384, PageID.15381.) As periodontitis progresses, the ligament and bone are increasingly damaged. This results in a "pocket" or "loss of attachment" between the

tooth's root and the gums. (*See* ECF No. 384, PageID.15381.) This loss of attachment distinguishes periodontitis from gingivitis. (ECF No. 374-8, PageID.12943.) These pockets permit harmful calculus to form on the tooth's root (the portion of the tooth below the normal gumline). (*See* ECF No. 366-3, PageID.9950; ECF No. 384, PageID.15426 n.197.) The damage caused to the alveolar ligament and bone by periodontitis is not reversible. (ECF No. 366-6, PageID.10830.)

Periodontitis is a stealthy disease: usually it is not painful until it reaches an advanced stage. (ECF No. 384, PageID.15420.) Thus, if a patient is not informed that she has periodontitis, she might not seek treatment for it until an abscess forms or her teeth have become loose. (ECF No. 384, PageID.15422–15423; ECF No. 366-3, PageID.9904.) At that point, the teeth are often not salvageable absent advanced surgical procedures. (ECF No. 384, PageID.15425 n.191.)

As a result of a "World Workshop" for periodontology in 2017, periodontitis is now categorized in three dimensions: stage, grade, and extent. Stage is a measure of severity. Stage I is the least severe ("a borderland between gingivitis and periodontitis") and Stage IV the most severe (significant alveolar bone loss and, possibly, tooth loss). (ECF No. 384, PageID.15386–15387.) Grade is a measure of how fast the disease is progressing, with Grade A for slow progression and Grade C for rapid. (ECF No. 384, PageID.15388.) Several individualized factors—referred to as "host" factors—affect the rate of progression. (ECF No. 384, PageID.15388; ECF No. 366-2, PageID.9872.) Among these host factors are smoking, diabetes, and oral hygiene. (*Id.*; ECF No. 384, PageID.15388.) As for extent, that is a measure of how

many teeth (and which) the disease is attacking; periodontitis can be localized to a few teeth or generalized throughout the mouth. (*See* ECF No. 384, PageID.15387.)

Although neither party has discussed it, the concept of "active" periodontitis may explain some of the inconsistent diagnoses in inmates' dental charts. Periodontitis is a chronic disease, but treatment may make the disease "stable" or, given the parties' heated debate over that term, treatment may greatly slow the disease. (ECF No. 374-8, PageID.12954; ECF No. 366-7, PageID.10980–10981.) Thus, it appears that a dentist might diagnose say, moderate periodontitis based on bone loss, but that diagnosis does not necessarily mean the disease is active. (ECF No. 366-6, PageID.10869, 10871.) And, while also not addressed by the parties, it appears that only "active" periodontitis requires immediate treatment. (ECF No. 366-6, PageID.10741 (Johnston testifying that after treatment, the patient is "reevaluate[d] to find out which sites are active or which sites are stable" and that treatment is discontinued for stable sites); ECF No. 363-5, PageID.8990–8991 (Maxwell testifying that "moderate bone loss" is "moderate periodontal disease" but that "just because you have whatever percent bone loss you have, does not mean you are in an acute situation"); ECF No. 366-7, PageID.10980–10981 (Gillette testifying that a patient can "have periodontal disease but they don't need treatment").)

Periodontitis is a common disease. About 45% of the adult population have some form of the disease. (*See* ECF No. 384, PageID.15381 & n.14.) But in correctional populations, there is a higher percentage of people with moderate to severe periodontal disease than in the general population. (ECF No. 384, PageID.15383.)

8

Left untreated, periodontitis can result in periodontal abscesses (ECF No. 384, PageID.15423, 15424–15425 n.51, 15467) and tooth loss (ECF No. 384, PageID.15376).

### 2. How is Periodontitis Diagnosed?

*Diagnosis of Periodontitis Generally*. Periodontitis is diagnosed based on several factors. Some of the factors—inflammation of the gums and the patient's oral health history—do not require a dentist to use any special tools. (See ECF No. 363-8, PageID.9217.) But a pair of tools for diagnosing periodontitis lie at the heart of this case: periodontal probing and "bitewing" x-rays.

Take probing first. Periodontal probing is the process of measuring pocket depths in millimeters using a periodontal probe. (*See* ECF No. 384, PageID.15381.) In other words, the probe is placed in the space between the tooth and the gums to check how deep the probe goes. Some might recall their hygienist reading out numbers as he works his way around the mouth, "3, 2, 3; 2, 1, 2; . . ."; that process is periodontal probing and charting. A "periodontal screening and recording" or "PSR" (not to be confused with "SRP," a treatment for periodontitis) is an abbreviated probing and charting used by many correctional departments and the military. (ECF No. 384, PageID.15382.) A PSR takes only a couple of minutes to complete. (ECF No. 366-9, PageID.11466.) In contrast, a comprehensive periodontal probing and charting involves measuring and recording six pocket depths of every tooth. (ECF No. 366-6, PageID.10718, 10833.) But even this more comprehensive process takes less than ten minutes. (ECF No. 363-10, PageID.9444; ECF No. 366-9, PageID.11465.)

9

It is standard practice to perform periodontal probing to diagnose periodontitis. One of Plaintiffs' experts, Jay Shulman, DMD, opines, "[periodontal probing has been the] standard of care for ages." (ECF No. 374-8, PageID.12953.) In his opinion, "You cannot diagnose periodontal disease without probing." (ECF No. 374-8, PageID.12953.) Stephen Harrel, DDS, Plaintiffs' other expert, similarly opines that periodontal disease cannot be diagnosed "without the use of a periodontal probe to measure the depth" of the "space between the gum and the tooth/root." (ECF No. 366-2, PageID.9859; *see also id.* at PageID.9923 (opining that without probing, there were no situations where periodontal disease could be accurately diagnosed).) And even Defendants' expert, Jeffrey Johnston, DDS, believes that the "standard of care" (which he agreed was "the minimum diagnostic and treatment process that a clinician should follow" for a particular illness (ECF No. 366-6, PageID.10680)) required dentists to use probing to diagnose periodontitis. (ECF No. 366-6, PageID.10765, 10850 ("I would agree that the probing is a standard of care").)

Moreover, several MDOC dentists conceded that in private practice generally, or at least at their private practices, periodontal probing is performed to diagnose periodontal disease. (*See e.g.*, ECF No. 366-7, PageID.10979 (Gillette), ECF No. 363-5, PageID.8995, 9002 (Maxwell), ECF No. 366-5, PageID.10476 (Minnich).) Even Jong Choi, MDOC's Dental Director and the primary defendant in this case, conceded that in private practice generally, and at his private practice specifically, periodontal probing is used to diagnose periodontal disease. (ECF No. 363-10, PageID.9346, 9444; *see also id.* at PageID.9323.)

Dentists also use x-rays to diagnose periodontitis. Two types of x-rays are at issue in this case. One is the panoramic x-ray, which, as the name suggests, is taken by a device rotating in a half circle around the patient's head; the result is an image of the entire mouth and upper and lower jaw. The other is the "bitewing" x-ray, which is taken by placing a device inside the patient's mouth; the result is an image of just a few teeth in one area of the mouth. Here is a panoramic x-ray and a bitewing x-ray:

Panoramic

Bitewing

 

(ECF No. 384, PageID.15400–15401.)

Although Plaintiffs' experts made compound statements—referencing both probing and x-rays at once—it appears that they also believe that periodontitis cannot be accurately diagnosed without bitewing x-rays. For instance, Shulman opines that under "professional standards," a periodontitis treatment plan would be based on "probing and bitewing x-rays." (ECF No. 384, PageID.15402, 15434.) He further opines that without "bitewing x-rays and periodontal probing," a patient's periodontitis might be underdiagnosed. (ECF No. 384, PageID.15485.) Harrel, also one of Plaintiffs' experts, believes that "the use of only panoramic radiographs for periodontal diagnosis is inadequate and below the standard of care." (ECF No. 366-2, PageID.9872.)

11

Defendants' expert disagrees—to an extent. Johnston believes that if a panoramic x-ray is of "diagnostic" quality, it can be used to stage periodontitis and, in more advanced cases, even diagnose it. (*See* ECF No. 366-6, PageID.10782; *see also id.* at PageID.10800, 10809.) Thus, Johnston believes that diagnosing periodontitis with a high-resolution panoramic x-ray and probing—as opposed to bitewing x-rays and probing—would not necessarily violate the standard of care. (*See* ECF No. 366-6, PageID.10783, 10785, 10850, 10857–10858.)

*MDOC Diagnosis of Periodontitis.* At the intake exam, probing is not used to diagnose periodontitis. (ECF No. 363-10, PageID.9291–9292, 9326 (Choi); ECF No. 363-5, PageID.8985, 9157 (Maxwell, intake dentist).) Bitewing x-rays are not taken at the intake exam, either. (ECF No. 363-5, PageID.9158 (Maxwell); ECF No. 363-10, PageID.9324–9325 (Choi).) Instead, MDOC takes a panoramic x-ray, which Shulman concedes is "high resolution for a pano." (ECF No. 374-8, PageID.12936.) Thus, MDOC's intake dentists assess periodontitis by conducting a visual inspection of the mouth (aided by a dental mirror), a review of the inmate's oral-health history, and a review of the panoramic x-ray. (ECF No. 363-10, PageID.9321, 9362 (Choi).) Following that exam, MDOC dentists designate inmates as having normal gums, gingivitis, early periodontitis, stable moderate periodontitis, unstable moderate periodontitis, or advanced periodontal disease. (ECF No. 384, PageID.15418 (Shulman); ECF No. 363-10, PageID.9505 (Choi memorandum).)

At the first complete exam, which takes place after serving two-and-half years or so in prison, MDOC dentists do take bitewing x-rays. But probing is still not

regularly performed. (ECF No. 363-10, PageID.9326 (Choi testifying that at a complete exam, there are no periodontal measurements and that pocket depths are not recorded); *see also* ECF No. 384, PageID.15421 (Shulman).) And if probing is performed, the pocket depths are not usually recorded, meaning that there are no baseline depths to track periodontitis progression. (ECF No. 363-10, PageID.9326; ECF No. 384, PageID.15421.)

Thus, to summarize, MDOC dentists diagnose periodontitis at intake without the benefit of periodontal probing or bitewing x-rays. At complete exams, MDOC dentists do use bitewing x-rays to diagnose periodontitis but rarely perform periodontal probing. Moreover, pocket depths are generally not recorded at any point during an inmate's incarceration.

### 3. How is Periodontitis Treated?

Before describing periodontitis treatment, some additional terminology is in order. Plaintiffs stress that "prophylaxis," "debridement," and "scaling and root planing" are three different procedures. And at least according to Current Dental Terminology codes published by the American Dental Association, they are correct. Under the CDT, a "debridement" involves "the preliminary removal of plaque and calculus that interferes with the ability of the dentist to perform a comprehensive oral evaluation." (ECF No. 366-2, PageID.9866.) And a "prophylaxis" is defined as the "[r]emoval of plaque, calculus, and stains from the tooth structures"—apparently a standard cleaning at, say, a six-month checkup. (ECF No. 366-2, PageID.9865.) In contrast to debridement and prophylaxis, "scaling and root planing" "involves

instrumentation of the crown *and root surfaces of the teeth* to remove plaque and calculus from these surfaces." (ECF No. 366-2, PageID.9866 (emphasis added).) Scaling and root planing is "therapeutic, not prophylactic, in nature" and is intended to be performed only when there is loss of attachment between the tooth and gums—otherwise "there is no exposed root surface to plane." (ECF No. 366-2, PageID.9866–9867.) In other words, while prophylaxis, debridement, and scaling and root planing all involve scaling the teeth to remove calculus, scaling and root planing is a specific treatment for periodontitis and necessarily includes going into the pocket formed by the disease and removing the tissue from the tooth root that has been permeated with calculus. (*See* ECF No. 366-2, PageID.9866–9867 (Harrel); ECF No. 366-3, PageID.9916–9917 (Harrel); ECF No. 384, PageID.15426 (Shulman); ECF No. 366-6, PageID.10734 (Johnston).)

According to Plaintiffs' experts, neither prophylaxis nor debridement suffices to treat periodontitis. (ECF No. 366-3, PageID.9914, 9962, 9971 (Harrel); ECF No. 384, PageID.15424–15426 (Shulman).) And, on this point, it appears that Johnston, Defendants' expert, agrees. (ECF No. 366-6, PageID.10750–10751 (agreeing debridement is not a treatment for "periodontal disease" and that a debridement would violate the standard of care for treating periodontitis); ECF No. 366-6, PageID.10724 (testifying that prophylaxis is a treatment for gingivitis).) Moreover, the experts largely agree that, typically, local anesthesia is used to perform a scaling and root planing, further distinguishing that treatment from prophylaxis and debridement. (ECF No. 384, PageID.15405 (Shulman); ECF No. 366-6, PageID.10734

(Johnston).) The evidence also suggests that scaling and root planing takes longer than a prophylaxis or debridement. (*See* ECF No. 384, PageID.15425 (Shulman); ECF No. 366-6, PageID.10726, 10736 (Johnston).)

Before 2020, MDOC dental staff might not have treated periodontitis with scaling and root planing or, at least, did not document "scaling and root planing" when they performed that procedure. Shulman reviewed 100 inmates' dental records from before 2020. (ECF No. 384, PageID.15432.) According to him, 61 of these 100 inmates were diagnosed with periodontitis at a complete exam, yet only a prophylaxis was documented on their charts. (ECF No. 315-11, PageID.8020.) In some of the dental records Shulman reviewed, the term "perio scale" appeared. (ECF No. 384, PageID.15465; ECF No. 374-8, PageID.12955.) But in Shulman's opinion, "perio scale" has "no clear definition" and "appears closer to an extended prophy" than a scaling and root planing. (ECF No. 384, PageID.15470.)

According to Choi, MDOC's Dental Director, there is a simple explanation for this. Prior to 2020, MDOC dentists and hygienists would use "prophylaxis," "debridement," and "perio scale" interchangeably and that each of these terms could include scaling and root planing. (ECF No. 374-9, PageID.13074, 13079.) Choi explains, "scaling and root planing versus prophylaxis, they are all the same teeth cleaning . . . . [A]s MDOC[,] we have been using the gross terminology as 'perio scaling' or 'scaling' or 'prophy' for all the situations, because we did not differentiate each terminology from one case to another." (ECF No. 374-9, PageID.13074.) "[The] bottom line," says Choi, "can be summarized as one word, a patient received a teeth cleaning,

our hygienists clean the teeth as needed." (ECF No. 374-9, PageID.13074, 13079; *see also* ECF No. 363-10, PageID.9243, 9245, 9408.)

Things changed starting in January 2020. That month, MDOC changed its computer system to the Corrections Offender Management System (COMS). (ECF No. 363-7, PageID.9202; ECF No. 363-10, PageID.9239.) With this change, MDOC began using the Current Dental Terminology codes published by the American Dental Association. (ECF No. 363-10, PageID.9238.) As such, for the past three years, MDOC has not used terms like "perio scale" and instead uses "Perio Scaling & Root Planing" along with the corresponding CDT codes for scaling and root planing. (ECF No. 379-1, PageID.14414.) Choi explains, COMS "prevent[s] . . . us [from] using the term[s] interchangeably." (ECF No. 374-9, PageID.13165.) And Defendants have produced evidence that from January 2020 to October 2022—a period that includes a routine-care hiatus due to COVID-19—MDOC dental staff "completed" over 900 scalings and root planings. (ECF No. 379-1, PageID.14368–14447.)

One other fact about how MDOC treats periodontitis: during an inmate's first two years of incarceration, he or she does not receive scaling and root planing for periodontitis (unless, perhaps, it is part of an urgent-care appointment). *See* Policy Directive 04.06.150 ¶ C (eff. May 1, 2018); Dental Services Manual at 4–5 (eff. Dec. 19, 2017). Maxwell, an intake and stabilization dentist, explains that if an inmate is diagnosed with acute periodontitis at intake, he or she would not be referred to the stabilization clinic for a scaling and root planing. (ECF No. 363-5, PageID.8989.) Instead, that inmate would be referred to the stabilization clinic for a debridement.

(ECF No. 363-5, PageID.8987, 9010.) Maxwell explains, "We refer for debridement because a debridement will allow for the hygienist to remove the large deposits of calculus that's present. That is a contributing factor to his acute periodontal issue at the point of exam." (ECF No. 363-5, PageID.8988.) Lisa Stout, an MDOC hygienist who has done a stint or two at the stabilization clinic, agrees that scalings and root planings are not performed at the clinic because "the patient is not eligible for routine treatment." (ECF No. 374-7, PageID.12862.) She explains that when she performed a debridement at the stabilization clinic she would just "knock[] off the big stuff" until the inmate could later receive a scaling and root planing. (ECF No. 374-7, PageID.12863.)

### C. Caries

This case also involves a separate, progressive disease: caries. The Court again takes a three-part approach: it will describe the nature of the disease, its treatment, and its diagnosis.

### 1. What is Caries?

In lay terms, caries is a cavity. For dentists, caries is "an infectious disease characterized by progressive destruction of tooth substance, beginning on the outer (enamel) surface or the exposed root surface." (ECF No. 384, PageID.15378.) An "incipient" lesion is one that has only caused damage to the tooth's enamel (a very tough but thin shell of the tooth). (ECF No. 384, PageID.15379.) At this point, the lesion "has the potential to re-mineralize, reversing the decay process." (ECF No. 384, PageID.15379.) As the decay deepens, it reaches the tooth's dentin, a substance less

resistant to decay than enamel. (ECF No. 384, PageID.15379.) According to Shulman, once a cavity has reached the dentin, "the patient should be scheduled for treatment." (ECF No. 384, PageID.15379; ECF No. 366-6, PageID.10842 (Johnston similarly testifying, "If I see caries that is getting halfway to the pulp, I'm going to want to do [a comprehensive exam] as soon as possible.").) If the caries lesion is allowed to progress further, it will eventually reach the tooth's pulp, i.e., the tooth's nerve and blood supply. (ECF No. 384, PageID.15379; ECF No. 366-6, PageID.10882.) Untreated caries can cause pain, infection, tooth loss, and, in some cases, a systemic infection. (ECF No. 384, PageID.15378.)

Like periodontitis, caries progression depends on an individual's host factors. These factors include diet and "dry mouth" caused by medications. (ECF No. 384, PageID.15380.) Because there are several factors that affect the rate of caries progression, it is not possible to state, as a general matter, how much time it would take for a cavity in the enamel to reach the dentin or pulp. (ECF No. 384, PageID.15430 (Shulman remarking that his "crystal ball is too cloudy to tell [him] how many months it [would] take the asymptomatic decay in [an inmate's tooth] to become symptomatic"); *see also* ECF No. 384, PageID.15430 (noting that the process "may take several years"); ECF No. 374-8, PageID.12936.)

### 2. How is Caries Treated?

Caries treatment depends on how far the lesion has extended into the tooth. For caries in the enamel only, a fluoride treatment with continued monitoring suffices. (ECF No. 374-8, PageID.12938.) If a cavity has reached the dentin, a filling

18

is typical treatment. (*See* ECF No. 374-8, PageID.12938.) Although MDOC provides fillings, they are not provided during an inmate's first two years in prison unless the cavity is urgent (but not so urgent to require extraction). (ECF No. 363-5, PageID.9042, 9059; *see also* ECF No. 363-10, PageID.9340.) Once a cavity has reached the pulp, a root canal is a common treatment. (ECF No. 384, PageID.15379.) But MDOC does not provide root canals, so for an inmate, an extraction might be the only remedy for a tooth with deep decay. *See* Policy Directive 04.06.150 ¶ N; (ECF No. 384, PageID.15379 n.6).

### 3. How is Caries Diagnosed?

In terms of the tools for diagnosing caries, the experts in this case largely agree.

According to Shulman, incipient lesions that have only attacked the enamel can be difficult to identify because "too little tooth has been affected to be seen on a radiograph." (ECF No. 384, PageID.15379.) Once caries has reached the dentin, it will still not be visible on a panoramic x-ray but can be diagnosed using a bitewing x-ray. (ECF No. 384, PageID.15401.) Further, says Shulman, when there is caries between teeth (i.e., interproximal decay), bitewing x-rays are needed to see it. (ECF No. 374-8, PageID.12935.) The exception is "very pronounced" interproximal caries— that decay will show up on even a panoramic x-ray. (*Id.*; *see also* ECF No. 366-3, PageID.9914 (Harrel).)

Defendants' expert largely agrees. In Johnston's opinion, a panoramic x-ray will reveal "gross" interproximal caries, but "it's much more difficult to see incipient

caries on a panorex than on a bitewing." (ECF No. 366-6, PageID.10785.) And Johnston conceded that the "standard of care" requires a dentist to use bitewing x-rays (or another type of intra-oral x-ray) to diagnose incipient, interproximal caries. (ECF No. 366-6, PageID.10786.)

As discussed, MDOC dental staff do not take bitewing x-rays at intake but do take them at the first complete exam.

### D. Plaintiffs' Challenges to MDOC's Dental Care

Now to the legal issues at hand.

This case is almost nine years old. Recounting the entire procedural history is not productive, but here are a few highlights. Plaintiffs filed this suit in 2014. In 2015, this Court denied Plaintiffs' first motion for class certification in part because it believed that threshold issues "such as exhaustion and mootness" should be resolved first. *Johannes v. Washington*, No. 14-CV-11691, 2015 WL 5634446, at *10 (E.D. Mich. Sept. 25, 2015). In 2016, the Court addressed Defendants' motion related to exhaustion and mootness and dismissed some of the named plaintiffs' claims. *See generally Johannes v. Washington*, No. 14-11691, 2016 WL 1253266 (E.D. Mich. Mar. 31, 2016). The case was then stayed for six months so that Plaintiffs could exhaust certain claims, and in late 2016, Plaintiffs filed a third amended complaint. (ECF No. 161, 168.) In 2018, following another motion by Defendants on the basis of exhaustion and some discovery, Plaintiffs filed their fourth amended complaint. (ECF No. 236.) Around this time, Plaintiffs also asked the Court to certify large classes consisting of

thousands, if not tens-of-thousands, of inmates in the custody of MDOC. *See* (ECF No. 242); *Dearduff v. Washington*, 330 F.R.D. 452, 456 (E.D. Mich. 2019).

The Court declined to certify some of the large classes Plaintiffs proposed. As the Court explained, in a group of thousands of inmates, the dental-health diversity is great. *See Dearduff v. Washington*, 330 F.R.D. 452, 466–67 (E.D. Mich. 2019). Imagine Jessica, who has never smoked, is not diabetic, is generally very healthy, and is fastidious about oral hygiene. Now imagine Michael, who is diabetic, has smoked for many years, is generally not very healthy, and has very poor oral hygiene. Suppose that at intake, Jessica is diagnosed with Stage I periodontitis, "the borderland between gingivitis and periodontitis" (ECF No. 384, PageID.15387), whereas Michael is diagnosed with Stage II, i.e., "established" periodontitis. If both Jessica and Michael go two-and-half years without scaling and root planing, there is at least a fair, and perhaps a very good chance that Jessica's periodontitis will not advance to a serious medical need, but just the opposite is true of Michael's periodontitis. (*See* ECF No. 366-6, PageID.10772 (Johnston discussing host factors).) So in a group of thousands of inmates, individualized inquiries abounded, meaning that the Court could not decide an issue central to each inmate's Eighth Amendment claim in "one stroke." *See Dearduff v. Washington*, 330 F.R.D. 452, 456, 467 (E.D. Mich. 2019) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).

But the Court did find that smaller classes with less dental-health diversity satisfied Rule 23's requirements for certification. And, ultimately, the Court certified

five classes. *Bownes v. Washington*, No. 14-CV-11691, 2021 WL 3700867, at *11 (E.D. Mich. Aug. 20, 2021).

Class IIA consists of inmates who have caries that reached the dentin or early, moderate, or advanced periodontitis. *Bownes*, 2021 WL 3700867, at *11. The members of this class claim that MDOC's failure to use intraoral x-rays at intake and failure to conduct periodontal probing at any point during their incarceration violates the Eighth Amendment's prohibition on cruel and unusual punishment. *See id.*

Class IIB consists of inmates who have healthy gums or gingivitis. *Bownes*, 2021 WL 3700867, at *11. The claims of this class will be clarified below but, for now, it suffices to say that these inmates claim that MDOC's failure to conduct probing and charting, and failure to provide certain dental cleanings, violates the Eighth Amendment.

Class IIC consists of inmates who have periodontitis but have not received all necessary scaling and root planing and follow-up treatment. *See Bownes*, 2021 WL 3700867, at *11. These inmates claim that MDOC's failure to provide them with scaling and root planing and the associated follow-up care violates the Eighth Amendment. *See id.*

The Court also certified two other classes. The members of Class III claim that MDOC does not provide dentures in a timely manner. *See Bownes*, 2021 WL 3700867, at *11. The members of Class IVB claimed that MDOC does not provide urgent care in a timely manner; by stipulation of the parties, the members of Class IVB agreed to dismiss their claim. (ECF No. 346, PageID.8486.)

22

Both sides now seek summary judgment.

## II. Legal Standards

### A. Cross-Motions for Summary Judgment

When, as here, both sides seek summary judgment, the Court considers each motion separately, and it is not necessarily the case that either party is entitled to summary judgment. *See Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 442 (6th Cir. 2021). When considering Plaintiffs' motion, the evidence is viewed in the light most favorable to Defendants and the initial (and ultimate) burden is on Plaintiffs to show that it is entitled to judgment as a matter of law. *See id.* The opposite is true when considering Defendants' motion. *See id.*

### B. Eighth Amendment Standards

The Eighth Amendment to the U.S. Constitution prohibits "cruel and unusual punishments." And a prison official subjects an inmate to cruel and unusual punishment if he is (1) deliberately indifferent to (2) a substantial risk that the inmate will suffer (3) serious harm. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

To expand on the third element first, not all the hardships of prison amount to serious harm. *Farmer*, 511 U.S. at 834. In the context of medical—or dental—care, an inmate generally establishes sufficiently serious harm in one of two ways. *See Phillips v. Tangilag*, 14 F.4th 524, 534 (6th Cir. 2021). He might show that his medical need "is one that has been diagnosed by a physician as mandating treatment." *Mattox v. Edelman*, 851 F.3d 583, 598 (6th Cir. 2017). Or he can show that his medical need was "so obvious that even a layperson would easily recognize

23

the necessity for a doctor's attention." *Id.* Either way, the harm is serious enough to trigger Eighth Amendment protection.

What about "substantial risk"? Inmates need not wait until serious harm befalls them before coming to court. In *Helling v. McKinney*, the plaintiff's cellmate smoked five packs of cigarettes a day. 509 U.S. 25, 28 (1993). Prison officials argued that to establish an Eighth Amendment claim, the plaintiff needed to show that he was "currently suffering serious medical problems" from the second-hand smoke. *Id.* at 32. The Supreme Court was not persuaded: "We have great difficulty agreeing that prison authorities . . . may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." *Id.* at 33. Thus, "subjecting individuals to a risk of future harm—not simply actually inflicting pain—can qualify as cruel and unusual punishment." *Baze v. Rees*, 553 U.S. 35, 49 (2008). But "[t]o establish that such exposure violates the Eighth Amendment," the risk must be "substantial," i.e., "very likely to cause serious illness and needless suffering, and give rise to 'sufficiently imminent dangers.'" *Id.* (quoting *Helling*, 509 U.S. at 33, 34–35).

That leaves the subjective prong of an Eighth Amendment claim. Under the deliberate-indifference standard, it is not enough that a reasonable prison official in the defendant's position would have appreciated that the plaintiff was at a substantial risk of serious harm. Instead, the defendant, personally, must have appreciated that the plaintiff was at a substantial risk of serious harm, yet, despite that understanding, failed to alleviate the risk. *Farmer v. Brennan*, 511 U.S. 825, 837

24

(1994) ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

Courts have tailored this deliberate-indifference test for claims based on inadequate medical care. If a doctor (or dentist or hygienist) did nothing more than fail to provide the treatment that an ordinary doctor would have, that negligent care does not establish deliberate indifference. *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018); *see also Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 447 (6th Cir. 2014) ("When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." (internal quotation marks omitted)).

That said, too many deviations below the mean can amount to deliberate indifference. *See Richmond v. Huq*, 885 F.3d 928, 940 (6th Cir. 2018) ("It is insufficient for a doctor caring for inmates to simply provide some treatment for the inmates' medical needs."); *Griffith v. Franklin Cnty., Kentucky*, 975 F.3d 554, 568 (6th Cir. 2020). Thus, where a doctor provides treatment, but that treatment is "so grossly incompetent[] [or] inadequate" that it shocks the conscience, the doctor has acted with deliberate indifference. *See Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018). Or to make the point less abstractly: if a prisoner has a severed finger, "take two and call me in the morning" will not do. *Cf. Murray v. Dep't of Corr.*, 29 F.4th 779, 788 (6th Cir. 2022).

### III. Facial Challenge to the Two-Year Rule

The Court begins with Bownes' facial challenge to the two-year rule. Although Defendants have not made a specific request for summary-judgment on this claim, they have asked the Court to dismiss the entire case. (See ECF No. 363, PageID.8795.) Further, because Bownes sought summary judgment on his challenge to the two-year rule, the issue has been fully briefed. (*See* ECF No. 366, PageID.9844–9850; ECF No. 369, PageID.11868–11876.) So the Court will proceed as if both sides had moved for summary judgment on this claim.

### A. The Two-Year Rule, Standing

Oddly, Bownes raised the issue of his standing to bring a facial challenge to the two-year rule, which, apparently, prompted Defendants to argue that he lacks standing. (ECF No. 366, PageID.9843; ECF No. 369, PageID.11872.) As Article III standing implicates this Court's subject-matter jurisdiction, the Court must not only address the issue, but it must do so before getting to the merits. *See In re Flint Water Cases*, 53 F.4th 176, 188 (6th Cir. 2022).

Bownes has the burden of proving his standing to challenge the two-year rule. *See Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 860 (6th Cir. 2020). To carry his burden at the summary-judgment stage, he must show that a reasonable factfinder could conclude that he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (internal quotation marks omitted).

26

Although Defendants say Bownes cannot meet any of these three elements, the Court homes in on their assertion that the Court cannot redress Bownes' injury from the two-year rule by granting an injunction. This is true. Bownes has now served enough time that he is no longer subject to the two-year rule.

But this is more of a mootness argument than a standing one. After all, when Bownes joined this suit, he was still subject to the two-year rule and, at that time, an injunction would have provided Bownes a few months of relief. (*Compare* ECF No. 236, PageID.6263 (fourth amended complaint filed in January 2018), *with* ECF No. 384, PageID.15466 (indicating that Bownes completed two years in April 2018).)

But whether addressed under standing or mootness the essential point is the same: Bownes is no longer subject to the two-year rule. And he seeks only forward-looking, injunctive relief. So his request for relief is moot.

True, there is a capable-of-repetition-yet-evading-review exception to mootness. And true, the evading-review requirement appears to be satisfied here: any inmate who challenges the two-year rule is likely to serve two years before the challenge can be fully litigated. *See In re Flint Water Cases*, 53 F.4th 176, 189 (6th Cir. 2022) (noting that Supreme Court has found two years "too short to obtain complete review").

But Bownes cannot satisfy the capable-of-repetition part of the exception. First, he does not try. Next, to satisfy that requirement, generally "the named plaintiff" must make "a reasonable showing that *he* will again be subjected to the alleged illegality." *Flint Water*, 53 F.4th at 189 (emphasis added) (internal quotation

27

marks omitted); *see also Chirco v. Gateway Oaks, L.L.C.*, 384 F.3d 307, 309 (6th Cir. 2004) (providing that exception applies where there is "a reasonable expectation that *the same complaining party* would be subjected to the same action again" (emphasis added)). Here, the only way for Bownes to be again subject to the two-year rule is if he is reincarcerated following release. Bownes' earliest release date is in 2026—but his latest is in 2038. Michigan Offender Tracking Information System, Melvin Bownes, https://perma.cc/B9MW-5YSV. That alone makes it somewhat doubtful that Bownes will again face the two-year rule. But even if Bownes is released relatively soon, he would have to be convicted of another crime or parole violation. This Court will not lightly infer recidivism. *Cf. O'Shea v. Littleton*, 414 U.S. 488, 497 (1974) ("[I]t seems to us that attempting to anticipate whether and when these respondents will be charged with crime and will be made to appear before either petitioner takes us into the area of speculation and conjecture.").

In short, the Court finds that Bownes' facial challenge to the two-year rule is moot, and thus, the Court lacks subject-matter jurisdiction over that claim. *See Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 584 (6th Cir. 2006) ("[A] federal court has a continuing duty to ensure that it adjudicates only genuine disputes between adverse parties. . . . The mootness inquiry must be made at every stage of a case.").

### B. The Two-Year Rule, Merits

Supposing that Bownes' facial challenge is not moot, the claim would fare no better on the merits.

In fact, Bownes' argument starts off on entirely the wrong track. He says—and Defendants agreed—that a facial challenge to a prison regulation should be analyzed under *Turner v. Safley*, 482 U.S. 78 (1987). (ECF No. 366, PageID.9844; ECF No. 369, PageID.11868.) And so, says Bownes, the question is whether the two-year rule is backed by a legitimate penological interest. (ECF No. 366, PageID.9850.)

But Turner alleged that prison regulations violated the First Amendment and the Fourteenth Amendment, 482 U.S. at 82, 93–94; in contrast, Bownes says the two-year rule violates the Eighth Amendment. The difference matters. "Although the Supreme Court has stated broadly that the standard of review [it] adopted in *Turner* applies to all circumstances in which the needs of prison administration implicate constitutional rights, *Turner* has been applied only where the constitutional right is one which is enjoyed by all persons, but the exercise of which may necessarily be limited due to the unique circumstances of imprisonment." *Jordan v. Gardner*, 986 F.2d 1521, 1530 (9th Cir. 1993) (internal quotation marks and citation omitted). Yet "Eighth Amendment rights do not conflict with incarceration; rather, they limit the hardships which may be inflicted upon the incarcerated as 'punishment.'" *Id.* Thus, "the *Turner* analysis does not apply to Eighth Amendment claims." *Linderman v. Vail*, 59 F. App'x 180, 182 (9th Cir. 2003).

Indeed, it would be odd that in analyzing an as-applied claim based on the Eighth Amendment, the question is whether the defendant was deliberately indifferent to a substantial risk of serious harm but that in analyzing a facial claim based on the same text, the question changes to whether there is a legitimate

penological interest for the prison's rule. *See Bucklew v. Precythe*, — U.S. —,139 S. Ct. 1112, 1127–28 (2019) (explaining, in the context of addressing a facial challenge based on the Eighth Amendment, that the type of challenge "does not speak at all to the substantive rule of law necessary to establish a constitutional violation").

So, under the proper standard, Bownes would need to show that MDOC's two-year rule violates the Eighth Amendment in all its applications. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."); *Payne v. Sevier Cnty., Tennessee*, 681 F. App'x 443, 447 (6th Cir. 2017) (applying *Salerno* to county policy of permitting nurses to diagnose detainees); *City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 415 (2015) (applying *Salerno* to city code).

The Court is hard pressed to see how Bownes could make such a showing. Given the many thousands of inmates subject to the two-year rule, surely there are a significant number who have no or only very minor dental problems and whose host factors favor very slow progression. While these "dentally fit" inmates might still prefer treatment like a cleaning or a filling, Bownes has not shown that they are at "substantial" risk of "serious" harm during their two- or three-year wait for routine care. In fact, in the context of addressing Class IIB's claims below, the Court reaches a very similar conclusion.

Accordingly, even if Bownes' challenge to the two-year rule were not moot, it would almost certainly fail on the merits.

30

## IV. Periodontitis Treatment Claim (Class IIC)

By definition, all members of Class IIC have some stage of periodontitis. As such, each member potentially requires a scaling and root planing or, at least, periodontitis maintenance. Yet, according to the members of Class IIC, MDOC does not provide scaling and root planing or the associated follow-up care. Accordingly, in their view, Defendants are deliberately indifferent to their periodontitis. And because they believe that untreated periodontitis is serious harm or at least places them at a substantial risk of serious harm, they claim that MDOC's failure to provide them with scaling and root planing and the associated follow-up care violates their Eighth Amendment rights

### A. Class IIC, Deliberate Indifference

The Court begins with the subjective prong: are Defendants deliberately indifferent to its inmates' periodontitis?

The members of Class IIC believe the answer is "yes" and direct the Court to their experts' opinions. As noted, Shulman reviewed the dental records of 100 MDOC inmates and found that 61 of those were diagnosed with periodontitis at a complete or periodic exam. (ECF No. 315-11, PageID.8020.) Yet, says Shulman, the treatment plans for those inmates never included scaling and root planing; instead, MDOC dentists would prescribe a "prophy." (ECF No. 315-11, PageID.8020.) Or in his words: "Treatment plans for prisoners assessed with periodontal disease rarely include periodontal treatment other than oral prophylaxis . . . . [A]nd while a dentist may treatment plan a patient for a prophy (and not prescribe scaling and root planing),

31

my record review shows that dental hygienists often perform 'periodontal scale' sua sponte." (ECF No. 384, PageID.15377.) But Shulman also concedes, "In my chart reviews, I often could not tell for certain from the clinical narrative, what periodontal procedure was performed." (ECF No. 384, PageID.15428, 15470.) Harrel, also one of Plaintiffs' experts, similarly opines, "The term 'perio scaling' as it appears in some MDOC dental records is not routinely used in dentistry and is not contained in the CDT. Perio scaling does not accurately describe [scaling and root planing]." (ECF No. 366-2, PageID.9867.) Harrel further says, "[the periodontal therapy provided by MDOC] is either inadequate or undocumented because the documentation does not tell me what was done. . . . I don't know what perio scale is because that is not a recognized form of documentation. Did they do root planing? They didn't say." (ECF No. 366-3, PageID.9961; *see also* ECF No. 366-2, PageID.9873.)

As this Court understands it, Shulman and Harrel essentially opine that MDOC dentists either (1) do not prescribe scaling and root planing to inmates with periodontitis (but sometimes hygienists perform that procedure anyway) or (2) prescribe scaling and root planing but improperly document that procedure as "perio scale" or "prophy" or "debridement."

In their reply brief, Defendants essentially take the position that Plaintiffs' evidence is stale. (*See* ECF No. 379, PageID.13884.) As noted, beginning in 2020, MDOC started using the Corrections Offender Management System (COMS). And with this change, MDOC dental staff began using the terminology and codes that are used in private practice, namely the Current Dental Terminology codes. And as part

32

of their reply brief, Defendants produced the results of a query of the COMS database. The query results show that from January 2020 to October 2022, MDOC hygienists (and sometimes dentists) have "completed" over 900 scalings and root planings. (ECF No. 379-1, PageID.14368–14447.)

This new evidence substantially undermines Class IIC's claim of indifference. Dental records from before MDOC implemented COMS are the foundation of their argument. According to Plaintiffs' experts, those records rarely (if ever) used the term "scaling and root planing." And so Plaintiffs' experts inferred that either MDOC was not providing that treatment or, at minimum, MDOC's documentation was substandard. Indeed, Plaintiffs concede that they "relied on the prior dental record system." (ECF No. 380-2, PageID.14598.) Thus, COMS introduced a crack in the foundation of Plaintiffs' theory: MDOC's dental records now use CDT terminology and codes, including the codes for scaling and root planing, and the dental records now expressly state, "D4341 Perio Scaling & Root Planing." (*See e.g.*, ECF No. 379-1, PageID.14375.)

Unfortunately for Defendants, while ultimately the COMS data (with some additional supplementation) will likely win the day for them, it does not win the day for them at the summary-judgment stage. To appreciate why, a bit of procedural history is in order.

In their opening summary-judgment brief, Defendants asserted, "MDOC continues to treat periodontal diseases through providing oral hygiene instruction, prophylaxis[,] scaling and root planing, and providing extractions when necessary."

33

(ECF No. 363, PageID.8838.) Yet that statement was not backed by a citation to the record. (*See id.*) True, Defendants did cite evidence of "thousands of hygiene appointments" (*id.* at PageID.8836), but they did not cite evidence of scaling and root planing, specifically. Plaintiffs caught this, and asserted in their response brief, "Defendants offer no citation to depositions, dental records or manual to support its claim that MDOC provides scaling and root planing." (ECF No. 374, PageID.12748.) That prompted Defendants to attach the COMS data to their reply brief.

And that spawned additional motion practice. (ECF Nos. 380, 381, 383.) To spare the details, Plaintiffs essentially say that Defendants have impermissibly introduced new evidence for the first time in a reply brief (ECF No. 380-2, PageID.14598) and, in any event, this evidence should have been handed over in discovery but was not (ECF No. 380-2, PageID.14602–14603; ECF No. 383, PageID.14665–14666). Plaintiffs thus ask the Court to disregard the COMS data. (ECF No. 380-2, PageID.14597, 14606.)

The Court agrees with Plaintiffs that Defendants should not be able to use the COMS data to prevail at the summary-judgment stage. To start, other than a reference to a declaration attaching a spreadsheet that identifies COMS data, Defendants did not discuss the COMS data, and in particular the number of recent scalings and root planings, in their opening brief. Sure, a defendant seeking summary judgment usually does not have to produce evidence to discharge its initial burden; it usually only has to show that the plaintiff lacks evidence supporting his or her claim. But here, Defendants opted to affirmatively argue that they provided treatment for

periodontitis. So they probably should have directed Plaintiffs to the backup for that argument. *See Mirando v. U.S. Dep't of Treasury*, 766 F.3d 540, 548 (6th Cir. 2014) ("When new submissions and/or arguments are included in a reply brief, and a nonmovant's ability to respond to the new evidence has been vitiated, a problem arises with respect to Federal Rule of Civil Procedure 56(c)." (internal quotation marks omitted)).

More troubling is the fact that Defendants did not produce the COMS data (or something similar) during the very lengthy discovery period. True, as Defendants say, the switch to COMS was mentioned during many depositions. Indeed, during his deposition, Choi explained, "[W]e used to use terms 'perio scaling,' 'prophy,' and 'scaling and root planing' interchangeably. . . . Now with the new system, . . . we are following the CDT code. . . . Now with the new system we do not have such a term like 'perio scale.'" (ECF No. 374-9, PageID.13079–13080.) That testimony should have tipped Plaintiffs off: after January 2020, MDOC's dental records would have included the CDT code for scaling and root planing if the procedure had been performed. Yet, as far as the Court can tell, Plaintiffs never specifically asked Defendants for a log showing how many times the "scaling and root planing" code had been used. In other words, Plaintiffs did not adapt their case, which seeks forward-looking relief, to the current MDOC practice. On the other hand, the COMS data may ultimately allow Defendants to prevail on one of the central claims in this case; so Defendants should have supplemented their initial disclosures with those results (or like data). *See* Fed. R. Civ. P. 26(a)(1)(A) (requiring the initial disclosure of information a party may use

"to support its . . . defenses"); Fed. R. Civ. P. 26(e)(1) (requiring supplementation of initial disclosures).

In sum, because the COMS data was attached to Defendants' reply brief, and because Defendants did not produce the COMS data during discovery, the Court will not consider that data in deciding whether Defendants are entitled to summary judgment.

The question remains, though, have Defendants shown that every reasonable factfinder would conclude that they are not indifferent to periodontitis? Without the COMS data, the answer is "no." Defendants' opening brief only relied on "thousands of hygiene appointments annually," yet those are not necessarily scalings and root planings. (*See* ECF No. 363, PageID.8836.) And it was reasonable for Shulman and Harrel to infer that because the term "scaling and root planing" was not in the dental records they reviewed, MDOC might not be consistently providing that treatment. True, the dental records did include the terms "prophy" or "perio scale," and Choi did testify that prior to COMS, MDOC dental staff used "prophylaxis," "debridement," and "perio scale" interchangeably and that each term could include a scaling and root planing. (ECF No. 374-9, PageID.13074, 13079.) But Shulman also opined that he rarely saw local anesthesia prescribed in connection with prophylaxis or "perio scale" and that local anesthesia would typically be provided for a scaling and root planing. (ECF No. 384, PageID.15470.) Accordingly, absent the COMS data, a reasonable factfinder could conclude that MDOC dental staff was not consistently providing scaling and root planing to inmates with periodontitis. *See Williams v. Sutley*, No.

120302, 2014 WL 12967583, at *6 (C.D. Cal. Mar. 6, 2014) (finding, where inmate was repeatedly provided *scalings* for his periodontitis, there was a genuine dispute as to whether inmate was provided *root planing*, and thus, a genuine dispute as to whether dentist was indifferent to inmate's periodontitis (emphases added)), *report and recommendation adopted*, 2014 WL 12967604 (C.D. Cal. Apr. 1, 2014).

In advocating for a different result, Defendants cite several cases where courts found that, as a matter of law, the defendant was not deliberately indifferent to the plaintiff's periodontal disease.

None of these authorities are binding, and all addressed a different claim than the one Class IIC pursues. The members of Class IIC claim that scaling and root planing is necessary to treat their periodontitis, and yet, Defendants are not ensuring that MDOC dental staff provide that necessary treatment; therefore, say these inmates, Defendants are indifferent to their periodontitis. Not one of the cases cited by Defendants addresses a similar claim. Instead, they largely address a dentist's use of medications or extractions to treat pain and infection caused by periodontal disease. *See Sands v. Cheesman*, 339 F. App'x 891, 893, 895 (11th Cir. 2009) (finding that dentist's treatment of "severe and at times acute persistent pain," which was ultimately associated with a periodontal abscess, did not amount to indifference where there was "no evidence" that dentist should have anticipated that plaintiff would develop an abscess); *Coward v. Clarke*, No. 7:20CV00702, 2022 WL 1018407, at *4–5, 10 (W.D. Va. Apr. 5, 2022) (finding dentist not indifferent where plaintiff made several complaints of pain associated with periodontal disease but dentist

"promptly examined [the plaintiff] and provided treatment (pain medication and antibiotics) the same day or the following day"); *Burke v. Illinois Dep't of Corr.*, No. 05 1059, 2006 WL 2850475, at *3–4, 9 (C.D. Ill. Oct. 2, 2006) (finding dentist not indifferent to inmate's tooth pain and infection from periodontal disease where dentist prescribed pain killers and antibiotics and ultimately recommended extraction). None of these cases addressed a claim of indifference to periodontitis because dentists did not prescribe scaling and root planning and the associated follow-up care.

*Williamson v. Correctional Medical Services*, another case cited by Defendants, is a bit closer to the mark. The plaintiff there sought an "order requiring CMS to provide standard dental treatment for periodontal disease" and asserted that "CMS refuses to treat active perio-infections and, when it did provide teeth cleaning, the process was substandard." *Williamson v. Corr. Med. Servs.*, No. CIVA 06-379-SLR, 2007 WL 2698256, at *2 (D. Del. Sept. 11, 2007). Perhaps the plaintiff's request for the "standard dental treatment for periodontal disease" includes a request for scaling and root planing. Still, *Williamson* does not discuss scaling and root planing specifically, and the evidentiary record in *Williamson* did not include multiple experts opining that scaling and root planing is necessary treatment for periodontitis.

In short, Defendants' authorities are not persuasive given the evidentiary record in this case.

Before turning to the objective prong, the Court addresses two loose ends regarding the subjective prong. Recall that Class IIC consists of all inmates with

early, moderate, or advanced periodontitis or, simply, all inmates with periodontitis. That condition unites the members of Class IIC. But the two-year rule divides them. In fact, the Eighth Amendment claim of those still under the two-year rule differs in two significant ways from the Eighth Amendment claim of those who have served two years.

First, unlike those who have served two years, it appears that there is no dispute that those who are subject to the two-year rule do not receive scaling and root planing (unless it is part of urgent care). As discussed, MDOC's Dental Policy Directive and Dental Services Manual classify "periodontal" procedures as "routine" dental care. That means that as a matter of written policy, those who have periodontitis but have not served two years do not receive scaling and root planing. And, as noted, practice bears this out. Maxwell, an intake dentist, states that inmates diagnosed with active periodontitis at intake are not referred to the stabilization clinic for scaling and root planing. (ECF No. 363-5, PageID.8987, 8989.) And Stout, a hygienist who has done stints at the stabilization clinic, states that she only performs debridements there, not scalings and root planings. (ECF No. 374-7, PageID.12862.)

Second, for members of Class IIC who are still under the two-year rule, the evidence of deliberate indifference differs.

In April 2018, Choi, MDOC's Dental Director, authored a memo to four dental supervisors about treating periodontitis. (ECF No. 363-10, PageID.9504–9505.) Choi wrote, "Based on the experience and research of the dentists on the [Dental Advisory Board] and the presentation to [the Board] from Dr. Jeff Johnston, . . . it was

acknowledged that periodontitis is generally a slowly developing immune response condition[.]" (ECF No. 363-10, PageID.9504.) (Yes, the same Johnston that now serves as Defendants' expert in this case.) Choi's memo continued, "The slow rate of progression of periodontitis, when coupled with appropriate self-care, means that as a practical matter, there is no harm done by not specifically treating, beyond self-care, early stage periodontal conditions during the first two years of incarceration." (ECF No. 363-10, PageID.9504.) "Similarly," Choi wrote, "moderate periodontitis, if stable with self-care, will not require intervening dental care in the first two years of incarceration to prevent the condition from becoming advanced." (*Id.*) On the other hand, "some moderate periodontitis conditions are not stable at the time of the prisoner's intake screening exam. . . . [U]nstable moderate periodontal condition should be identified for stabilization care sufficient to attempt to change the condition from unstable to stable." (*Id.*) Finally, as to inmates with advanced periodontal disease, Choi's memo explained that these inmates "have experienced too much bone loss to save the affected tooth or teeth" and recommended extraction "to reduce the risk of infection and eliminate the source of the immune system provocation." (*Id.*)

Choi's memo goes a fair way toward showing that his (or the Dental Advisory Board's) decision not to treat periodontitis with scaling and root planing during an inmate's first two years of incarceration was not the result of indifference to periodontitis. To the contrary, it appears to have been the result of reasoned, medical judgment. To be sure, Plaintiffs' experts strongly disagree that periodontitis is ever stable. (ECF No. 366-2, PageID.9875; ECF No. 366-3, PageID.9966.) And even if

Choi's "stable moderate" category is valid, Plaintiffs' experts argue that MDOC dentists cannot accurately place inmates into that category given the lack of periodontal probing and bitewing x-rays. (ECF No. 384, PageID.15419.) But all of that sounds a lot like proof that Choi (or the Board) is falling short of the standard of care for periodontitis, not that they are indifferent to the disease. Or stated differently, while Choi and the Board's approach to periodontitis may not be based on sound dental science, the proper question is whether Choi and the Board, personally, understand that their approach places inmates at substantial risk of serious harm from periodontitis, yet, despite that understanding, choose to pursue it anyway. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

That said, a final determination as to Choi's indifference must be deferred to trial. Defendants did not even mention Choi's memo in their summary-judgment motion. And had Defendants raised the memo, perhaps Plaintiffs could have argued that Choi's approach to periodontitis treatment during an inmate's first two years of incarceration is "so grossly incompetent[] [or] inadequate" that it shocks the conscience. *See Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018). After all, Harrel opines that it is "very unlikely" that moderate periodontitis is stable and that there is no situation where it is acceptable to delay treatment of periodontitis for two years. (ECF No. 366-3, PageID.9966, 9969.) And even Defendants' expert, Johnston, states that in his practice, he would never delay periodontitis treatment for two years. (ECF No. 366-6, PageID.10702–10703.) Most persuasive, though, is that during his deposition, Choi admitted that moderate periodontitis requires scaling and planing

41

and even admitted that early periodontitis requires scaling and planing. (ECF No. 363-10, PageID.9281–9282.) In other words, Choi's testimony is arguably contrary to his memo. Accordingly, Choi's memo does not warrant summary judgment.

The second loose end relates to the COMS data. While the Court will not consider that evidence at this stage of the case, it makes sense to consider it at trial. As Defendants correctly state, this case is about prospective, injunctive relief. (ECF No. 379, PageID.13884.) So what matters is not whether MDOC dental staff failed to provide or document scaling and root planing in the past. What matters is whether they are doing so now and will continue to do so for the foreseeable future. After all, the Court is not going to order MDOC to provide a treatment that it is already providing. And the COMS data bears directly on whether MDOC is currently providing scaling and root planing.

So the Court will permit Defendants to use the COMS data (and any similar evidence that they produce to Plaintiffs) at the bench trial in this case. Until then, the Court will have the parties engage in limited discovery on the extent that MDOC is providing scaling and root planing and periodontitis maintenance to inmates with periodontitis. As it stands, the COMS data shows 900 scalings and planings. But does that cover 90% of the inmates who needed the procedure? Or only 30%? The former indicates little indifference to periodontitis, the latter not so much. Accordingly, some additional discovery is in order. The Court will detail the discovery process at the end of this opinion.

In sum, without the COMS data, Defendants have not shown that every reasonable factfinder would conclude that they are not deliberately indifferent to inmates' periodontitis.

## B. Class IIC, Substantial Risk of Serious Harm

Aside from arguing that they were not deliberately indifferent to Plaintiffs' periodontitis, Defendants also argue that periodontal disease, by itself, is not a serious medical need. They say that "the case law establishes a high standard": "[o]nly where periodontal disease presents with other symptoms and reaches an acute stage does it constitute a serious medical condition." (ECF No. 363, PageID.8830.) "On its own," they argue, "periodontal disease simply does not satisfy the Eighth Amendment standard." (*Id.*) The law is not so clear.

To be sure, there are cases that state, "periodontitis is not a serious medical need." *Moore v. Parham*, No. 1:16CV1519, 2017 WL 4118458, at *5 (E.D. Va. Mar. 23, 2017). *Coward v. Clarke*, No. 7:20CV00702, 2022 WL 1018407, at *2 (W.D. Va. Apr. 5, 2022) ("[A] diagnosis of periodontitis does not in itself create a serious medical need[.]" (internal quotation marks omitted)).

But there are also cases saying that "periodontal disease or gingivitis . . . is a serious medical condition which is manifested by the loss of teeth." *Board v. Farnham*, 394 F.3d 469, 483 n.7 (7th Cir. 2005); *Rucano v. Koenigsmann*, No. 9:12-CV-00035, 2014 WL 1292281, at *10 (N.D.N.Y. Mar. 31, 2014) ("Defendants concede that periodontal disease is a serious medical condition, and we agree.").

In this Court's opinion, it all depends. Remember Jessica, the healthy, fastidious-oral-hygiene inmate with very early periodontitis? If she does not receive scaling and root planning for say, two-and-a-half years, she probably will only suffer minimal alveolar bone and ligament loss. So she probably is not at a substantial risk of serious harm during the two-and-a-half-year period. But what about Michael, the unhealthy, poor-oral-hygiene inmate with moderate periodontitis? If he goes without scaling and root planning for two-and-a-half years, his moderate periodontitis will quite likely reach the advanced stage with the attendant risk of abscess or tooth loss. So his periodontitis (coupled with the two-year rule) probably places him at a substantial risk of serious harm. (*See* ECF No. 366-6, PageID.10803–10804; *cf.* ECF No. 374-9, PageID.13158 (Choi agreeing that an inmate can go from normal gums to moderate periodontitis in two years). Or to say all this another way, there are quite likely some inmates with periodontitis that due to their individual or "host" factors, have a good chance of avoiding the worst the disease has to offer. But others in Class IIC will not be so fortunate. And virtually anyone who has experienced an abscess knows it is a serious medical need. *See also* MDOC Dental Service Manual (eff. Dec. 19, 2017) (providing that "[t]ooth or soft tissue abscess with infection" qualifies for "urgent" or "emergency" services; *Coward v. Clarke*, No. 7:20CV00702, 2022 WL 1018407, at *7 (W.D. Va. Apr. 5, 2022) ("[P]eriodontal inflammation around one or more teeth that reaches an acute stage may be considered 'a serious medical need.'").

In any event, "if a plaintiff suffer[s] from a minor or non-obvious medical condition, he can show that his condition was objectively serious 'if it is 'one that has

been diagnosed by a physician as mandating treatment.'" *Mattox v. Edelman*, 851 F.3d 583, 598 (6th Cir. 2017). Here, Shulman, a dentist, has opined that periodontitis requires treatment. (ECF No. 384, PageID.15384 ("Untreated, [periodontitis] could progress, and the affected dentition may be lost."); ECF No. 384, PageID.15425 ("[Scaling and root planing] is the standard of care for non-surgical treatment of periodontal disease.").) Even Choi admits that a patient with periodontitis requires scaling and planing. (ECF No. 363-10, PageID.9281–9282.) And, by definition, the members of Class IIC all have periodontitis. So under the would-a-doctor-mandate-treatment test, there is at least a genuine dispute over whether the members of Class IIC have a serious medical need.

All that said, the Court agrees with Defendants to some extent. Quite likely there are inmates in Class IIC who are not now experiencing serious harm and are not even at a substantial risk of experiencing serious harm in the foreseeable future. So the Court agrees with Defendants that a mere diagnosis of periodontitis does not, by itself, establish a substantial risk of serious harm. The problem, though, is neither party has attempted to draw a tenable dividing line between those whose periodontitis does expose them to a substantial risk of serious harm and those whose periodontitis does not. And because there are a significant number of people in Class IIC who a reasonable factfinder could conclude are at a substantial risk of serious harm, the Court sees no basis to grant summary judgment on Class IIC's claims. Indeed, neither party seeks partial summary judgment. And while Class IIC is

perhaps not cohesive enough to meet Rule 23's requirements, neither party has sought to redefine the class, either.

In sum, a reasonable factfinder could conclude that a significant number of people in Class IIC are at a substantial risk of serious harm. So summary judgment is not warranted on the objective prong, either.

### C. Class IIC, Representative's Claims

In a similar vein, Defendants argue that Plaintiff Anthony Richardson, who represents Class IIC, and Plaintiff Melvin Bownes who, along with Richardson, represent Class IIA and Class IIB, "have failed to show that they have suffered from a serious medical need." (ECF No. 363, PageID.8833.) According to Defendants, "While both Bownes and Richardson have been diagnosed with periodontal disease, neither complains of pain related to their periodontal condition or any other side effects or symptoms that would cause their condition to become serious." (*Id.*)

Even if Defendants are correct that Bownes and Richardson have not actually suffered serious harm attributable to their periodontal disease, a reasonable factfinder could still conclude that MDOC's treatment of their disease placed them at a "substantial risk" of serious harm.

Start with Richardson. In spring 2017, he was diagnosed with "moderate" periodontitis, and the calculus on his teeth was also "moderate." (ECF No. 363-16, PageID.9698.) Yet the dental record indicates that Richardson was only given a "prophy" and that his teeth were "[s]caled and polished"; no local anesthesia is indicated. (ECF No. 363-16, PageID.9698.) About 18 months later, in fall 2018,

Richardson was diagnosed with "moderate advanced" periodontitis with "moderate heavy" calculus. (ECF No. 363-16, PageID.9699.) Again, only a "prophy" was provided and there is no indication that local anesthesia was used. (*Id.*) Those data points support an inference that Richardson needed, but was not provided, scaling and root planing. And while that certainly does not mean that Richardson suffered serious harm, a reasonable factfinder could conclude that without scaling and root planing, he was at a "substantial risk" of serious harm. *See Flanory v. Bonn*, 604 F.3d 249, 255 (6th Cir. 2010) ("In *Helling*, the Supreme Court explicitly rejected 'petitioners' central thesis that only deliberate indifference to current serious health problems of inmates is actionable under the Eighth Amendment.'").

Now consider Bownes. At his intake exam, he was diagnosed with "moderate" periodontitis with "heavy" calculus. (ECF No. 363-13, PageID.9628.) Yet Bownes was not sent to the stabilization clinic. (*See id.*; ECF No. 363, PageID.8818.) Bownes did end up receiving a scaling and root planing but given the two-year rule, not until two-and-half years after his intake diagnosis.  (ECF No. 363-13, PageID.9635.) Although Harrel concedes that "some people progress rapidly, some people progress slowly," he also opines that "if you have moderate [periodontitis], it's going to progress almost assuredly more quickly." (ECF No. 366-3, PageID.9964.) Johnston, Defendants' expert, similarly opines that in his practice, he would not let a patient with periodontitis go untreated for two years. (ECF No. 366-6, PageID.10702–10703.) Thus, a reasonable factfinder could conclude that toward the end of this two-and-half-year period, Bownes was at "substantial risk" of his periodontitis advancing to the

point of abscess or tooth loss. Accordingly, Defendants have not shown that, as a matter of law, Bownes was not subjected to a substantial risk of serious harm.[1]

### V. Periodontitis and Caries Diagnosis Claim (Class IIA)

Unlike Class IIC's challenge to MDOC's dental *treatment*, the members of Class IIA challenge MDOC's dental *diagnoses*. In particular, the members of Class IIA, all of whom have periodontitis or caries that have reached the dentin, assert that MDOC's failure to conduct periodontal probing and charting at any point during their incarceration, and MDOC's failure to take bitewing x-rays during the intake exam, violate the Eighth Amendment. Although the members of Class IIA believe that probing, charting, and bitewing x-rays are necessary to establish a baseline so that disease progression can be tracked over time, it appears that their primary concern is that without those diagnostic tools, their disease is at a substantial risk of being underdiagnosed. For instance, because MDOC does not perform periodontal probing, an inmate with early periodontitis might be underdiagnosed with gingivitis. And, say the members of Class IIA, underdiagnosis risks undertreatment.

In seeking summary judgment, Defendants have addressed the claims of Class IIA, Class IIB, and Class IIC together. (*See* ECF No. 363, PageID.8826 (arguing that prisoners in "Classes IIA–C" have not established an Eighth Amendment claim).) And the Court has already addressed Class IIC's claims. But, having studied the record,

---

[1] The Court reiterates that Plaintiffs seek prospective relief, so to the extent that Bownes and Richardson may have in the past been exposed to a substantial risk of serious harm may not be a proper basis for seeking that relief. This was not adequately addressed in the summary-judgment briefing and thus, the Court expects that it will be addressed during trial.

the Court believes that Class IIA's claims materially differ from Class IIC's claims such that they should have been addressed separately. So the Court will do so below.

## A. Class IIA, Substantial Risk of Serious Harm

First consider Defendants' argument that periodontitis, in and of itself, is not a serious medical need. (ECF No. 363, PageID.8827–8831.) Because Class IIA seeks improved diagnostic techniques (as opposed to treatment), the proper question is whether MDOC's current method of diagnosing periodontitis and caries exposes the members of Class IIA to a substantial risk of serious harm.

A simple thought experiment reveals the answer. Given the many thousands of inmates in Class IIA, there must be hundreds who have (1) early periodontitis and (2) host factors for rapid progression. For convenience, call one of these inmates "Christopher." The evidence suggests that at Christopher's first complete exam, MDOC dental staff will not perform periodontal probing. (*See* ECF No. 384, PageID.15421; ECF No. 363-10, PageID.9326.) Yet Shulman and Harrel are adamant that periodontitis cannot be accurately diagnosed without periodontal probing. (ECF No. 374-8, PageID.12953 (Shulman); ECF No. 366-2, PageID.9859, 9923 (Harrel).) Thus, a reasonable fact finder could conclude that there is a substantial risk that at Christopher's first complete exam, he will be diagnosed with merely gingivitis when, in fact, he has early periodontitis. (*See* ECF No. 366-9, PageID.11461–11462 (MDOC dentist Mark Cooks agreeing that without probing and bitewing x-rays, a patient with early periodontitis might be diagnosed as having only gingivitis); ECF No. 384, PageID.15376 (Shulman opining that the lack of probing "results in underdiagnosis

49

of periodontal disease"); *see also* ECF No. 384, PageID.15385 (similar).) And if Christopher is underdiagnosed with gingivitis, he will not be scheduled for a scaling and root planing—that treatment is reserved for periodontitis. (*See* ECF No. 366-6, PageID.10802.) This is especially problematic for Christopher given that he is one of the members of Class IIA who has host factors favoring rapid progression. Thus, a reasonable factfinder could conclude that before Christopher's next annual exam, there is a substantial risk that his periodontitis will progress from early periodontitis to advanced periodontitis. (ECF No. 366-2, PageID.9872 (Harrel opining that "the system wide lack of periodontal probing and charting in millimeters . . . is [a] practice below the standard of care subjecting inmates to risk of serious harm, tooth morbidity, and/or mortality"); ECF No. 366-3, PageID.9945 (similar).) Yet, if Christopher had been properly diagnosed, his early periodontitis could have been arrested before advancing.

A similar point can be made for members of Class IIA who have caries. Shulman opines that "decay that has reached the dentin can be diagnosed using bitewing x-rays while it is not visible on a panoramic x-ray." (ECF No. 384, PageID.15401.) And both Shulman and Harrel are adamant that a panoramic x-ray will only pick up "very pronounced" interproximal caries (cavities between teeth). (ECF No. 374-8, PageID.12935; ECF No. 366-3, PageID.9914.) And Johnston, Defendants' expert, agrees that interproximal caries will not show up on a panoramic x-ray unless they are "gross." (ECF No. 366-6, PageID.10785.) Yet, at intake, MDOC only takes panoramic x-rays. (ECF No. 363-5, PageID.9158 (Maxwell), ECF No. 363-

10, PageID.9324–9325.) Thus, a reasonable factfinder could conclude that at intake, there is a substantial risk that many inmates' moderate, interproximal caries will be missed. Further, assuming that these inmates have host factors for rapid caries progression—which, undoubtedly numerous people in Class IIA have—there is a substantial risk that these inmates' moderate, interproximal caries will advance to the pulp before their first bitewing x-rays in two-plus years. And once caries reach the pulp, abscess or tooth loss is likely, especially given that MDOC does not provide root canals. (ECF No. 384, PageID.15379 ("When decay reaches the pulp, the tooth will require either endodontic (root canal) treatment or extraction").) Thus, a reasonable factfinder could conclude that many in Class IIA with caries—for example, those who have moderate, interproximal caries, who have factors for rapid progression, and who are still under the two-year rule—are at a substantial risk of serious harm due to MDOC's failure to take bitewing x-rays at intake.

In fact, taking the evidence in the light most favorable to Plaintiffs, a reasonable factfinder could conclude that this very thing happened to Bownes. A review of Bownes' electronic dental record indicates that at his intake exam, where only a panoramic x-ray was used, he was not diagnosed with caries.  (*See* ECF No. 363-13, PageID.9628.) Yet, at his first complete exam, which included bitewing x-rays, he was diagnosed with "gross" interproximal caries. (ECF No. 363-13, PageID.9632.) But by that point, the caries had progressed, and Bownes required a tooth extraction. (*See* ECF No. 363-13, PageID.9632.) Take the facts in the light most

favorable to Plaintiffs, a reasonable inference is that Bowens had caries at the time of intake, but the panoramic x-ray did not reveal them, i.e., he was underdiagnosed.

In short, a reasonable factfinder could conclude that for numerous members of Class IIA, MDOC's failure to perform periodontal probing and charting at any point during their incarceration, and MDOC's failure to take bitewing x-rays during their intake exam, exposes them to a substantial risk of serious harm.

That said, as with Class IIC, the Court agrees with Defendants that, quite likely, there are members of Class IIA who are not at a substantial risk of serious harm from MDOC's diagnostic methods. But, again, none of the parties have attempted to draw dividing lines. And, again, none of the parties have sought to redefine Class IIA more narrowly. No party seeks partial summary judgment, either. And given that there are likely hundreds of inmates in Class IIA who a reasonable factfinder could conclude are at a substantial risk of serious harm from MDOC's diagnostic methods, the Court will not sua sponte revisit the Rule 23 requirements.

### B. Class IIA, Deliberate Indifference

As to the other prong of an Eighth Amendment claim, Defendants invoke the familiar line of cases where courts concluded that a plaintiff's mere disagreement with her medical provider's treatment does not establish deliberate indifference. *See e.g.*, *Rhinehart v. Scutt*, 894 F.3d 721, 740 (6th Cir. 2018) ("An inmate's disagreement with the testing and treatment he has received . . . does not rise to the level of an Eighth Amendment violation."). Defendants point out that MDOC dentists use visual inspection, oral-health history, and a panoramic x-ray to diagnose periodontitis and

caries at intake. (ECF No. 363, PageID.8838.) Although Plaintiffs maintain that probing and bitewing x-rays are needed to accurately diagnose periodontitis and caries, in Defendants' view, this is a mere disagreement with how MDOC diagnoses those diseases. (*See id.*) And, say Defendants, an inmate's mere disagreement with a diagnostic method is not an Eighth Amendment claim. (*See id.*)

Although neither party has paid it enough attention, in this Court's view, Choi's testimony is critical to answering the indifference question. Choi is MDOC's Dental Director, and between the two defendants, it is Choi who is much more responsible for developing policies about probing, charting, and bitewing x-rays. (*See* ECF No. 363-10, PageID.9253, 9255, 9435.)

So what did Choi say at his deposition? Choi explained that he has not recommended that MDOC implement a policy of periodontal probing and charting because he "d[id] not see the need" for it; in his view, "it is not . . . absolutely necessary for [MDOC dental staff] to measure each pocket depth." (ECF No. 363-10, PageID.9293.) Choi further explained, "What we have been doing for our patient[s] in terms of periodontal evaluation, just taking the x-ray, looking at the radiograph, that is adequate method or ways of providing the service." (ECF No. 363-10, PageID.9294.) And when asked if inmates are at a substantial risk of harm because intake dentists only perform a visual inspection and take a panoramic x-ray, Choi responded, "[t]here is minimal harm." (ECF No. 363-10, PageID.9322.) Indeed, Choi "[did] not agree" that periodontal disease would be understated because the intake dentists did not use probing and bitewing x-rays. (ECF No. 363-10, PageID.9336.)

Choi even went so far as to say that it would not violate the standard of care in private practice to assess a patient's periodontal status without probing and bitewing x-rays. (ECF No. 363-10, PageID.9297–9298.) In short, Choi believes that probing is not necessary to assess periodontal disease. And it appears that Choi further believes that bitewing x-rays are not necessary to assess periodontal disease.

That gets Defendants a long way towards summary judgment—at least on Class IIA's challenge to MDOC's diagnosis of periodontitis (as opposed to caries). This is not a dental-malpractice case. So proof that an objectively reasonable dentist would probe and take bitewing x-rays to stage or diagnose periodontitis is not enough. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("[A] complaint that a physician has been negligent in diagnosing . . . a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). What matters is whether Choi, personally, appreciates that without probing or bitewing x-rays, inmates are at a substantial risk of an improper periodontitis diagnosis and thus, are at a substantial risk of their disease progressing to the point of serious harm. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). But Choi's testimony indicates just the opposite: he believes that visual inspection, oral-health history, and a panoramic x-ray suffice for a periodontal assessment. Indeed, Choi believes there is "minimal harm" from assessing periodontitis that way.

That said, if a medical professional makes "a decision that represents such a substantial departure from accepted professional judgment, practice, or standards,

54

as to demonstrate that [he] actually did not base the decision on such a judgment," it is reasonable to infer deliberate indifference. *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). Thus, a medical professional's treatment decisions will not be accorded deference if "no minimally competent professional would have so responded under those circumstances." *Id.* at 698 (internal quotation marks omitted); *see also Griffith v. Franklin Cnty., Kentucky*, 975 F.3d 554, 568 (6th Cir. 2020) (providing that a prisoner might show deliberate indifference by establishing that his medical care was "so woefully inadequate as to amount to no treatment at all").

Here, a reasonable factfinder could conclude that Choi's beliefs about MDOC's ability to assess *particular cases* of periodontitis deviates so far from the standard of care, that it bespeaks of indifference to those cases.

Consider the evidence. According to Shulman, "periodontal probing has been . . . the standard of care for ages, for 30 years as far as I can remember, maybe longer, and it is beyond dispute that it is the standard of care. You cannot diagnose periodontal disease without probing. . . . [P]robing is a sine qua non." (ECF No. 374-8, PageID.12953.) And Harrel similarly opines that there are no situations where periodontitis could be accurately diagnosed without probing. (ECF No. 366-2, PageID.9859; *see also id.* at PageID.9923.) Even Johnston, Defendants' expert, admits that the "minimum" diagnostic process involves probing. (ECF No. 366-6, PageID.10680, 10765, 10784–10785 (testifying that the standard of care requires probing).) And Mark Cooks, an MDOC dentist, believes that without probing and bitewing x-rays, it is more likely than not that periodontitis will be understated. (ECF

No. 366-9, PageID.11530.) Moreover, other departments of corrections, including the Federal Bureau of Prisons and departments that have emerged from class actions, perform some type of periodontal probing. (ECF No. 384, PageID.15382 & nn.19, 20, PageID.15396.) Choi himself admits that in dental school, he was not taught that a visual inspection and panoramic x-ray were all that was needed to assess periodontal disease, and he further admits to probing and charting in his own private practice. (ECF No. 363-10, PageID.9297, 9324–9325, 9444.)

Taking all this evidence together, a reasonable factfinder could conclude that the universal standard, i.e., what even a half-decent dentist would do, is to perform periodontal probing to diagnose periodontitis. As such, a reasonable factfinder could conclude that any method of diagnosing periodontitis that does not involve probing is such a deviation from the professional norm that the decision to use such a method was not based on medical judgment but, instead, indifference.

True, for many cases of periodontitis (and caries), it is quite likely that visual inspection, oral-health history, and panoramic x-ray are adequate for assessing the disease or, at least, that approach would not expose inmates to a substantial risk of serious harm. In fact, although it was unclear if he was referring to caries or periodontitis, Johnston opines that "moderate to advanced cases requiring urgent care can be easily recognized and diagnosed with panoramic images." (ECF No. 363-8, PageID.9220.) And so for many cases of periodontitis, Choi's subjective belief that MDOC is adequately assessing periodontitis is probably not "such a substantial departure from accepted professional judgment, practice, or standards, as to

demonstrate that [he] actually did not base the decision on such a judgment," *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008).

But the Court is not yet convinced that Choi truly believes that MDOC's diagnostic methods are sufficient for some hard-to-diagnose cases of periodontitis or caries. For instance, in the absence of probing, some early-stage periodontitis may be diagnosed as gingivitis, resulting in the inmate not being prescribed scaling and root planing. (*See* ECF No. 366-6, PageID.10800 (Johnston agreeing that a panoramic x-ray might not show bone loss associated with early periodontitis).) And, as discussed, it appears to be undisputed that a panoramic x-ray will not reveal early or moderate interproximal caries.

In all, while Choi's testimony goes a long way toward establishing that MDOC's failure to use bitewing x-rays (at intake) and failure to perform periodontal probing and charting (at any time) is not attributable to deliberate indifference to periodontitis, the Court prefers a more complete record of Choi's state of mind. In particular, as the ultimate finder of fact in this case, the Court would like more testimony on whether, for certain hard-to-diagnose cases of periodontitis and caries, Choi appreciates that MDOC's method of diagnosing the disease risks not identifying its presence, and if he does, whether he further appreciates that a missed diagnosis risks the disease advancing to the point of serious harm.

## C. Class IIA, Representatives' Claims

Here—although neither party has taken care to do so—Bownes' and Richardson's individual claims of inadequate diagnosis must be analyzed separately

57

from their individual claims of inadequate treatment (which the Court addressed above). Class IIA's claim is about diagnosis. Yet even without bitewing x-rays at intake or periodontal probing, MDOC dentists were still able to diagnose Bownes' and Richardson's periodontitis and caries. Thus, it might seem that no reasonable factfinder could find for Bownes and Richardson on their claim that MDOC's method of diagnosing periodontitis and caries is constitutionally inadequate.

But, as discussed, Bownes' electronic dental record indicates that he was not diagnosed with caries at intake (where only a panoramic x-ray was taken), yet he was diagnosed with "gross" interproximal caries at his first complete exam (where bitewing x-rays were taken). (ECF No. 363-13, PageID.9628–9629, 9632.) And by the time of Bownes' complete exam, his tooth was beyond salvaging and required extraction. (ECF No. 363-13, PageID.9632.) Thus, it is at least possible that MDOC's use of panoramic x-rays at intake exposed Bownes to a substantial risk of caries progression. Yet Defendants have not addressed this possibility in their summary-judgment motion.

As for Richardson, after a long history of periodontitis, he was diagnosed with gingivitis in February 2019. (ECF No. 363-16, PageID.9700.) (It is unclear whether the gingivitis diagnosis was because his periodontitis had been treated, whether gingivitis was in a different area of the mouth, or whether some of the diagnoses were incorrect.) It is at least possible that had probing been performed in February 2019, Richardson's gingivitis would have been more accurately diagnosed as periodontitis. And if it had been, Richardson should have been scheduled for a scaling and root

planing. So MDOC's failure to perform periodontal probing in February 2019 may have exposed Richardson to a substantial risk of serious harm. Defendants have not addressed this possibility in their summary-judgment motion.

In short, absent an argument focused on Bownes' and Richardson's claims of inadequate diagnosis, summary judgment on those claims is not warranted.

## VI. Class IIB's Claims

### A. Class Scope and Class Claims

Before addressing Class IIB's claims, it helps to both clarify the scope of the class and the members' legal claims.

Class IIB, as originally defined by the Court, consisted of inmates with healthy gums, gingivitis, early periodontitis, and stable moderate periodontitis. The Court did not include inmates with more severe cases of periodontitis (unstable moderate or advanced) in Class IIB because, given the evidence at the time, it appeared that MDOC was treating those cases of periodontitis. *See Dearduff v. Washington*, 330 F.R.D. 452, 469 (E.D. Mich. 2019).

As the case wore on, Plaintiffs asked the Court to expand Class IIB to include inmates with the more severe cases of periodontitis. And given Plaintiffs' request and the evidence they cited, the Court elected to both redefine Class IIB and to create a new class, Class IIC. Class IIC consisted of inmates with early, moderate, or severe periodontitis, or, more simply, with periodontitis, while Class IIB was modified to include only inmates that did not have periodontitis, i.e., they had healthy gums or

59

gingivitis. *Bownes v. Washington*, No. 14-CV-11691, 2021 WL 3700867, at *11 (E.D. Mich. Aug. 20, 2021).

Some clarification of the scope of Class IIB and Class IIC is in order. On the one hand, Class IIC could consist of inmates who MDOC has identified as having periodontitis, with Class IIB consisting of inmates who MDOC has identified as having gingivitis or healthy gums. On the other hand, Class IIC could consist of those inmates who in fact have periodontitis, with Class IIB consisting of inmates who in fact have gingivitis or healthy gums. The Court now clarifies that Class IIB and Class IIC consist of the latter. This class definition is preferrable given Plaintiffs' claims that MDOC does not accurately diagnose periodontal disease.

Having clarified the scope of Class IIB, the Court turns to clarifying Class IIB's legal claims. When the Court redefined Class IIB, it articulated the legal claim as follows: "Each [member of Class IIB] claims that he or she has a serious medical need (e.g., a baseline measurement or gingivitis), and that MDOC's policy of treating that serious medical need (e.g., not obtaining a baseline measurement and not providing a prophylaxis until two years in prison) amounts to deliberate indifference." *Bownes*, 2021 WL 3700867, at *11. Although it was Plaintiffs'—not the Court's—obligation to clearly articulate the claims of the class, the bottom line is that the claims of Class IIB should be stated clearly so that they can be properly adjudicated whether now or at trial.

Based on the parties' summary-judgment briefing and the expert reports, the Court believes that the members of Class IIB intended to make two types of claims.

The first claim is similar to Class IIC's claim, a treatment claim. For those in Class IIB who have healthy gums and are still under the two-year rule, they apparently claim that not being provided a prophylaxis for two to three years violates the Eighth Amendment. (Those who have served two years are eligible for a prophylaxis on an annual basis, and the Court does not believe that any members of Class IIB are claiming that waiting one year for a cleaning is a concern of the Constitution.) For those in Class IIB who have gingivitis, they apparently claim that they are not provided a treatment with CDT Code D4346, i.e., "the removal of plaque, calculus and stains from supra-and-sub-gingival tooth surfaces when there is generalized moderate or severe gingival inflammation *in the absence of periodontitis*." (ECF No. 366-2, PageID.9865 (emphasis added).) For these members, MDOC's failure to provide this D4346 scaling allegedly violates the Eighth Amendment.

The second type of claim is like Class IIA's claim, a diagnosis claim. Apparently, the members of Class IIB believe that they are entitled to periodontal probing and charting at all their exams and bitewing x-rays at their intake exams. Without these diagnostic tools, they believe they are at a substantial risk of serious harm.

With the scope of the class and the legal claims clearly defined, the Court turns to analyzing Class IIB's claims. The Court begins with the claims brought by members of Class IIB with gingivitis, and then turns to the like claims brought by members of Class IIB with healthy gums.

## B. Class IIB, Members with Gingivitis

The claims brought by members of Class IIB with gingivitis can be divided into a challenge to MDOC's treatment for gingivitis and a challenge to MDOC's diagnosis of gingivitis. And those claims can be still further divided depending on whether the inmate making the claim is still under the two-year rule. Again, the parties have failed to address the issues at this level of granularity, but a proper Eighth Amendment analysis demands it.

### 1. Treatment Claims

The Court begins by considering the treatment claims of members of Class IIB who have gingivitis and who are still under the two-year rule. All experts in this case agree that the proper treatment for gingivitis is good oral hygiene, smoking cessation, and either a prophylaxis or a gingivitis-specific cleaning (D4346). (ECF No. 242-7, PageID.6420 (Shulman); ECF No. 366-2, PageID.9865 (Harrel distinguishing prophylaxis from D4346); ECF No. 366-6, PageID.10721 (Johnston).) And it is not disputed that cleanings are "routine" procedures, meaning that MDOC inmates are not even eligible for them until they have served two years in prison and do not actually receive them until two-and-half or three years in prison. (ECF No. 384, PageID.15446 (indicating that 50% of inmates wait 28 months for their first cleaning and that 25% of inmates wait 34 months for their first cleaning).) Thus, a reasonable factfinder could conclude that inmates with gingivitis who are still under the two-year rule will not receive full treatment for their gingivitis for two to three years.

But that alone does not answer the Eighth Amendment question. Instead, Plaintiffs must further show that not receiving full gingivitis treatment for two-and-a-half years (1) exposes them to a substantial risk of serious harm and (2) Defendants know of and are indifferent to that risk. On these two fronts, the Court doubts that Plaintiffs have the proofs they need. Even so, the Court will defer its final decision to trial.

Start with the objective prong. There is testimony from Defendants' expert suggesting that untreated gingivitis will not progress to a serious harm in two-and-a-half years. (ECF No. 363-8, PageID.9222; ECF No. 366-6, PageID.10769.) Indeed, it appears that an inmate's gingivitis would have to progress from gingivitis to early periodontitis and then from early periodontitis to moderate (or advanced) periodontitis before the inmate is at a substantial risk of abscess or tooth loss. In other words, an inmate with gingivitis is a few steps removed from serious harm. That said, nothing in the record rules out a progression to serious harm in say, two-and-a-half years. And given that there are likely hundreds of inmates with gingivitis who are still under the two-year rule, some of those inmates surely have host factors for rapid progression. (ECF No. 374-8, PageID.12943 (Shulman testifying that progression depends on individualized factors); ECF No. 366-2, PageID.9872 (Harrel, similar); ECF No. 363-8, PageID.9222 (Johnston, similar).) Thus, a reasonable factfinder could conclude that there are numerous inmates with gingivitis who are still under the two-year rule that are at a substantial risk of serious harm. (ECF No.

384, PageID.15459 (Shulman noting Renetra Robinson's progression from gingivitis at intake to moderate periodontitis two years later).)

That leaves the question of Defendants' indifference. As with Class IIC, Choi's memo presents a considerable hurdle for Plaintiffs. Choi's memo cited "the research and experience" of MDOC's Dental Advisory Board and a presentation to the Board by Johnston. (ECF No. 363-10, PageID.9504.) And the memo further stated, "The slow rate of progression of periodontitis, when coupled with appropriate self-care, means that as a practical matter, there is no harm done by not specifically treating, beyond self-care, early stage periodontal conditions during the first two years of incarceration." (ECF No. 363-10, PageID.9504.) Although Choi was perhaps only expressly talking about periodontitis, given that gingivitis is a less severe form of periodontal disease, the ready inference is that he likewise believes that inmates with gingivitis are not at a substantial risk of serious harm if they do not receive a cleaning during their first two years of incarceration. So Choi's memo is strong evidence that he is not indifferent to inmates with gingivitis who are under the two-year rule.

But as noted in addressing Class IIC's claim, Defendants did not rely on Choi's memo in seeking summary judgment. So, arguably, Plaintiffs had no reason to address it and should be given an opportunity to do so. Further, during his deposition, Choi agreed that a patient with gingivitis could progress to having early periodontitis if they are not treated for two years. (ECF No. 363-10, PageID.9348.) Choi further acknowledged that an inmate could progress from healthy gums to moderate

64

periodontitis in a two-year period. (ECF No. 374-9, PageID.13158.) Thus, while close, the Court will not grant Defendants summary judgment on this claim.

What about the members of Class IIB who have gingivitis and who have already served two years? Here, the Court reaches a different result. Even setting aside the COMS data (which might well show that the gingivitis-specific cleaning (D4346) is being provided), it is undisputed that inmates who have served two years are eligible for a prophylaxis once per year. *See* Dental Services Manual at 17; (ECF No. 363-10, PageID.9449–9450). Even though Harrel indicates that a prophylaxis is not the same as the gingivitis-specific cleaning, both involve scaling to remove plaque and calculus. (ECF No. 366-2, PageID.9865–9866.) So MDOC is providing some treatment for gingivitis. And Plaintiffs have not directed the Court to evidence showing that a prophylaxis annually, along with good oral hygiene (something in the inmate's control), is "so grossly incompetent[] [or] inadequate" that it shocks the conscience. *See Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018). The most a reasonable factfinder could conclude is that by not providing the gingivitis-specific cleaning, but merely a prophylaxis annually, Choi has been negligent to inmates' gingivitis. But that does not establish deliberate indifference. *See id.* Accordingly, Defendants are entitled to summary judgment on the inadequate treatment claim brought by inmates who have gingivitis and who have served two years in prison.

### 2. Diagnosis Claims

The members of Class IIB with gingivitis also apparently challenge MDOC's failure to use bitewing x-rays at intake and failure to conduct periodontal probing

and charting at any point during their incarceration. From these inmates' perspective, MDOC's failure to probe and take bitewing x-rays places them at a substantial risk of underdiagnosis, which, in turn, places them at a substantial risk of not receiving needed treatment for their gingivitis.

Conceptually, these inmates' claims about MDOC's diagnostic techniques track the claims of Class IIA. The members of Class IIA, all of whom have periodontitis or caries that have reached the dentin, assert that without probing and bitewing x-rays, their conditions risk being underdiagnosed and thus, undertreated. Similarly, the members of Class IIB with gingivitis apparently maintain that without probing and bitewing x-rays, they are at a substantial risk of being diagnosed with healthy gums and thus, they will not receive treatment for their gingivitis.

Factually, however, the inadequate-diagnosis claim brought by inmates with gingivitis is weaker than the analogous claim brought by inmates with periodontitis. Objectively, gingivitis is simply not as serious as periodontitis. So there is a lower risk of serious harm from underdiagnosing gingivitis than underdiagnosing periodontitis. (ECF No. 366-6, PageID.10769 (Johnston opining that "there's many patients that never progress, especially in the gingivitis stages").) Subjectively, although Choi may have only been referring to periodontitis, he testified that he believes that MDOC's diagnostic methods—visual inspection, oral-health history, and panoramic x-ray—are sufficient to perform a periodontal evaluation. (ECF No. 363-10, PageID.9294–9295, 9297–9298, 9336.) True, in addressing Class IIA's claim, the Court held that a reasonable factfinder could conclude that even a "half-decent"

dentist would perform probing to diagnose periodontitis. But it appears that probing to diagnose gingivitis is less universal. In particular, Johnston opines that even in private practice, the standard of care would permit a dentist to not probe a patient with gingivitis for two years. (*See* ECF No. 366-6, PageID.10770, 10810–10811.) Accordingly, Defendants are entitled to summary judgment on the claim brought by members of Class IIB with gingivitis who claim that MDOC's failure to perform probing or take bitewing x-rays at intake amounts to deliberate indifference to gingivitis.

### C. Class IIB, Members with Healthy Gums

#### 1. Treatment Claims

Inmates who do not have gingivitis or periodontitis, i.e., inmates who have healthy gums, are also part of Class IIB. Apparently, these inmates also bring claims of inadequate treatment and inadequate diagnosis.

The Court begins with treatment. Because these inmates have healthy gums, it appears that the only "treatment" they seek is a standard cleaning or prophylaxis. Historically, most new inmates waited around two-and-half years (or a bit longer) for their first prophylaxis. (ECF No. 384, PageID.15446.) Thus, for members of Class IIB with healthy gums, this is the pertinent question: are they at a substantial risk of serious harm because they do not receive a cleaning for two-and-half years? On this record, every reasonable factfinder would answer "no."

True, as with other examples this Court has given, there are likely inmates with healthy gums whose host factors make them particularly susceptible to rapid

periodontal disease progression. Indeed, among the dental records Shulman reviewed, only two inmates, Cody Ray and Reginald Harbin, were diagnosed as having healthy gums ("WNL" or "within normal limits") at intake. Yet, by the time of their first complete exam over two years later, Ray had "generalized moderate periodontal disease" and Harbin had "moderate/mild" periodontitis with "class 2 mobility" on one tooth and the prognosis for that tooth was "poor/fair." (ECF No. 384, PageID.15444, 15467.)

But at least in Ray's case, it appears that he did not practice good oral hygiene. (ECF No. 374-9, PageID.13158 (Choi discussing Ray); ECF No. 374-3, PageID.12763–12765 (Ray's electronic dental record).) And Defendants cannot be faulted for that.

In any event, Ray's and Harbin's cases merely show that it is possible for an inmate with healthy gums to progress to a serious periodontal disease in two-and-half years. But the Eighth Amendment does not deal in possibilities. Instead, a "substantial" risk in the Eighth Amendment context is one that is "very likely to cause serious illness and needless suffering, and give rise to 'sufficiently imminent dangers.'" *Baze v. Rees*, 553 U.S. 35, 49 (2008). Plaintiffs have not directed the Court to sufficient evidence that an inmate with healthy gums who practices good oral hygiene—something within the inmate's control—is "very likely" to experience an abscess, tooth loss, or other serious harm because they do not receive a cleaning for two-and-half years. (*See* ECF No. 374-8, PageID.12943–12944 (Shulman stating that there is no typical amount of time for periodontal disease progression and that it depends on host factors).)

68

In short, Defendants are entitled to summary judgment on the claim that they are violating the Eighth Amendment by not providing healthy inmates with a dental cleaning for two-and-half years.

And to the extent that healthy inmates who are not subject to the two-year rule bring a similar claim, the Court notes that they are entitled to cleanings every year. Because these inmates will receive cleanings more frequently than those subject to the two-year rule, they are at even less risk of serious harm. It follows then, that Defendants are entitled to summary judgment on these inmates' treatment claim as well.

### 2. Diagnosis Claims

Now consider members of Class IIB with healthy gums who claim that MDOC's method of diagnosing periodontal disease violates their Eighth Amendment rights. Inmates with healthy gums are at the bottom of the periodontal disease ladder. So unlike an inmate with gingivitis who, due to the lack of probing and bitewing x-rays, can be underdiagnosed as having healthy gums, inmates with healthy gums cannot be underdiagnosed.

Why, then, do inmates with healthy gums claim that they are at risk of harm absent probing, charting, and bitewing x-rays? Like inmates with periodontal disease, these inmates believe that probing and charting and bitewing x-rays are necessary to establish their baseline periodontal health. That way, when their periodontal health is assessed in the future, there is a point of comparison, which, in turn, allows the dentist to gauge disease progression.

Some evidence backs their position. For instance, Harrel opines, "[Periodontal disease] progression varies and for that reason, the standard of care requires dental practitioners to make comparisons over time using the original baseline derived from periodontal probing and charting and intra-oral x-rays and comparing those objective result[s] with subsequent periodontal probing and charting and intra-oral x-ray results." (ECF No. 366-2, PageID.9872.)

While the "standard of care" may require that patients with healthy gums receive probing, charting, and bitewing x-rays, the proper question is whether inmates with healthy gums are at a substantial risk of serious harm if they do not receive probing, charting, and bitewing x-rays. Plaintiffs have not directed the Court to any evidence that would permit a reasonable factfinder to answer that question affirmatively. Harrel did not equate the "standard of care" with Eighth Amendment standards. (*See* ECF No. 366-2, PageID.9857.) And while Harrel did use Eighth Amendment terminology in opining that "[t]he MDOC's admitted failure to require periodontal probing and charting is below the standard of minimum care placing *all* MDOC inmates at risk of serious harm of tooth morbidity and/or mortality" (ECF No. 366-2, PageID.9871), this blanket statement is not tailored to inmates with healthy gums. And it appears much more important for inmates with periodontal disease to have their pocket depths recorded so that dentists can gauge how fast the disease is progressing. But inmates with healthy gums, by definition, do not have periodontal disease that can progress.

Accordingly, to the extent that inmates with healthy gums claim that their Eighth Amendment rights are violated because they do receive periodontal probing, charting, and bitewing x-rays, Defendants are entitled to summary judgment.

## D. Class IIB, Representatives' Claims

As noted, Defendants argue that Bownes' and Richardson's dental records do not reflect any serious medical need attributable to their periodontal condition. (ECF No. 363, PageID.8832–8833.) And so Defendants seek dismissal of Bownes' and Richardson's individual claims.

This Court has twice addressed this argument in the context of Class IIA's and Class IIC's claims. Although Bownes and Richardson also are representatives of Class IIB, and although there are material, factual differences between the claims brought by Class IIA (periodontitis diagnosis), Class IIC (periodontitis treatment), and Class IIB (gingivitis treatment and diagnosis), the Court is not inclined to address Defendants' argument a third time. As stated, Defendants have not separately analyzed the claims of Class IIA, Class IIB, and Class IIC. Further, both Bownes and Richardson challenge MDOC's failure to provide scaling and root planing (treatment) and failure to probe, chart, and use bitewing x-rays (diagnosis). Those challenges are analogous to the challenges brought by members of Class IIB with gingivitis.

## VII. Denture Claim (Class III)

The members of Class III challenge the time it takes for MDOC to provide dentures to inmates—they say it takes too long. *See Bownes v. Washington*, No. 14-CV-11691, 2021 WL 3700867, at *11 (E.D. Mich. Aug. 20, 2021).

Defendants say things have changed in the nine years this case has been pending. For instance, MDOC implemented "DentTrak," a database that tracks a denture from start to finish. (ECF No. 363, PageID.8840.) According to Defendants, providing an inmate with dentures involves seven steps and six shipments. (ECF No. 363, PageID.8841.) As such, they say a 180-day time-to-completion is reasonable, and that in the year preceding February 28, 2022, they hit that mark 83% of the time. (ECF No. 363, PageID.8841.) For these and other reasons, Defendants say they are entitled to summary judgment on Class III's claim.

In their response to Defendants' summary-judgment motion, Plaintiffs use the word "denture" exactly once. (ECF No. 374, PageID.12743.) They make no argument in support of Class III's claim. They do not dispute that a 180-day time-to-completion is reasonable or that MDOC is hitting that mark at an 83% clip. Even in their own motion for summary judgment, dentures are mentioned only in the most cursory way. (ECF No. 366, PageID.9817.)

Because Plaintiffs have opposed other aspects of Defendants' summary-judgment motion but have not opposed Defendants' arguments about dentures, Class III, and its representative, James Gunnels, have abandoned their claims. *See Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."). Accordingly, the Court will grant Defendants summary judgment on Class III's and Gunnel's claims.

## VIII. Brownell's Urgent Care Claim

The members of Class IVB challenged the time it took for MDOC to provide urgent care. By stipulation of the parties, Class IVB's claim was dismissed. (ECF No. 346, PageID.8486.) Apparently believing that this stipulation did not encompass the claims of Class IVB's representative, Timothy Brownell, Defendants seek summary judgment on Brownell's individual claims. (ECF No. 363, PageID.8849–8850.)

As with Class III claims, Plaintiffs have not opposed Defendants' arguments on Brownell's claims. According, the Court will grant Defendants summary judgment on Brownell's individual claims.

## IX. Plaintiffs' Motion for Summary Judgment

So far, the Court has largely focused on Defendants' motion for summary judgment. But Plaintiffs seek summary judgment too.

Ultimately, Plaintiffs have the burden of proving their Eighth Amendment claims. That means to win summary judgment, Plaintiffs must show that even when taking the facts in the light most favorable to Defendants, every reasonable factfinder would find for them. *See Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012); *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015).

Plaintiffs have not carried this burden. What has been said so far probably makes this apparent. But as a double check, the Court highlights a few points made earlier.

The members of Class IIA claim inaccurate diagnosis of their periodontitis and caries. A reasonable factfinder could conclude that MDOC's diagnostic methods are

accurate for at least some easy-to-identify cases of periodontitis and caries. (*See* ECF No. 366-10, PageID.11730 (MDOC dentist Smith testifying that she can often diagnose periodontitis by visual inspection and panoramic x-rays); ECF No. 366-6, PageID.10784 (Johnston testifying that it is "possible" to diagnose advanced periodontitis with only visual inspection and panoramic x-ray).) Moreover, Plaintiffs have not addressed Choi's repeated statements that he believes that visual inspection and a panoramic x-ray suffice to evaluate periodontitis. (ECF No. 363-10, PageID.9293-9294, 9297–9298, 9322, 9336.) Indeed, Plaintiffs' motion consists of page after page of deposition testimony that probing and bitewing x-rays are the standard for diagnosing periodontitis, but Plaintiffs make little effort to map these facts onto the elements of an Eighth Amendment claim. (*See* ECF No. 366, PageID.9852–9853.) So the Court will not grant Plaintiffs summary judgment on Class IIA's claims. *See Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015) ("Where, as here, the movant is seeking summary judgment on a claim as to which it bears the burden of proof, it must lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim.").

The members of Class IIC claim inadequate treatment for their periodontitis. But, as explained, for those past the two-year mark, COMS data suggests that MDOC is providing scalings and root planings. And, as discussed, Defendants should have the opportunity to present that data at trial because this case is about prospective

injunctive relief. So members of Class IIC past the two-year mark are not entitled to summary judgment. For those within the two-year window, Choi's memo—right or wrong—suggests that he is not indifferent to their periodontitis. Plaintiffs have not addressed Choi's memo, and even though Plaintiffs' experts disagree with the memo, the evidence must be taken in the light most favorable to Defendants at the summary-judgment stage. So to the extent that Plaintiffs have sought summary judgment on Class IIC's claims (which their motion does not even make clear), their request will be denied.

That leaves Class IIB. The Court has granted Defendants summary judgment on the claims brought by members of this class with healthy gums. As for Class IIB members with gingivitis, Plaintiffs have not specifically argued that inmates with gingivitis are, as a matter of law, at a substantial risk of serious harm and further, that Choi is indifferent to that harm. And the Court believes that a reasonable factfinder could find that two to three years without treatment is not a substantial risk of serious harm for some inmates with gingivitis (e.g., those with good oral hygiene and host factors favoring slow progression). And a reasonable factfinder could find that Choi is not indifferent to at least those inmates' gingivitis. As for diagnosis, a reasonable factfinder could likewise conclude that many inmates with gingivitis who are underdiagnosed with healthy gums are not at a substantial risk of serious harm or, if they are, Choi is not indifferent to that risk.

Accordingly, the Court will deny Plaintiffs' motion for summary judgment.

## X. Conclusion and Order

For the reasons given, the Court DENIES Plaintiffs' motion for summary judgment (ECF No. 366). Plaintiffs' motion to file a sur-reply (ECF No. 380) is GRANTED to the extent that the Court did not consider the COMS data in addressing Defendants' motion for summary judgment.

Further, the Court GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment (ECF No. 363) as follows:

- Bownes' facial challenge to the two-year rule is DISMISSED;

- Class IIA's Eighth Amendment claim based on inadequate diagnosis of periodontitis and caries will proceed to trial;

- The inadequate-treatment claim under the Eighth Amendment brought by members of Class IIB with gingivitis who have not yet served two years will proceed to trial, but the same claim brought by members of Class IIB with gingivitis who have served two years will be DISMISSED;

- The inadequate-diagnosis claim under the Eighth Amendment brought by members of Class IIB with gingivitis will be DISMISSED;

- The inadequate-diagnosis and inadequate-treatment claims under the Eighth Amendment brought by members of Class IIB with healthy gums will be DISMISSED;

- Class IIC's Eighth Amendment claim based on inadequate treatment of periodontitis will proceed to trial;

- Class III's and James Gunnels' claim based on MDOC's provision of dentures is DISMISSED; and

- Timothy Brownell's claim based on MDOC's provision of urgent care is DISMISSED.

The parties are to complete a 90-day period of discovery that will close on April 30, 2023. Defendants are to produce to Plaintiffs COMS data that Defendants intend to use at trial. As noted, the Court expects the trial proofs to reflect how often scalings and root planings are being performed. More probative than a pure count of the number of procedures would be data showing the number of times the treatment was provided as compared to the number of times the treatment was needed. Additionally, it would be useful to separate data for inmates subject to the two-year rule, and those who are not subject to that rule. Defendants are to produce the evidence they intend to use at trial to Plaintiffs on or before March 15, 2023. (The data provided need not be in the exact format that Defendants will use it at trial.) Plaintiffs then have until April 30, 2023 to conduct a two-hour deposition of one witness, with the scope of the deposition limited to the discovery Defendants produced. If either side chooses to supplement their expert reports based on the COMS data, they must provide the opposing side with the supplement on or before April 30, 2023.

SO ORDERED.

Dated: January 26, 2023

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE